U... .ED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

AUG 2 7 2008

Clerk, U.S. District and
Bankruptcy Courts

CHRISTOPHER YOUNG *# 61107066*
PETITIONER,
*FDC-Philadelphia*
*PoB 562*
vs.
*Philadelphia, PA 19105*

: Case No._____

: Criminal case no. 2:06cr710
: United States District Court
: Eastern District of Pennsylvania

MICHAEL MUKASEY,
UNITED STATES ATTORNEY GENERAL
RESPONDENT,

: VERIFIED PETITION FOR WRIT OF HABEAS
: CORPUS AD SUBJICIENDUM THE "GREAT WRIT"
: WITH AN AFFIDAVIT OF SPECIFIC NEGATIVE
: AVERMENT IN SUPPORT AND A VERIFIED
: PETITION FOR BAIL PENDING HABEAS CORPUS
: REVIEW

---

VERIFIED PETITION FOR WRIT OF HABEAS
CORPUS AD SUBJICIENDUM THE "GREAT WRIT"

---

**COMES NOW,** Christopher Young, unrepresented, not pro se, but sui juris,
(hereinafter "Petitioner"), who hereby respectfully request that this Court issue a writ
of Habeas Corpus Ad Subjiciendum, thus affording the relief outlined below. Further, the
Petitioner request that this Honorable Court enter an Order which declares the aboved
mentioned Criminal case 2:06cr710, which is being brought forward against Petitioner in
the United States District Court, Eastern District of Pennsylvania, viod and order dis-
missal, with prejudice of all charges stemming from the indictment and prosecution of
said Criminal case. Moreover, Petitioner request this Court issue an Order granting imm-
ediate release from any restraints and/or conditions set out by the United States Dis-
trict Court of the Eastern District of Pennsylvania, U.S. Marshals department, Troy E.
Levi, Warden FDC-Philadelphia and Michael Mukasey, United States Attorney General. Or
issue Bail pending review of said Habeas Corpus.

Case: 1:08-cv-01511
Assigned To : Robertson, James
Assign. Date : 8/27/2008
Description: Habeas Corpus/2255

1

## I.

### Procedural History

A Criminal Complaint was filed on December 7 2006, and a subsequent indictment followed for the arrest of Petitioner. The Complaint alleged violations of Title 18 USC Code 1951(a)(1) and 924(c). Petitioner was taken into custody on December 15, 2006 by FBI (federal Bureau of Investigation) pursuant to said criminal complaint and subsequent indictment.

## II.

### Issues Presented

Petitioner argues that the original passage of Title 18 of the United States Code was fatally flawed as a result of Constitutional violations as well as several departures of House and Senate procedure which rendered Title 18 of the United States Code void ad initio. The question presented by the Petitioner is whether the legislative process that the record indicates was followed by the Eightieth Congress during consideration of HR 3190 was constitutionally deficient, and if so whether said improprieties render said Title illegal, void, and/or positive law thereby precluding United States District Courts from exercising jurisdiction over federal criminal prosecutions.

2

The Petitioner acknowledges the contention that Title 18 is illegal, invalid or void is no longer new to Federal Courts. Several petitioners have unsuccessfully raised the issue in various forms. See *United States v. Risquet,* 426 F. Supp. 2d 310 (E.D. Pa. 2006); *United States v. Mims, Cr. No. 9:98cr39,* 2006 U.S. Dist. LEXIS 65462 (E.D. Tex., Sept. 1, 2006); *United States v. McCuiston, Cr. No. C-04-676, C.A. No. C-07-193,* 2007 U.S. Dist. LEXIS 67467 (S.D. Cir. Tex., Sept. 12, 2007); *United States v. Harbin, Cr. No. C-01-221(3), C.A. No. C-07-260,* 2007 U.S. Dist. LEXIS 45932; (S.D. Tex., June 25, 2007), and 2007 U.S Dist. LEXIS 70033, (S.D. Tex., September 21, 2007); *United States v. Johnson,* NO. 08-1336, 2008 U.S. App. LEXIS 6154 (3RD Cir. 2008). However, the previous arguments have focused almost exclusively on claims that there was a single sine die adjournment by Congress.

The Courts, largely in unpublished opinions, citing conclusions of other non published opinions have refused to conduct an in-depth analysis of the claims, see *Harbin*, 70033, page 5. Petitioner will also discuss *sine die* issues, but contends that this Petition also contains arguments which are wholly separate from those heretofore presented to federal courts. Accordingly, the Court is asked to re-consider de novo all of the arguments presented in the instant petition.

Thus, even if the Court should find the *sine die* argument alone insufficient to invalidate Title 18, the additional issues, supporting facts and arguments related to the passage/enactment of H.R. 3190, also known as, P.L. 80-772  will provide cause to

support the relief requested through this Petition. The following is a detailed listing of the questions presented ad seriatim to this Court.

    a. Whether the several adjournments of the 80th Congress in its first and second sessions, during the consideration of H.R. 3190, which later became known as P.L. 80-772 and codified as Title 18 U.S.C. resulted in the death of the bill in accordance with the provisions of the U.S. Constitution and House Parliamentary Rules.

    b. Whether the absence of the necessary quorum during the House vote on P.L. 80-772 rendered the vote null and void in accordance with House Parliamentary Rules.

    c. Whether H.R. 3190, which passed the House on May 12, 1947, and was later amended and textually different when it passed the Senate on June 18, 1948, was significantly separate and distinct requiring a joint committee reconciliation on the full text of the bill rather than mere concurrence by the House on the amendments prior to its presentment to the President for his approval and signature.

    d. Whether the presentment of H.R. 3190 to President Harry S. Truman who subsequently signed the bill into law during Congressional adjournment, failed to meet the Quorum, Bicameral and Presentment requirements of the U.S. Constitution as set out in House Parliamentary Rules.

    e. Whether the bill presented to President Harry S. Truman marked was the actual document that had been passed by the House of Representatives.

The central focus of this Petition is whether the enactment of H.R. 3190 into Public Law 80-772, ultimately becoming Title 18 of the United States Code, was carried out by the 80th Congress in the procedurally proper and constitutionally mandated manner. Petitioner asserts that the foregoing issue(s) precluded constitutional passage. Further, Petitioner contends that aforementioned list of defects, viewed singularly or plurally, renders the resultant Title 18 and each of its provisions null and void.

Should this Court finds any or all of Petitioner's points in this petition valid, then the only appropriate and constitutionally proper remedy is to order the Petitioner's immediate release from confinement.

## III.

### Legal Arguments

### A. Jurisdiction

This Court has Jurisdiction over this action pursuant to Article 1, Section 9, Clause 2, of the United States Constitution, et. Seq., because it is alleged that the Petitioner is currently bound in federal custody in violation of the Constitution and laws of the United States. Additionally, Petitioner invokes the jurisdiction of this Court pursuant to 28 USC 1331 in that the action arises out of the Constitution and laws of the United States and seeks corrective action by officers and employees of the United States in their official capacity.

Inasmuch as this petition questions the propriety of the grant of jurisdiction to federal courts via Title 18, Petitioner request the Court to take judicial notice of the premise of jurisdictional authority. In United States v. Cotton, 535 U.S. 625, 630,2002 Lexis 3565 (2002), the term "jurisdiction" was defined as, "the Courts stautory or constitutional power to adjudicate the case." This concept, also known as "subject jurisdiction", invokes a Court's power to hear a case and can never be forfeited or waived. Consequently, defects insubject matter jurisdiction require correction regardless of whether the error was raised in District Court. United States v. Peter, 310 F.3d 709, 712 (11th Cir. 2002). Jurisdictional error has been historically recognized as fundamental, and one for which collateral relief is available. Habeas Corpus proceedings have been used to attack convictions and sentences entered by a court without proper jurisdiction.

Since jurisdictional error questions a court's authority to adjudicate a matter before it, such error can never be waived, and the doctrine of procedural default does not apply. Thus a petitioner seeking relief from a Court that does not have jurisdiction faces no procedural hurdle. Moreover, while lack of Article III jurisdiction cannot be waived it also cannot be conferred upon a federal district court by consent, by action, or by stipulation. *California v. LaRue*, 400 U.S. 109, 112, 34 L.Ed. 342, 93 S.Ct. 390 (1972). The validity of an order on sentencing of a federal district court depends upon that court having jurisdiction over both the subject matter and the defendant. *Stoll v. Gottlieb,* 305 U.S. 171-172, 83 L.Ed 104, 59 S.Ct. 134 (1938).

The District Court obtained jurisdiction over Petitioner via 18 U.S.C. § 3231, which ostensibly gives the "district courts of the United States ... original jurisdiction ... of all offenses against the laws of the United States." 18 U.S.C. § 3231, as well as most of chapter 211 (entitled "Jurisdiction and Venue") of said Title, became effective on June 25, 1948, upon the enactment of Public Law 80-772, during the Second Session of the 80th Congress.

"The challenge in this case goes to the subject-matter jurisdiction of [federal courts] and hence its power to issue the order." *United States Catholic Conference v. Abortion Mobilization, Inc.,* 487 U.S. 72, 77 (1988). "Federal courts are courts of limited jurisdiction ...Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction." *Insurance Co. of Ireland, Ltd. v. Compagnie des Bauxite de Guinea,* 456 U.S. 694, 701 (1982); *Kline v. Burke Const. Co.,* 260 U.S. 226, 234 (1922) (all lower federal courts "derive[] [their] jurisdiction wholly from the authority of Congress"); *United States v. Hudson &*

*Goodwin,* 11 U.S. (7 Cranch) 32, 33 (1812) (federal courts "possess no jurisdiction but what is given to them by the power that creates them."). If anything, this is even truer in criminal cases. *United States v. Hall,* 98 U.S. 343, 345 (1879) (federal "courts possess no jurisdiction over crimes and offenses ... except what is given to them by the power that created them"); *Hudson & Goodwin,* 11 U.S. at 33-34. *See also, e.g., United States v. Wiliberger,* 18 U.S. (5 Wheat) 76, 95-105 (1820) ("the power of punishment is vested in the legislative, not the judicial department," criminal statutes are to be construed strictly, "probability" cannot serve to "enlarge a statute" and an offense not clearly within the terms of a statute precludes federal court jurisdiction).

Subject-matter jurisdiction means "'the courts' statutory or constitutional power to adjudicate the case,'" *United States v. Cotton,* 535 U.S. 625, 630 (2002) (quoting *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89 (1998)); *Rhode Island,* 37 U.S. at 718 ("Jurisdiction is the power to hear and determine the subject-matter in controversy between parties to a suit, to adjudicate or exercise any judicial power over them"); *Reynolds v. Stockton,* 140 U.S. 254, 268 (1891) ("Jurisdiction may be defined to be the right to adjudicate concerning the subject matter in a given case"). "Subject matter limitations on federal jurisdiction serve institutional interests by keeping the federal courts within the bounds the Constitution and Congress have prescribed," *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 583 (1999).

"Without jurisdiction the court cannot proceed at all in any cause ... and when it ceases to exist, the only function of the court is that of announcing the fact and

dismissing the cause." *Steel Co.,* 523 U.S. at 94 (quoting *Ex parte McCardle,* 74 U.S. (7 Wall) 506, 514 (1868)); *Willy v. Coastal Corp.,* 503 U.S. 131, 137 (1992) ("lack of subject-matter jurisdiction … precludes further adjudication"). The Supreme Court has asserted over and over that "[t]he requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co.,* 523 U.S. at 94-95 (quoting *Mansfield C.&L.M.R. Co. v. Swan,* 111 U.S. 379, 382 (1884)); *see also, Insurance Co. of Ireland,* 456 U.S. at 702.

Because subject matter jurisdiction "involves a court's power to hear a case, [and thus] can never be forfeited or waived … correction [is mandatory] whether the error was raised in district court" or not. *Cotton,* 535 U.S. at 630; *Steel Co.,* 523 U.S. at 94-95. When a district court did "not have subject-matter jurisdiction over the underlying action … [its] process[es] [are] *void* and an order of [punishment] based [thereupon] … must be reversed." *United States Catholic Conf.,* 487 U.S. at 77; *Willy,* 503 U.S. at 139 ("[T]he [punishment] order itself should fall with a showing that the court was without authority to enter the decree."); *Ex parte Fisk,* 113 U.S. 713, 718 (1885) ("When … a court of the United States undertakes, by its process … to punish a man … [respecting] an order which that court had no authority to make, the order itself, being without jurisdiction, is *void* and the order punishing … is equally *void*)).

Habeas corpus review "is limited to the examination of the jurisdiction of the court whose judgment of conviction is challenged." *Bowen v. Johnson,* 306 U.S. 19, 23

(1939); see also INS v. S    Cyr, 533 U.S. 289, 311-314 (20  ). A court "has jurisdiction to render a particular judgment only when the offense charged is within the class of offenses placed by the law under its jurisdiction." Bowen, 306 U.S. at 24. If it is found that the court lacks jurisdiction to try Petitioner, any resultant judgment would be void and the prisoner must be discharged. Ex parte Yarbrough, 110 U.S. 651, 654 (1884).

Petitioner is being held by order of United States Magistrate Court, acting pursuant to grant of original jurisdiction authorized by Public Law 80-772, 18 USC 3231. The Magistrate Court ordered Petitioner to be held in the custody of the Bureau of Prisons. Thus, as the issues presented in this petition relate to jurisdiction, Petitioner is allowed to raise them at any time. And if the court is found to have never had jurisdiction over Petitioner, the complaint, arrest, incarceration and indictment upon which the Petitioner's imprisonment is based, are null and void, ab initio. Further, Petitioner believes the evidence establishes that the Constitutional violations described herein warrant issuing the Writ of Habeas Corpus Ad Subjiciendum.

## B. Venue

Venue is authorized pursuant to Title 28  1651(a) which provides: The Supreme court **and all courts established by Act of Congress** may issue all writs necessary... However, Petitioner also seeks an independent tribunal to determine whether the Magistrate and the District Courts of the Eastern District of Pennsylvania  have properly exercised jurisdiction over this matter. Thus, to avoid

potential conflicts of interest in the courts of the Eastern District, this Petition is brought in the United States District Court for the District of Columbia the situs of the action complained of as well as the headquarters location of the Respondent. As observed almost 100 years ago, a "writ of habeas corpus is a writ of right and is never to be denied in any case where the liberty of the subject is made the subject of inquiry." *State ex rel. McBride v. Superior Court for King County*, 103 Wash. 409, 417; 174 P. 973, 976 (Wash. 1918).

### C. Legislative Procedure; Enacting A Bill

This case presents the "profoundly important issue"[2] of the constitutionality of an act of Congress.[3] Although "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House Representatives," (Art. I, § 1, U.S. Const.) "when [Congress] exercised its legislative power, it must follow the 'single, finely wrought and exhaustively considered procedures' specified in Article I." *Metropolitan Wash. Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 244, 263 (1994) (*quoting Chadha*, 462 U.S. at 951). Article 1 establishes "just how those powers are to be exercised." *Chadha*, 462 U.S. at 945.

An act of Congress "does not become a law unless it follows each and every procedural step chartered in Article I, §7, cl. 2, of the Constitution." *Landgraf v. USI Film Products*, 511 U.S. 244, 263 (1994) (citing *Chadha*, 462 U.S. at 946-51; *Clinton*,

---

[2] *Clinton v. City of New York*, 524 U.S. 417, 439 (1998).

[3] *INS v. Chadha*, 462 U.S. 919, 929 (1983).

524 U.S. at 448 (noting requisite "steps" taken before bill in question may "'become a law'" and establishing that a procedurally defective enactment cannot "'become a law'" pursuant to the procedures designed by the Framers of Article I, § 7, of the Constitution).

The United States Constitution requires "three procedural steps": (1) a bill containing its exact text be approved by a majority of the Members of the House of Representatives; (2) the Senate approve precisely the same text; and (3) that text be signed into law by the President. The United States Supreme Court has stated: "If one paragraph of *that text* had been omitted at any one of those three stages, [the] law [in question] would not have been validly enacted."[4] *Clinton,* 524 U.S. at 448.

The "draftsmen" of the Constitution "took special pains to assure these [legislative] requirements could not be circumvented. During the final debates on Art. I, § 7, Cl. 2, James Madison expressed concern that it might easily be evaded by the simple expedient of calling a proposal a 'resolution' or 'vote' rather than a 'bill.' As a consequence, Art. I, § 7, Cl. 3, …was added." *Chadha,* 462 U.S. at 947 (citing 2 Farrand, 301-302, 304-305).

---

[4] All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.
Art. I, § 1, of the Constitution.

[A] Majority of each [House] shall constitute a Quorum to do Business…
Art. I, § 5, Cl. 1.

Every Bill which shall have passed [both Houses], shall before it becomes a Law be presented to the President of the United States; If he approve he shall sign it…
Art. I, § 7, Cl. 2.

Every … Resolution…to which the Concurrence of [both Houses] may be necessary (except on a question of Adjournment) shall be presented to the President of the United States and before the Same shall take effect, shall be approved by him…
Art. I, § 7, Cl. 3.

Whether actions authorized under a resolution are "an exercise of legislative powers depends not on their form but upon 'whether they contain matter which is properly to be regarded as legislative in its character and effect,'" *Chadha,* 462 U.S. at 952 (quoting Sen. Rep. No. 1335, 54th Cong. 2d Sess., 8 (1897). "If the power is legislative, Congress must exercise it in conformity with the bicameralism and presentment requirements of Art. I, § 7." *Metropolitan Wash. Airports,* 501 U.S. at 276. *See also Bowsher v. Synar,* 478 U.S. 714, 756 (1986) (Stevens, J., concurring) ("It is settled, however, that if a resolution is intended to make policy that will bind the Nation, and thus is 'legislative in its character and effect,' Sen. Rep. No. 1335, 54th Cong., 2d Sess., 8 (1897) – then the full Article I requirements must be observed. For 'the nature or substance of the resolution, and not its form, controls the question of its disposition.' Ibid.").

Title 1, U.S.C. § 106 (enacted July 30, 1947), ch. 388, § 1, 61 Stat. 634, requires: "When [a] bill or joint resolution shall have passed both Houses, it shall be printed and shall then be called the enrolled bill, or joint resolution as the case may be, and shall be signed by the presiding officers of both Houses and sent to the President of the United States." The statute provides: "During the last six days of a session such engrossing and enrolling of bills and joint resolutions may be done otherwise than as above prescribed, upon the order of Congress by concurrent resolution." Thus, although engrossment and enrollment of bills and resolutions may be completed in exceptional matters "[d]uring the last six days of a session," the text and context clearly reveal the procedures involved are required to be performed while Congress is in session.

### D. Congressional Consideration of H.R. 3190

After numerous failed attempts, the bill entitled H.R. 3190 was introduced with a Report by the Committee on the Judiciary, House of Representatives, and committed to the Committee of the entire House of Representatives on the State of the Union of the First Session of the 80th Congress (1947), entitled "Crimes and Criminal Procedure."[5] *See* HOUSE REPORT No. 304 (April 24, 1947), cover & pg. 1 **(App. A)**; *see also* 94 CONG. REC. D556-57 (DAILY DIGEST) (charting H.R. 3190) **(App. B)**. H.R. 3190 differed from "five ...bills which...preceded it... [because] it constitute[d] a revision, as well as a codification, of the Federal laws relating to crimes and criminal procedure." 93 CONG. REC. 5048-49 (May 12, 1947) **(App. C)**. The Bill was intended (1) to revise and compile all of the criminal law, (2) to "restate[]" and "consolidate[]" "existing statutes," (3) to "repeal" "obsolete, superseded, redundant and repetitious statutes," (4) to coordinate the Criminal Code with the "Federal Rules of Criminal Procedure" formerly enacted, and (4) to "clarify and harmonize" penalties of the "many acts" passed by Congress which were found to be "almost identical." (Id.). "The bill was ordered to be engrossed and read a third time, was read a third time, and passed" the House on May 12, 1947, id; 94 CONG. REC. D556-57 (DAILY DIGEST), supra **(App. B)**, sent to the Senate and there "referred to the Committee on the Judiciary." 93 CONG. REC. 5121 **(App. D)**.

On July 27, 1947, Congress conditionally adjourned pursuant to Sen. Con. Res. 33, without the Senate ever taking up H.R. 3190. *See* 93 CONG. REC. 10439, 10522 (July 26, 1947) **(App. E)**. "In effect the [July 27, 1947] adjournment was a *sine die*

---

[5] May 12, 1947.

adjournment, not an intersession adjournment." *Kennedy v. Sampson,* 511 F.2d 430, 444, Appendix n.4 (D.C. Cir. 1974).[6]

Congress indisputably adjourned *sine die* on July 27, 1947, thereby breaking the continuity of that legislative session. Constitution, JEFFERSON'S MANUAL & RULES OF THE HOUSE OF REPRESENTATIVES, 79th Cong. 2d Session, (H.Doc. No. 769), **(App.S)**; Rules of the House of Representatives, § 941, Sec. 132, pg. 459 (Leg. Reorganization Act of 1946 mandating that both "Houses shall adjourn *sine die* no later than the last day of...July of each year"). *See also, Kennedy,* 511 F.2d at 444 Appendix n. 4. While several district courts have held there can be no *sine die* adjournment where there is a date set to reconvene, *United States v. Harbin,* supra. However, House Rules mandate such an adjournment at the end of July, Cf *Anderson v. Dunn,* 19 U.S. (6 Wheat) 204, 231 (1821). ("[T]he legislative body ceases to exist on the moment of its adjournment or periodic dissolution...  Continuity of a session of Congress is broken...by an adjournment *sine die*"), limited and partially overruled on other grounds, *Kilbourne v. Thompson,* 103 U.S. 168, 196-99 (1881); *The Pocket Veto Case,* 279 U.S. 655, 681 (1929) (final adjournment "terminates the legislative existence of the Congress"); House Doc. No. 769, supra, JEFFERSON'S MANUAL, pg. 265 (emphasis added) (applying Art. I, § 3, U.S. Const. **(App.S)**. *See also* 59TH CONGRESS HOUSE RULES MANUAL, House Doc. No. 355 Volumes IV and V **(App. T)** (same).

---

[6] Noting that [t]he President *pocket vetoed* 19 bills presented to him after the adjournment," id., establishing that the adjournment was unequivocally *sine die*. *Kennedy,* 511 F.2d at 444, Appendix, n. 4. ("The Senate and the House of Representatives [of the 80th Congress] adjourned on July 27, 1947, under a 'conditional final adjournment' resolution, H.Con. Res. 33"); 93 CONG. REC. 10400. Pursuant to the resolution, the two Houses were to stand in adjournment until January 2, 1948 unless recalled into session earlier by specified Senate and House leaders.  In effect, the adjournment was a *sine die* adjournment, not an intra session adjournment.  On November 17, 1947, Congress convened pursuant to a proclamation of President Truman and adjourned *sine die* on December 19, 1947.  The President *pocket vetoed* 19 bills presented to him after the adjournment of July 27, 1947").

The July 27, 1947, adjournment *sine die* caused the death of H.R. 3190, because all pending legislation dies upon such adjournment. See F. Riddick, THE UNITED STATES CONGRESS: ORGANIZATION AND PROCEDURE 56 (1949). See also Memorandum for Janet Reno, Attorney General, from Acting Asst. AG Chris Schroeder, Office of Legal Counsel, U.S. Dept. of Justice (Nov. 19, 1996) (Adjournment *sine die* "'produce[s]...the death of all pending legislation'") (*quoting Continuing Effect of a Congressional Subpoena Following the Adjournment of Congress,* 6 Op. O.L.C. 744 (1982) and citing F. Riddick, THE UNITED STATES CONGRESS: ORGANIZATION AND PROCEDURE, supra at 56).

Congress re-convened on November 17, 1947, by Presidential proclamation. Even assuming the adjournment on July 27, 1947, did not close the former session, the reconvention undoubtedly did because it began a new session as a matter of law. As established by a Congressional Manual, "If convened by the President's proclamation, [Congress] must begin a new session, and of course determine the preceding one to have been a session... [Such] act of adjournment is merged in the higher authority of the Constitution." House Doc. No. 769, supra, JEFFERSON'S MANUAL, pg. 265 (emphasis added) (applying Art. I, § 3, U.S. Const, supra. **(App. S);** 59TH CONGRESS HOUSE MANUAL, (HOUSE DOCUMENT. 355) HINDS PRECEDENTS OF THE HOUSE OF REPRESENTATIVES, supra **(App. T)** (same).

The Presidential proclamation "beg[a]n a new session and of course determine[d] the preceding [session] to have been a [concluded] session," effectively rendering it

adjourned *sine die* and thereby "terminat[ing] the legislative existence of Congress." *The Pocket Veto Case,* 279 U.S. at 681. "Congress [can] separate in two ways only, to wit, by adjournment or dissolution by the efflux of their time." 59TH CONG. H.RULES MANUAL, House Doc. No. 355, supra at 301 **(App. T)**. The convention of a session by Presidential proclamation has no relation to "dissolution by the efflux of" a congressman's "time". Such a Presidential convention can *only* effectuate an adjournment *sine die* because it acts to cut off or close the prior session. Id., pg. 301-302.

Thus, the "new session," exclusively "terminate[d]" the prior session and its "legislative existence." *The Pocket Veto Case,* 279 U.S. at 681. At that time, "all pending matters…discontinued and all parliamentary functions cease[d]." MEMO FOR AG, supra (*citing McGrain v. Daugherty*, 273 U.S. 135, 181 (1927)(relying on SENATE RULES AND MANUAL, 1925, pg. 303)). Therefore, even if the adjournment *sine die* on July 27, 1947, did not "'produce[]'" or "result in" "the death of [H.R. 3190, which had] not [yet been] enacted," the reconvening of Congress by Presidential proclamation certainly and unavoidably did.

The November 17, 1947, reconvention of Congress was pursuant to a Presidential proclamation; yet, Congress again "adjourned *sine die* on December 19, 1947," without the Senate passing H.R. 3190. *Kennedy,* 511 F.2d at 444, Appendix n.4. Thus, the First Session of the 80th Congress adjourned *sine die* twice and closed without H.R. 3190 passing both houses as required. *See also* House Concurrent Resolution No. 127, 80th Congress, 1st Session, Dec. 19, 1947, 61 Stat 1029 (declaring the Dec. 19, 1947

adjournment to be an adjournment *"sine die"* "notwithstanding the provisions of Sen. Con. Res. 33") **(App. F)**; UNITED STATES CODE SERVICE, LAWS OF THE 80TH CONGRESS, FIRST SESSION, West Publishing Co. & Ed. Thompson Co. 1947, Adjournment Resolutions, H.Con. Res. 127, pg. LXXXIX (Dec. 19, 1947 adjournment was *sine die*) **(App. G)**.

H.R. 3190 was never reintroduced by the House of Representatives during the Second Session of the 80th Congress, which began on January 2, 1948. Nevertheless, the Senate Committee on the Judiciary attempted to resurrect H.R. 3190 with amendments on June 14, 1948, under Sen. Rep. No. 1620, without regard that it had *died*, not once, but *twice*, upon the *sine die* adjournments of the 80th Congress' First Session. The Bill was reintroduced as if it had passed the House during the Second Session. 94 CONG. REC. 8075 (June 14, 1948) **(App. H)**. Compare 94 CONG. REC. D556-57 (DAILY DIGEST), supra **(App. B)** (showing that the only introduction of H.R. 3190 by the House of Representatives came on April 24, 1947).

Significantly, H.R. 3190 was introduced into the Senate under Sen. Rep. No. 1620 with a "large volume of amendments" explaining that "the new Federal Rules of Criminal Procedure [were] keyed to the bill and [were] reflected in part II of [the new proposed] Title 18." The supporters of the Bill proclaimed that, by passing the bill, "[u]ncertainty will be ended." Its supporters wanted "the amendments adopted en bloc," including a new jurisdictional section for Title 18.

In fact, H.R. 3190 was not included in Sen. Rep. No. 1620, only the text of the proposed amendments was included therein. *See*, Sen. Rep. No. 1620 **(App. I).** "[T]he amendments were considered and agreed to en bloc" after which they were read and then "ordered to be engrossed." 94 CONG. REC. 8721-22 (June 18, 1948) **(App. J).** The bill itself, wholly separate from the "amendments – was "ordered…to be read a third time" which it was and it "passed" the Senate. It was moved that "the Senate insist upon its amendments" to H.R. 3190 in the House. (Id. at 8722).

The House subsequently received Sen. Rep. No. 1620 with its proposed amendments. The House clerk "read the Senate amendments" into the record, with which the House concurred. 94 CONG. REC. 8864-65 (June 18, 1948) **(App. K).** The House never voted on the text of H.R. 3190, amended or otherwise, at that time or at any other time during the Second Session of the 80th Congress. Other than concurring with the Senate amendments, the House took no action on H.R. 3190, which had been reintroduced into the Second Session of the 80th Congress by the Senate through Sen. Rep. No. 1620 for the first time on June 18, 1948.

On June 19, 1948, the Senate informed the House that "the Senate had passed without amendment concurrent resolutions of the House," namely H.Con. Res. 218 and 219. 94 CONG. REC. 9349 **(App. M).** H.Con. Res. 218 "provid[ed] adjournment of the two Houses of Congress until December 31, 1948" and H.Con. Res. 219 "authoriz[ed] the signing of enrolled bills following adjournment." (Id.).

Specifically, H.Con. Res. 219 resolved that notwithstanding the adjournment of the two Houses until December 31, 1948, the Speaker of the House of Representatives and the President pro tempore of the Senate be, and they were thereby, authorized to sign enrolled bills and joint resolutions. *See* CONCURRENT RESOLUTIONS, SECOND SESSION, 80th Cong., H.Con. Res. 219, June 20, 1948, 62 Stat. 1436 **(App. L)**.

Congress adjourned on June 20, 1948, pursuant to H.Con. Res. 218, which, required re-assembly on New Year's Eve, "Friday, December 31, 1948, at 12 o'clock meridian." 94 CONG. REC. 9349, **(App.M)**, and 9169 **(App. N)**. The adjournment was "in effect…a *sine die* adjournment, not an inter-session adjournment." *Kennedy*, 511 F.2d at 444, Appendix, n. 5.[7] Neither House of Congress was in session thereafter until July 26, 1948, when both Houses reconvened "pursuant to a proclamation of President Truman." *Kennedy*, 511 F.2d at 444, Appendix, n. 5.

In summary, the Congressional session which was convened by Presidential proclamation on November 17, 1947, "adjourned *sine die* on December 19, 1947." *Kennedy*, 511 F.2d at 444, Appendix n. 4. The adjournment caused "'the death of all pending legislation not enacted,'" which included H.R. 3190. MEMO FOR AG, supra (citation omitted). H.R. 3190 originally died with the adjournment *sine die* on July 27, 1947. But, even if it did not, it certainly did when Congress met in "a new session"

---

[7] Noting that "[t]he President pocket vetoed 14 bills presented to him after the adjournment," establishing that the adjournment was unequivocally *sine die*. *Kennedy*, 511 F.2d at 444, Appendix, n. 5 ("The Senate and House of Representatives [of the 80th Congress] adjourned on June 20, 1948, under a "conditional final adjournment" resolution, H.Con. Res. 218; 94 CONG. REC. 9158. Pursuant to the resolution, the two Houses were to stand in adjournment until December 31, 1948, unless recalled into session earlier by specified Senate and House leaders. In effect, the adjournment was a *sine die* adjournment, not an intra session adjournment. On July 26, 1948, Congress convened pursuant to a proclamation of President Truman. The President *pocket vetoed* 14 bills presented to him after the adjournment of June 20, 1948").

pursuant to Presidential proclamation and under "the higher authority of the Constitution [Art. I, § 3]." 59TH CONG. H. RULES MANUAL, supra **(App. T)**. And, then again, the "adjourn[ment] *sine die* on December 19, 1947," undoubtedly "'produce[d]...the death'" of H.R. 3190, if it had somehow survived the earlier effectual adjournment *sine die*.

Congress in any case expressly declared the December 19, 1947, adjournment to be an adjournment *sine die*. H.Con. Res. No. 127, 80th Congress, 1st Session, Dec. 19, 1947, 61 Stat 1029, supra **(App. F)**; UNITED STATES CODE SERVICE, LAWS OF THE 80TH CONGRESS, FIRST SESSION, H. Con.Res. 127, supra, pg. LXXXIX **(App. G)**.

H.R. 3190 was not re-introduced in the "new session" of Congress, which began under Presidential proclamation on November 17, 1947, or at any time by the House of Representatives during the Second regular Session (1948) of the 80th Congress. H.R. 3190 reappeared, albeit by number only, and without text, under Sen. Rep. 1620 on June 14, 1948, as if it had never died during the previous adjournments *sine die* or as if it had been re-introduced under the same House of Representatives' number with which it had originally entered the House, on May 12, 1947. 94 CONG. REC. 8075, supra **(App. H)**; Sen. Rep. 1620), supra **(App. I)**; 93 CONG. REC. 5048-49 (original introduction of H.R. 3190), supra **(App. C)**.

Congressional records indicate Sen. Rep. 1620 "contain[ed] a large volume of amendments" intended for H.R. 3190, which had never been previously presented to the House of Representatives, and which were hastily "agreed to en bloc," "read", and

"ordered to be engrossed." Then, and quite separate from the action upon the amendments, the Bill (H.R. 3190) was "ordered...to be read a third time," and it "passed" the Senate.[8] The amendments and H.R. 3190 were then received by the House of Representatives, where the Clerk read only the amendments contained in Sen. Rep. No. 1620. The House of Representatives did not address in any way the text of H.R. 3190, but merely concurred in "[t]he Senate amendments." 94 CONG. REC. 8864-65, supra **(App. K)**.

The House of Representatives never considered or voted on the text of H.R. 3190 – the bill itself – during this session of Congress, and on June 20, 1948, entered an adjournment that was "in effect...a *sine die* adjournment," *Kennedy,* 511 F.2d at 444, Appendix n. 5. That part of H.R. 3190 that "passed" the Senate on June 18, 1948, 94 CONG. REC. 8721-8722, supra **(App. J)**, was that text which was read for the "third time." The amendments under Sen. Rep. No. 1620 were read a single time in the House, but H.R. 3190 as amended was never read in either House at any time, was not voted upon at any time, and never passed at any time. The Senate's order to "engross" the "amendments" –clearly not engrossed on June 18, 1948, when H.R. 3190 was read for the third time - establishes that the bill read for the "third time" by the Senate (and never voted on by the House in that session) was an entirely different bill textually than the one signed by the Speaker of the House, the President pro tempore of the Senate, and President Truman.

---

[8] The first and second readings of H.R. 3190 were the readings in the session of Congress which ended by adjournment *sine die* on July 27, 1947, because it had not been subject to discussion, debate, or consideration since that session ended. National Archives & Records Adm. Cert., H.R. 3190, supra **(App. P)**. Thus the first and second readings of the bill in the Senate were on the bill that was passed by the House in the First Session, not the amended bill that was presented to the President for signature.

### E. Parliamentary Violations

With both Houses adjourned *sine die*, with no quorum, with Congress disassembled and dispersed, the Speaker of the House and President pro tempore signed H.R. 3190[9] on June 23, 1948.  94 CONG. REC. 9354 **(App. O);** National Archives & Records Adm. Cert., H.R. 3190 signed by the Speaker, President Pro Tempore, and President Truman. **(App. P).**  Further, during said Congressional adjournment *sine die*, while disassembled, dispersed, with no quorum to do business, the bill was purportedly presented by the Committee on House Administration to President Truman, on June 23, 1948, who then signed H.R. 3190 on June 25, 1948 at 12:23 P.M. E.D.T., 94 CONG. REC. 9364-67 **(App. Q);** National Archives & Records Adm. Cert., H.R. 3190, supra **(App. P);** 94 CONG. REC. D557 (DAILY DIGEST), supra **(App. B).**


The enacting clause of Public Law 80-772 (H.R. 3190), as signed by the Speaker of the House, the President pro tempore of the Senate, and President Truman, stated that the enactment proceeded "by the Senate and House of Representatives of the United States of America in Congress assembled." *See* National Archives & Records Adm. Cert., H.R. 3190 as signed into P.L. 80-772, supra **(App. P).**  Each signatory knew when he signed the Bill that Congress had already been adjourned and disassembled, that neither "House" was legislatively in existence at that time, and that the legislative process had ceased within the terms of Article I, Section 5 and Article I, Section 7 on June 20, 1948.

---

[9] As previously noted, the Senate voted on the amendments proposed under Sen. Rep. No. 1620 separately from H.R. 3190 itself. Moreover, the Senate ordered the amendments in question to be "engrossed" before and separately from the "read[ing]" and "pass[age]" of H.R. 3190. *See* 94 CONG. REC. 8722, supra **(App. J).** The House voted on the amendments in question, but never voted on H.R. 3190 at any time during the Second Session of the 80th Congress. 94 CONG. REC. 8864-65, supra **(App. K).**

After Congress adjourned on June 20, 1948, pursuant to H.Con. Res. 219, a single officer of each House of Congress signed a bill purporting to be H.R. 3190 on June 23, 1948, 94 CONG. REC. 9354, supra (**App. O**), and presented that bill to the President, who signed it on June 25, 1948.   94 CONG. REC. 9365-67 (**App. Q**).   Thus, the post-adjournment signature "provision [of H.Con. Res. 219] was an important part of the legislative scheme," leading to the enactment of Public Law 80-772, without which it would never have "become a Law." *Bowsher,* 478 U.S. at 728.   Public Law 80-772 expressly, (and based on the record, falsely), stated that it was "enacted" while both Houses were "in Congress assembled."   See National Archives & Records Adm. Cert. H.R. 3190, signed into P.L. 80-772, supra (**App. P**).

1 U.S.C. § 101 requires every "enacting clause of all Acts of Congress" to state: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled."   The Supreme Court, in *Marshall Field & Co. v. Clark,* 143 U.S. 649 (1892), defined the essence of this procedure:

> The signing by the Speaker of the House of Representatives, and, by the President of the Senate, in open session, of an enrolled bill is an official attestation by the two houses of such bill as one that has passed Congress.  It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him.

143 U.S. at 672.

1 U.S.C. § 106 codified this well-recognized substantive and implicit constitutional requirement. Reading 1 U.S.C. §§ 101 and 106 together compels the conclusion that all acts respecting a bill toward enactment must occur at least through presentment to the President while Congress is in session.

It is well established that a *sine die* "adjournment terminates the legislative existence of Congress." *The Pocket Veto Case,* 279 U.S. at 681. "'Th[e] expression, a 'house,' or 'each house,' [when] employed... with reference to the faculties and powers of the two chambers ... always means ... the constitutional quorum, assembled for the transaction of business, and capable of transacting business.'" 279 U.S. at 683 (quoting I CURTIS' CONSTITUTIONAL HISTORY OF THE UNITED STATES 486, n. 1). Moreover, the term "'House'" means "the House in session," 279 U.S. at 682, and "'as organized and entitled to exert legislative power,' that is, the legislative bodies 'organized conformably to law for the purpose of enacting legislation.'" Id. (*quoting Missouri Pacific Railway,* 248 U.S. at 281). [T]hus, the "attestation" by the presiding officers and the "declaration by the two houses ... to the President," *Marshall Field,* 143 U.S. at 672, could not have been an "attestation" or "declaration" by any such "house" or "houses" during adjournment *sine die* because no such "houses" exist constitutionally at such time. *See also, United States National Bank of Oregon v. Independent Insurance Agents of America,* 508 U.S. 439, 455, n.7 (1993) (noting that the rule established in *Marshall Field,* 143 U.S. at 672, made statutory by 1 U.S.C. § 106, turned upon "the enrolled bill signed in open session by the Speaker of the House of Representatives and the President of the Senate" (emphasis added)).

When a bill has passed the House of Representatives, it must be printed as an "engrossed bill", which "shall be signed by the Clerk of the House ... sent to the other House, and in that form shall be dealt with by that House and its officers, and, if passed, returned signed by said Clerk." 1 U.S.C. § 106 (emphasis added). In the immediate case, H.R. 3190 was passed by the House of Representatives on May 12, 1947, engrossed, and sent to the Senate, and there referred to the Senate Committee on the Judiciary. *See* 93 CONG. REC. 5048-49, supra **(App. C)**; 5121, supra **(App. D)**. However, it was not dealt with in that form" and did not pass "in that form."

Instead, amendments were proposed under cover of Sen. Rep. No. 1620, were "agreed to en block," read into the record a single time, and "ordered to be engrossed," 94 CONG. REC. 8721-22, supra **(App. J)**. Then, "the bill [H.R. 3190] was read the third time and passed." 94 CONG. REC. 8722, supra **(App. J)**. This contravenes the procedures of the House of Representatives for the 80th Congress. "When a bill with Senate amendments comes before the House, the House takes up each amendment by itself ..." H.Doc. No. 769, STAGES OF A BILL IN THE HOUSE, § 983, No. 13, pg. 483.

Moreover, "[t]he House in which a bill originates enrolls it." Id. No. 15. However, in the case of House bills, such as H.R. 3190, the "chairman of the Committee on House Administration ... affixes to the bills examined a certificate that the bill has been found truly enrolled." Id. No. 16. No such certificate is "affixe[d]" to H.R. 3190 as

certified by the officials of the National Archives.  National Archives & Records Adm. Cert. H.R. 3190, supra **(App. P)**.

Thus, it appears on the face of the purportedly amended H.R. 3190, that it was not "enrolled," there is no record in the House of Representatives prior to June 20, 1948 -- the day Congress adjourned *sine die* -- that it had been or was to be "enrolled" and, therefore, in addition to the fact that the bill did not follow the course of law as prescribed, it lacks both of the elements underlying the *Marshall Field* evidentiary rule – i.e., the "signing" must be "in open session" and must be upon "an enrolled bill." *Marshall Field,* 143 U.S. at 672.[10]

The reference to the H.R. 3190 purportedly "found truly enrolled" is identified thus: "H.R. 3190.  An act to revise, codify, and enact into positive law title 18 of the United States Code, entitled 'Crimes and Criminal Procedure.'"  94 CONG. REC. 9363 **(App. U)**.  It does not indicate whether it is referring to H.R. 3190 as passed by the House on May 12, 1947 – the only time the House ever voted on it, 93 CONG. REC. 5048-49, supra **(App. C);** See also 94 CONG. REC. D556-57 (DAILY DIGEST) (showing passage in the House of H.R. 3190 the only time on May 12, 1947), supra, **(App. B),** or the amended H.R. 3190 passed by the Senate on June 18, 1948.  94 CONG. REC. 8721-22, supra, **(App. J).**[11]

---

[10] On July 26, 1948, "Mr. LaConte, from the Committee on House Administration, reported that the committee had examined and found" that 3190 had been "truly enrolled."  94 CONG. REC. 9363, supra, **(App. U)**.  This alleged finding appears over a month after the June 20, 1948 adjournment *sine die* and over a month since the Speaker of the House, President pro tempore of the Senate, and President Truman allegedly signed H.R. 3190 and it was deposited in the State Department as an enactment.  The statutory mandate after final passage and printing to "call[]" the bill in such final form "the enrolled bill," 1 U.S.C. § 106, July 30, 1947, ch. 388, § 1, 61 Stat. 634, is determined by the certificate "affixe[d] to the bill," H.Doc. No. 769, STAGES OF A BILL, supra, No. 16, all of which is required before the "sign[ing] by the presiding officers of both Houses and sent to the President of the United States."  1 U.S.C. § 106.

[11] As noted previously, the June 18, 1948 passage by the Senate of H.R. 3190 appears to have been the same H.R. 3190 passed by the House on May 12, 1947.  However, even if the Senate's passage involved an amended version (which the record does not show) of H.R. 3190, the absence of the required certificate of enrollment affixed to the bill and the purported finding of enrollment long after

Art. I, § 7, mandates that a bill that has passed both Houses "shall before it becomes a Law, be presented to the President of the United States." Art. I, § 7, Cl. 2; *Chadha,* 462 U.S. at 945. However, the constitutional requirement to "present" such a bill to the President "can only contemplate a presentment by the Congress in some manner, [because] ... [a]t that point the bill is necessarily in the hands of the Congress." *United States v. Kapsalis,* 214 F.2d 677, 680 (7th Cir. 1954), <u>cert. denied</u>, 349 U.S. 906 (1955). Thus, presentment is clearly part of the legislative procedure required as essential to enactment of a bill as law. *Chadha,* 462 U.S. at 945, 947, 951. "After a bill has been presented to the President, no further action is required by Congress in respect of that bill, unless it be disapproved by him ..." *La Abra Silver Mining Co. v. United States,* 175 U.S. 423, 454 (1899). Clearly, presentment is part of the constitutionally mandated "Business," Art. I, § 5, Cl. 1, to be "exercised in accord with [the] single, finely wrought and exhaustively considered procedures" "prescri[bed] ... in Art. I, §§ 1, 7." *Chadha,* 462 U.S. at 951.

"'Congress,'" of course, "'cannot grant to an officer under its control what it does not possess,'" *Metropolitan Wash. Airports,* 501 U.S. at 275 (*quoting Bowsher*, 478 U.S. at 726. Congress does not possess the "'capab[ility] of transacting business'" and is not "'entitled to exert legislative power,'" when its "legislative existence" has been "terminate[d]" by an "adjournment" *sine die. The Pocket Veto Case,* 279 U.S. at 681-83.

---

the bill had been purportedly signed and sent to the Department of State as an enactment into positive law appears to be a post-factum cover-up of a mistake of constitutional proportion.

Congress, therefore, could not "present" to the President a Bill signed after an adjournment *sine die* which terminated the existence of the legislative session. "The signing by [the presiding officers of the two houses], in open session, of an enrolled bill is an attestation by the two houses." *Marshall Field*, 143 U.S. at 672. Such a signing while Congress is under legislative termination by adjournment cannot constitute "an attestation by the two houses." *The Pocket Veto Case*, 279 U.S. at 683 ("[H]ouse ... with reference to the faculties and powers of the two chambers ... always means ... the constitutional quorum, assembled for the transaction of business, and capable of transacting business."); *Wright*, 302 U.S. at 600 (Stone, J., concurring) ("The houses of Congress, being collective bodies, transacting their routine business by majority action are capable of acting only when in session and by formal action recorded in their respective journals, or by recognition, through such action, of an established practice.").

Whether the action taken under H.Con. Res. 219 was an "exercise of legislative power" depends upon whether it was essentially "legislative in purpose and effect." *Chadha,* 462 U.S. at 952. "In short, when Congress '[takes] action that ha[s] the purpose and effect of altering the legal rights, duties, and relations of persons ... outside the Legislative Branch,' it must take that action by the procedures authorized in the Constitution." *Metropolitan Wash. Airports,* 501 U.S. at 276 (quoting *Chadha,* 462 U.S. at 952-55). "If Congress chooses to use a [] resolution ... as a means of expediting action, it may do so, if it acts by both houses and presents the resolution to the President," *Consumer Energy Council of America v. F.E.R.C.,* 673 F.2d 425, 445 (D.C. Cir. 1982),

aff'd, *Process Gas Consumers Group v. Consumer Energy Council of America*, 463 U.S. 1216 (1983).

The inescapable conclusion as to the "purpose and effect" of H. Con. Res. 219 was to enact a bill that at the time of adjournment on June 20, 1948, had not been enrolled and did not textually exist. The Senate brought the long-dead H.R. 3190 into consideration for the first time in the Second Session of the 80th Congress with "a large volume of amendments" under Sen. Rep. 1620, at which time the "amendments were considered and agreed to en bloc" and "ordered to be engrossed." 94 CONG. REC. 8721-22, supra **(App. J)**. H.R. 3190 was thereupon read for the "third time" and "passed" by the Senate. (Id.) The House immediately thereafter "concurred in" the amendments, but never voted on the text of H.R. 3190 then or at any time during that session. 94 CONG. REC. 8864-65. *See also* 94 CONG. REC. D556-57 (DAILY DIGEST) (showing passage in the House of H.R. 3190 the only time on May 12, 1947), supra **(App. B)**.

The bill, purportedly H.R. 3190, signed by the legislative officers on June 23, 1948, presented thereafter to the President and signed by him on June 25, 1948, is a text that did not exist prior to the adjournment. Instead, this version of H.R. 3190 – never considered or voted on by the House and doubtfully by the Senate – contains the texts of the amendments for the first and only time. Here, the 80th Congress, surreptitiously provided a bill the text of which had never passed either House "'mask[ed] under … [the] indirect measure,'" *Metropolitan Wash. Airports,* supra, 501 U.S. at 277 (quoting Madison, THE FEDERALIST, No. 48, pg. 334 (J. Cooke 1961 ed.)) of a resolution

purporting to authorize continuing legislative action during adjournment, with no quorum and no Congress, of an extra-congressional bill. Public Law 80-772 did not become a law, as required by the constitutional procedures mandated under Art. I, § 5, Cl. 1 and Art. I, § 7, Cl. 2, it is unconstitutional and *void ab initio*.

It has been acknowledged heretofore that Petitioner's argument has been raised, with little success, by other criminal defendants. However, petitioner asserts that those non precedential conclusory opinions have not fully analyzed the foregoing facts nor addressed the entirely of the argument presented herein. The only published opinion located by the Petitioner is that from this district, *United States v. Risquet*, supra in which Senior Judge Marvin Katz rejected the claim. The Court found that the Third Circuit had not "addressed the specific issue of §3231's enactment", but noted that other district courts had "retained jurisdiction pursuant to the statute despite challenges to its validity." Id. at 311.

The court went on to cite non published conclusions of those courts that "[t]he 1948 Amendments passed both houses of Congress and was signed into law by President Truman on June 25, 1948." Without review of the record to the contrary the Court merely adopted the conclusion that "the amendments and statutes relied upon for jurisdiction in this case were 'properly enacted and are binding.'" Citing *United States v. Lawrence,* No. 02-200, 2006 U.S. Dist. LEXIS 5501, 2006 WL 250702, at 1 (N.D. Ill. Jan. 27, 2006). See also, *Jones v. Unknown Warden,* No. 06-0082, 2006 U.S. Dist. LEXIS 6386, 2006 WL 389833 at 1 (E.D. Mo Feb 17, 2006).

Rather than looking into the legislative history of H.R. 3190, Judge Katz assumed that since no contrary case law had been presented by the defendant and that both the Supreme Court and the Third Circuit Court of Appeals had previously applied 18 U.S.C. § 3231, in and of themselves refute the allegation that the Title was defective. Judge Katz ignored the fact that no court has fully considered the record of the legislation. Moreover, the *Riquet* Court assumed that the previously unchallenged application of the Title alone legitimized the process of enactment. Petitioner respectfully requests that this Court not bind itself to conclusions based on assumptions based on other conclusions and conduct and in-depth inquiry into the procedure employed to bring H.R. 3190 into law.

Lastly, the Court concluded that if the District Court has no jurisdiction pursuant to 18 USC § 3231, then jurisdiction would vest pursuant to the prior statute. However, that conclusion ignores the fact that on June 25, 1948 President Truman also signed into law P.L. 80-773. This Public Law enacted into positive law Title 28 United States Code et. Seq. That Act (Ch.646 § 1, 62 Stat. 869) repealed the former criminal jurisdiction granted to the district courts, id § 39 et. seq. Stat. 991, (positive repeal listing former 28 U.S.C. § 41 ¶ 2 in schedule of repealed statutes). Thus, there is no jurisdictional statue which is a predecessor of 18 U.S.C. § 3231 currently in force; and therefore, none that a Petitioner must challenge in order to advance his or her claims.

Other courts have concluded that the *Marshall Field* (enrolled bill) Rule prohibits the impeachment of a bill once it is signed by the Speaker of the House and the President

Pro Tempore of the Senate. That holding likewise fails, because the *Marshall Field* case dealt with a bill signed by the Speaker and President pro tempore "in Congress assembled". As established by the record presented herein, P.L. 80-772 was signed by the Speaker and President pro tempore after Congress adjourned on June 20, 1948. Further, the standard of review fails to consider the strictures of the Rules Enabling Act.

Since stare decisis provides no precedent value to district court decisions, and no court has made a non-conclusory ruling and detailed findings of fact and law on the issues presented, the best and only valid evidence is contain in the historical record of the 80th Congress; Constitution of the United States; decisions of the United States Supreme Court and the Parliamentary Rules governing the actions of the Legislative Branch.

## IV.
## REQUEST FOR HEARING OR ARGUMENT

In accordance with the ruling in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d. 335 (1986), Petitioner respectfully requests this Honorable Court grant a full evidentiary hearing to determine the merits of this Petition; further allowing Petitioner to be present and provide additional expert testimony and/or evidence at such hearing. Pursuant to Fed. R. Evid. 902(5), (see also, 28 U.S.C. § 2072(a) and (b), the petitioner will at that time submit Court Journals of the two Houses certified by the National Archives and Records Administration.

Petitioner also requests the Court to take judicial notice of <u>entitlements</u> provided to all citizens of the United States under established law, as they relate to this Petition.

Specifically, Petitioner requests judicial notice of the following:

1) Petitioner is entitled to have the claim(s) set forth herein, taken as true until proved otherwise or until disproven by affidavit or evidence.[12]

2) Petitioner is entitled to discovery related to the jurisdictional claims, as set forth herein.[13]

3) Petitioner is entitled to have the Court take judicial notice of the facts and law as they relate to Public Law 80-772, and to have a directed verdict rendered declaring those statutes as unconstitutional.[14]

4) Petitioner is entitled to a fair tribunal and an unbiased Court that will ensure any Constitutional rights are upheld and protected. This can only be accomplished if the Court, upon learning of the invalid nature of the statutes in question (Public Law 80-772...Title 18 of the U.S. Code), adheres to, and subsequently applies the provisions of the U.S. Constitution and issue rulings that follow the "letter of the law", no matter how costly and/or inconvenient to the government.[15]

Order or Judgment obtained in violation of due process, obtained by fraud, obtained by collusion of the parties, or obtained without jurisdiction is void. See, e.g., *Williams v. New Orleans Public Service, Inc.,* 728 F.2d 730, 735 (5th Cir. 1984); *New York Life Insurance Co. v. Brown,* 84 F.3d 137, 143 (5th Cir. 1996); *Government Financial Services One L.P. v. Peyton Place,* 62 F.3d 767, 772-773 (5th Cir. 1995); *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938); *Bradley v. Fisher,* 80 U.S. 335, 351-352, 13 Wall 335, 20 L.Ed. 646 (1871)

Also, where the evidence clearly establishes that there is no jurisdiction over a subject matter, any further action or authority exercised by the Court is unnecessary and

---

[12] Petitioner presents this Petition in affidavit form, supported by facts, which must be taken as true. See *Kohlberg v. Lehlback,* 160 U.S. 293, 16 S.Ct. 304, 40 L.Ed. 432 (1895) (facts duly alleged are deemed true unless denied or controverted by evidence); 3 AmJur2d, Affidavits, §20("The courts MUST accept an affidavit as true if it is uncontradicted by a counter-affidavit or evidence").

[13] Where issues arise as to jurisdiction or venue, discovery under the Federal Rules of Civil Procedure (Rules 26-27) is available to ascertain the facts bearing on such issues. *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 350-351, 57 L.Ed.2d. 253, 98 S.Ct. 2380 (1978).

[14] F.R.E. 201. *U.S. v. Boyd,* 289 F.3d 1254. 1258 (10th Cir. 2002); *Werner v. Werner,* 267 F.3d 288, 295 (3d Cir. 2001); *General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F. 3d 1074, 1083 (7th Cir. 1997).

[15] Constitution of the United States; Separation of Powers Doctrine.

without any binding legal or judicial authority. A Judge who has knowledge that their Court lacks proper subject-matter jurisdiction, but continues to exercise this non-legal authority, is acting in a manner that has been found to be un-excusable. *Angel v. Bullington,* 330 U.S. 183 (`1947). No time limit exists for an attack on a void judgment. See *Briley v. Hidalgo,* 981 F.2d 246, 249 (5th Cir. 1993). A void judgment is one that, from its inception, is a complete nullity and without legal effect. *Holstein v. Chicago,* 803 F.Supp. 205, (N.D. Ill. 1992), recons. denied, 149 FRD 147, and affirmed, (7th Cir. 1994), US App LEXIS 17428; *Jones v. Giles,* 741 F.2d 245 (9th Cir. 1984). A court has no discretion regarding a void judgment and the right to relief is absolute. See *Brazosport Towing Co. v 3,838 Tons of Sorghum Laden,* 607 F.Supp. 11, 15 to 16 (S.D. Tex. 1984) affirmed without opinion, 790 F.2d 791 (5th Cir. 1985); *Recreational Properties v Southwest Mortgage Services, Inc.* 804 F.2d 311, 314 (5th Cir. 1986); *Burnham v Superior Court of California,* 495 US 604, 609, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990)

# V.
# CONCLUSION AND PRAYER FOR RELIEF

Petitioner has established that H.R. 3190[16]: (1) failed to pass one or both Houses of Congress and/or (2) that the legislative process continued after Congress adjourned *sine die* by legislative officers acting pursuant to H.Res. 219, all of which violated Article I, Section 5, Clause 1, Article I, Section 7, Clause 2, and/or Article I, Section 7, Clause 3 of the Constitution– and any of which rendered Public Law 80-772 unconstitutional and *void ab initio.*

Therefore, because "the offense[s] charged … [were] placed by the law under [the] jurisdiction," of the district court pursuant to 18 U.S.C. § 3231 of Public Law 80-

---

[16] Which became Public Law 80-772.

772, which is unconst    itional and "void, the court    without jurisdiction and the prisoner must be discharged." Yarbrough, 110 U.S. at 654. Since Public law 80-772 has never been enacted as required by Article I, Section 5, Clause 1, Article 1, Section 7, Clause 2, and Article I, Section 7, Clause 3 of the Constitution, thereof, rendering void ab initio the jurisdiction by which the Magistrate and District Court acted to detain Petitioner in Executive custody. As such the court's actions were "ultra vires," (Ruhrgas AG, 526 U.S. at 583 (quoting Steel Co., 523 U.S. at 101-102)) and "coram nonjudice." Rhode Island, 37 U.S. at 720. This is precisely the office and function of habeas corpus- i.e., to "examin(e).. the jurisdiction of the court...," (Bowen, 306 U.S. at 23) and where, as here, the court was clearly "without jurisdiction...the prisoner... must be discharged." Yarbrough, 110 US at 654.

In conclusion, Title 18 of the Criminal Code and specifically 18 USC 3231 are null and void, ab initio because the document signed into law by the Speaker of the House, President pro tempore, and President of the United States. is textually diff- erent than the bill "passed" by the 80th Congress. These actions occurred in violation of Articl I, Section 7 of the Constitution of the United States. Since Petitioner remines incustody pursuant to the Order of December 7, 2006, there is a continuing violation of Petitioner's **DUE PROCESS RIGHTS,** and the Court should effectively render said Order void.

The District Court should remedy these actions by issuing a Writ of Habeas Corpus Ad Subjiciendum The "Great Writ" as requested herein: adopt the findings of fact and law established in this Petition for writ of habeas corpus pursuant to  Article I, Section 9, Clause 2, of the  U.S. Constitution, and finally, ordering the  Petitioner to be released from his illegal and unlawful custody.

35

FFIDAVIT OF SPECIFIC NEGA'. 'E

AVERMENT IN SUPPORT

I, the Undersigned, hereinafter "Affiant," being of Majority age and competent to testify, My yes be yes, My no be no, do hereby affirm and declare the following to wit:

1. That, Affiant sees no proof or evidence that Title 18 United States Code was ever properly enacted in the proper procedure and constitutionally mandated manner, and believes none exist.

2. That, Affiant sees no proof or evidence Troy E. Levi, Warden of FDC-Philadelphia, hereinafter "Respondent", dose not lack any legal or lawful grant of jurisdictional authority to hold, detain, imprison Affiant, and believes none exist.

3. That, Affiant sees no proof or evidence that Affiant is not presently detained and imprisoned illegally and unlawfully by Respondent, at FDC-Philadelphia, 7th and Arch streets, Philadelphia, Pennsylvania, and believes none exist.

4. That, Affiant sees no proof or evidence that the United States District Court of Eastern District of Pennsylvania does not lack any legal or lawful grant of jurisdictional authority, because said title 18 was never properly enacted in the proper procedure and constitutionally mandated manner, and believes none exists.

5. That, Affiant sees no proof or evidence that Troy E. Levi, Warden of FDC-Philadelphia is not holding me on behalf of Michael Mukasey, and believes none exists.

6. That, Affiant sees no proof or evidence that this Verified Petition

for the Writ of Habeas Corpus ad Subjiciendum is not brought against
Michael Mukasey in the United States District Court for the District of
Columbia, and believes none exists.

**Further, Affiant sayeth naught.**

## VERIFIED PETITION FOR BAIL PENDING
## HABEAS CORPUS REVIEW

**Comes Now,** Petitioner, appearing specially and not Generally, moves the
Court to allow for Bail on Petitioner's Own Recognizance. The Plain State-
ment of facts are as follows:

**1.** That, Petitioner is entitled to Bail pending Habeas Corpus Review as a
matter of right due to Respondents unlawful and illegal restraint of Petit-
ioner for the last 19 months

**2.** That, Petitioner is a life long domiciliary, familyman and propertyman,
in Philadelphia Pennsylvania,

**3.** That, Petitioner swears by oath to appear for all court dates.

**4.** That, Petitioner is a hard working Tractor Trailer Driver, with a Valid
Pennsylvania, Commercial Drivers License (CDL)

**5.** That, Petitioner has maintained an excellent prison record, wherein con-
tinously availing himself of various educational courses during said in-
carceration.

**6.** That, Petitioner has continously voluntared for employment at the FDC,
being that while a prisoner is here on pre-trial status the prison does not
allow him to work.

**7.** That, Petitioner's claim for Bail on Petitioner's Own Recognizances is
based on the question of laws as raised pursuant to Article 1, Section 9,
Clause 2, of the United Staes Constitution and 28 USC, Section 1651(a)

herein which poses a liberty intrest and the highest likelihood and proba-
bility of success for issuance of said Writ of Habeas Corpus Ad Subjici-
endum.


## VERIFICATION AND CERTIFICATION

The Undersigned herewith, declares and affirms that the Undersigned issues
this **VERIFIED PETITION FOR WRIT OF HABEAS CORPUS AD SIBJICIENDUM THE "GREAT
WRIT" WITH AFFIDAVIT OF SPECIFIC NEGATIVE AVERMENT IN SUPPORT AND VERIFIED
PETITION FOR BAIL PENDING HABEAS CORPUS REVIEW** with sincere intent, poss-
esses competence for stating the matters set forth herein, and declares and
affirms upon Undersigned's unlimited commercial liability, knowing the pains
and penalties of perjury, that the contents are true, correct, complete,
admissible as evidence and not meant to mislead, in accordence with Under-
sign's sincerly held spiritual convictions and creed.

Additionally, Undersned does herewith certify and atrest that Undersign
did prepare and execute this herein instrument, and that the foregoing
statements made by the Undersigned are the truth, the whole truth and noth-
hing but the truth and are of Undersigned's own personal first-hand know-
ledge.


## REBUTTAL

The Respondent, Michael Mukasey, his designated representative, successor or assign, want-
ing to rebut any aspect of the AFFIDAVIT OF SPECIFIC NEGATIVE AVERMENT IN SUPPORT, may do
so point for point, using their Christian or Baptismal name or name givin at birth in Upper
and lower case letter's format, sworn true, complete, correct, not meant to mislead, having
personal first-hand knowledge of each and every rebutted point, under their full commercial
liability before a Notary. No unsworn declaration  shall be accepted, as they can be

utilized to shade the rr    . or lie by omission.

**Further,** each and every unrebutted point shall be deemed the truth of the matter as any unrebutted point of an Affidavit stands as the truth when unrebutted. Additionally each unrebutted point shall further demonstrate no genuine issue as to a material fact regarding that unrebutted point and that Respondents tacit acquiescence shall be evidence and proof of Respondents agreement and approval to each unrebutted point to not dispute, controvert or contest in a judicial or administrative remedial process(es), of any kind by the Undersigned.

Respectfully prepared and executed this 70th day of July 2008 A.D. by:

CHRISTOPHER YOUNG

61107066/PETITIONER
FDC-PHILADELPHIA
PHILA, PA. 19105
BOX 562

### ACKNOWLEDGMENT

**KNOW ALL MEN,** no Notary Public available, the above herein signatory, having the aforestated location, did prepare the within instrument as of the date represented

**WHEREFORE,** now in the presence of the herein-below Testes, the Undersigned affirms and attests, on Undersigned's full commercial liability and Understanding the pains of perjury, executes and authenticates as factual, genuine and truthful the within instrument on the date last above writtin.

CHRISTOPHER YOUNG

Teste                    Teste                    Teste

39

## PROOF OF SERVICE

The Undersigned, CHRISTOPHER YOUNG, does hereby affirm and attest that a true and correct copy of the **VERIFIED PETITION FOR WRIT OF HABEAS CORPUS AD SUBJICTENDUM THE "GREAT WRIT" WITH AN AFFIDAVIT OF SPECIFIC NEGATIVE AVERMENT IN SUPPORT AND A VERIFIED PETITION FOR BAIL PENDING HABEAS CORPUS REVIEW, WAS** cause to be sent via first-class, pre-paid U.S.P.S. regular mail, address in the following manner to wit:


Michael Mukasey, Attorney General
U.S. Department of Justice
Constitution Avenue & 10th Streets, N.W.
Washington, D.C. 20530


Karen S. Marston, Assistant U.S. Attorney
U.S. Department of justice
Eastern District of Pennsylvania
615 Chestnut street, Suite 1250
Philadelphia, Pennsylvania 19106

## PROOF OF FILING

I hereby certify that the foregoing Petition for Writ of Habeas Corpus Ad Subiiciendum and all supporting documents was filed on day the       day of July, 2008, A.D., by forwarding it on this day for further delivery to the Disrict Court by first-class maiL, postage prepaid.

CHRISTOPHER YOUNG/Petitioner

*APPENDICIES*

08 1511

**FILED**

AUG 2 7 2008

Clerk, U.S. District and
Bankruptcy Courts

80TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
1st Session } { No. 304

# REVISION OF TITLE 18, UNITED STATES CODE

APRIL 24, 1947.—Committed to the Committee of the Whole House on the State of
the Union and ordered to be printed

Mr. ROBSION, from the Committee on the Judiciary, submitted the
following

# REPORT

### [To accompany H. R. 3190]

The Committee on the Judiciary submits the following report in
explanation of the accompanying bill entitled "A bill to revise, codify,
and enact into positive law, title 18 of the United States Code, entitled
'Crimes and Criminal Procedure.' " The present bill has been substi-
tuted for an earlier bill [H. R. 1600] on which hearings were held, and
contains changes recommended by the subcommittee.

## PRELIMINARY STATEMENT

### SCOPE OF REVISION

The starting point in this revision was the Criminal Code of 1909.
To that were added those criminal provisions in other titles of the
United States Code which could be transferred without injury to the
text of such titles, and with due regard to maintaining the framework
of the official United States Code prepared for Congress in 1926 by
the former Committee on Revision of Laws of the House and enacted
by Congress June 30, 1926.

This revision includes all applicable criminal laws in effect April 15,
1947.

Before actual revision was begun a scientific plant was assembled.
This included:

1. The complete text of title 18, United States Code, 1940 edition.
2. Criminal provisions from other titles of the code pertinent to
this revision.
3. Applicable constructions of the courts.
4. Notes based upon a careful examination of the Code of Federal
Regulations and law review articles.
5. Exhaustive historical notes.

1

App.    *A*

D556     CONGRESSIONAL RECORD—DAILY DIGEST     DECEMBER 81

## HISTORY OF BILLS ENACTED INTO PUBLIC LAW (80TH CONG., 2D SESS.)—Continued

| Title | Bill No. | Date introduced | Committees— hearings House | Committees— hearings Senate | Date reported House | Date reported Senate | Report No. House | Report No. Senate | Page of Congressional Record of passage House | Page of Congressional Record of passage Senate | Date of passage House | Date of passage Senate | Public law Date approved | Public law No. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| To amend the Railroad Retirement Act of 1937, to increase certain annuities, and the Railroad Unemployment Insurance Act with respect to taxes levied thereunder. | H. R. 6766 (S. 2782) | June 1 | IFC* | LPW | June 2 | June 9 | 2154 | 1574 | 7436 | 7933 | June 8 | June 12 | June 23 | 744 |
| Amending District of Columbia Code, relative to admissibility of testimony. | S. 1266 | May 12, 1947 | DC | DC | June 3 | May 29, 1947 | 2188 | 212 | 7455 | 7010 | June 8 | June 16, 1947 | June 24 | 745 |
| To increase salary of Coordinator of Federal Agencia in Puerto Rico. | S. 2508 | Apr. 15 | PL | IIA | June 4 | May 12 | 2208 | 1229 | 8484 | 6294 | June 16 | May 24 | June 24 | 746 |
| Permitting mining locations under United States mining laws within the game sanctuary of the Navy Mineral Reserve. | H. R. 2867 | Mar. 31, 1947 | PL | IIA | July 14, 1947 | June 11 | 912 | 1597 | 9596 | 7944 | July 21, 1947 | June 12 | June 24 | 747 |
| To amend Veterans Regulation No. 1 (a), pts. I and II, to establish a presumption of service connection for chronic and tropical diseases. | H. R. 3889 | June 18, 1947 | VA | Fin* | July 8, 1947 | June 7 | 808 | 1536 | 9669 | 7924 | July 21, 1947 | June 12 | June 24 | 748 |
| To amend the Food and Drug Act, to authorize seizure of adulterated or misbranded produce. | H. R. 4071 | July 2, 1947 | IFC | IFC* | July 8, 1947 | Apr. 30 | 807 | 1221 | 134 | 8239 | Jan. 13 | June 15 | June 24 | 749 |
| To permit free entry of crude or broken limestone to be used in manufacture of fertilizer. | H. R. 3275 | Feb. 4 | WM | Fin | Feb. 23 | Apr. 15 | 1415 | 1129 | 1610 | 8238 | Feb. 24 | June 15 | June 24 | 750 |
| Conferring jurisdiction over Fort Des Moines Veterans' Village upon the State of Iowa. | H. R. 6188 | Apr. 12 | PW* | PW | Apr. 15 | June 10 | 1747 | 1585 | 5199 | 7941 | May 3 | June 12 | June 24 | 751 |
| Relative to admission of Filipinos to the U.S. Naval Academy. | H. R. 6698 | May 25 | AS* | AS | June 8 | June 17 | 2258 | 1766 | 8489 | 8755 | June 16 | June 18 | June 24 | 752 |
| Navy appropriations for 1949. | H. R. 6772 | June 2 | App* | App* | June 2 | June 14 | 2135 | 1621 | 7073 | 8301 | June 3 | June 15 | June 24 | 753 |
| To ratify contract for purchase of certain mineral land from the Choctaw and Chickasaw Indians. | S. J. Res. 203 (H. J. Res. 363) | June 2 | PL | IIA | May 5 | May 10 | 1868 | 1266 | 8214 | 6390 | June 4 | May 24 | June 24 | 754 |
| Providing for a National Institute of Dental Research. | H. R. 6726 (S. 176) | May 27 | IFC* | LPW | June 2 | July 7, 1947 | 2138 | 436 | 7415 | 7934 | June 8 | June 12 | June 24 | 755 |
| To provide for the issuance of free passes on railroads to official watch inspectors. | H. R. 2192 | Feb. 20 | IFC | IFC | June 17 | June 8 | 2394 | 1538 | 8954 | 7924 | June 18 | June 12 | June 24 | 756 |
| To increase certain benefits payable under the Longshoremen's and Harbor Workers' Compensation Act. | S. 2237 (H. R. 6647) | Feb. 27 | E&L | LPW* | June 1 | May 17 | 2095 | 1315 | 7397 | 6302 | June 8 | May 24 | June 24 | 757 |
| To clarify the position of Air Force Secretary and to authorize Secretaries of Army, Navy, Air Force, and Secretary of Defense to establish certain positions in professional and scientific service. | S. 2505 | Apr. 15 | POC&S | AS | June 11 | May 26 | 2306 | 1408 | 8494 | 6778 | June 16 | June 1 | June 24 | 758 |
| Selective Service Act of 1948. | S. 2655 (H. R. 6401) 2706 | May 12 | AS | AS* | May 7 | May 12 | 1881 | 1268 | 8828 | 7681 | June 18 | June 10 | June 24 | 759 |
| To authorize lease of certain space in Lafayette Building in the District of Columbia by FWA. | S. | May 19 | | PW | | June 12 | | 1614 | 8947 | 8721 | June 18 | June 18 | June 24 | 760 |
| Relative to consolidation of the Lighthouse Service with the Coast Guard. | H. R. 239 | Jan. 3, 1947 | MMF | IFC | Apr. 23, 1947 | June 11 | 294 | 1594 | 5055 | 7942 | May 12, 1947 | June 12 | June 24 | 761 |
| Providing pensions for certain widows of Spanish-American War veterans. | H. R. 4562 | Jan. 14 | VA | Fin | June 11 | June 17 | 2316 | 1747 | 8495 | 8754 | June 16 | June 18 | June 24 | 762 |
| To authorize Marine Band attendance at 1948 national assembly of the Marine Corps League. | H. R. 5056 (S. 2066) | Jan. 20 | AS* | AS | June 2 | June 8 | 2150 | 1541 | 7414 | 7926 | June 8 | June 12 | June 24 | 763 |

App. B

Page 1

Case 1:08-cv-01511-JR    Document 1-2    Filed 08/28/2008    Page 4 of 74

| Subject | Bill No. | Date | Com. | Com. | Date | Date | No. | No. | No. | No. | Date | Date | Date | Page |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Addition of certain surplus Federal lands to the Chickamauga and Chattanooga Military Park, Ga., and Tenn. | H. R. 5936 | Mar. 22 | PL | IIA | May 5 | June 11 | 1862 | 1600 | 5995 | 7944 | May 18 | June 12 | June 24 | 764 |
| To amend the Standard Time Act relative to placing a certain portion of the State of Idaho in the third time zone. | H. R. 6318 (S. 2597) | Apr. 22 | IFC* | IFC | May 12 | May 13 | 1948 | 1287 | 6010 | 8239 | May 18 | June 15 | June 24 | 765 |
| National military appropriations for 1949. | H. R. 6771, 6812 (S. 2869) | June 2, June 7 | App* FA | App* FR | June 2, June 8 | June 17, June 15 | 2135, 2257 | 1763, 1683 | 6957, 8489 | 8618, 8727 | June 2, June 16 | June 17, June 18 | June 24, June 24 | 766, 767 |
| To extend for 1 year the terms of two additional Assistant Secretaries of State. | H. R. 6641 (S. 2740) | May 20 | POCS | POCS | June 11 | June 15 | 2309 | 1685 | 8494 | 8728 | June 16 | June 18 | June 25 | 768 |
| To provide annuities for certain surviving spouses of annuitants retired prior to Apr. 1, 1948. | H. J. Res. 433 | June 18 | WM | | | | | | 9222 | 9098 | June 19 | June 19 | June 25 | 769 |
| To authorize free entry of certain railroad equipment under certain conditions from France. | H. R. 4659 (S. 1857) | Dec. 8, 1947 | Jud | BC | May 28 | June 9 | 2077 | 1560 | 7390 | 7930 | June 8 | June 12 | June 25 | 770 |
| Confirming certain oil contracts negotiated by Treasury. | H. R. 6412 | Apr. 30 | Jud | Jud | May 10 | June 14 | 1898 | 1623 | 6000 | 6722 | May 18 | June 18 | June 25 | 771 |
| To codify Title 3 of the United States Code, entitled "The President." | H. R. 3190 | Apr. 24, 1947 | Jud | Jud | Apr. 24, 1947 | June 14 | 304 | 1620 | 5048 | 8722 | May 12, 1947 | June 18 | June 25 | 772 |
| To codify Title 18 of the United States Code entitled "Crimes and Criminal Procedure." | H. R. 3214 | Apr. 25, 1947 | Jud | Jud | Apr. 25, 1947 | June 9 | 308 | 1559 | 8392 | 7930 | July 7, 1947 | June 12 | June 25 | 773 |
| To codify Title 28 of the United States Code, entitled "Judicial Code and Judiciary." | S. 2242 (H. R. 6396) | Mar. 2 | Jud* | Jud | May 4 | Mar. 2 | 1854 | 950 | 7888 | 6916 | June 11 | June 2 | June 25 | 774 |
| To authorize admission of displaced persons. | S. 2401 (H. R. 5917), 2675 (H. R. 2770), (H. R. 6751) | Mar. 23 | AS | AS | June 8 | June 8 | 2265 | 1542 | 8492 | 7925 | June 16 | June 12 | June 25 | 775 |
| To provide for military justice within the Air Force. | | Mar. 29 | PL | IIA | June 4 | May 27 | 2210 | 1418 | 8484 | 6782 | June 16 | June 16 | June 25 | 776 |
| To amend the Organic Act of Puerto Rico. | | May 17, May 28 | AS | AS | June 8 | June 2 | 2256 | 1451 | 8498 | 7696 | June 16 | June 10 | June 25 | 777 |
| Fixing the rank of the assistant to the Chief of Engineers (in charge of river and harbor and flood-control improvements). | H. J. Res. 297 | Jan. 15 | FA | FR | May 18 | June 17 | 1972 | 1760 | 7381 | 8754 | June 8 | June 18 | June 25 | 778 |
| Increasing the sum to $50,000 for statue of Commodore John Barry for presentation to Eire. | H. R. 945 (S. 19) | Jan. 14, 1947 | Jud | Jud* | June 2 | June 7 | 2162 | 1510 | 7418 | 7945 | June 8 | June 12 | June 25 | 779 |
| Relative to pay of jurors in the United States courts. | H. R. 2766 | Mar. 25, 1947 | Jud | Jud | May 11 | June 8 | 1923 | 1544 | 6007 | 7926 | May 18 | June 12 | June 25 | 780 |
| Relative to probation system in United States courts. | H. R. 4114 | July 8, 1947 | IFC | LPW | May 11 | June 9 | 1927 | 1578 | 6008 | 7933 | May 18 | June 12 | June 25 | 781 |
| Authorizing certain expenditures from appropriations of the Public Health Service. | H. R. 5524, 5886 | Feb. 24, Mar. 17 | App* Jud | App* FW | Feb. 24, Apr. 6 | Apr. 23, June 15 | 1420, 1661 | 1167, 1641 | 1772, 6012 | 6596, 6723 | Feb. 26, May 18 | May 19, June 18 | June 25, June 25 | 782, 783 |
| Army-civil functions appropriations for 1949. | H. R. 6093 | Apr. 21 | POCS | POCS | May 11 | June 15 | 1938 | 1687 | 7380 | 8727 | June 8 | June 18 | June 25 | 784 |
| Providing that certain taxes collected during fiscal year shall be established as a disbursement in the interest of the National Archives. | H. R. 6935, 1853 | June 15, Dec. 10, 1947 | App* MMF | App* FR | June 15, May 7 | June 19, Mar. 31 | 2348, 1878 | 1769, 1045 | 9461, 5996 | 9054, 4288 | June 16, May 18 | June 19, Apr. 12 | June 25, June 26 | 785, 786 |
| Second deficiency appropriations for 1948. | | | | | | | | | | | | | | |
| Authorizing the Coast Guard to maintain aids to navigation. | S. 2186, 2591 | Feb. 20, Apr. 30 | MMF HA | IFC PW | June 17, June 18 | May 27, June 2 | 2397, 2402 | 1415, 1439 | 8957, 8837 | 6781, 7693 | June 18, June 18 | June 1, June 19 | June 26, June 26 | 787, 788 |
| Relating to yacht clubs belonging to yacht clubs. | | | | | | | | | | | | | | |
| Acceptance of statue of Gen. Jose Gervasio Artigas from Uruguay. | H. J. Res. 190 | May 6, 1947 | HA | RAdm | May 14, 1947 | June 19 | 382 | 1770 | 5279 | 9956 | May 14, 1947 | June 19 | June 26 | 789 |
| Authorizing the printing and binding of Cannon's House Procedure. | H. R. 3218 | Apr. 25, 1947 | PL | IIA | July 10, 1947 | June 4 | 860 | 1493 | 317 | 7701 | Jan. 19 | June 10 | June 26 | 790 |
| To authorize an emergency fund for the Bureau of Reclamation to assure the continuous operation of its irrigation and power systems. | H. R. 6039 | Mar. 30 | AS | AS | Apr. 14 | June 17 | 1734 | 1764 | 4644 | 6755 | Apr. 20 | June 18 | June 26 | 791 |
| Authorizing permanent appointment in each the Regular Army and Regular Air Force of one officer in the grade of general. | | | | | | | | | | | | | | |

*Printed hearings.

App. B

Page 2

amount each year for the development of farm-to-market roads. The Commissioner of Public Roads, Mr. Thomas H. MacDonald, spoke in favor of the bill. General Fleming, Commissioner of Public Works, favored the bill. No one appeared in opposition to the bill. It was reported unanimously by the Public Works Committee. Three identical bills have been introduced in the other body by three different Senators. The President recommended the passage of such measure in his message to the Congress on January 3 of this year. This bill will not require a single dollar of appropriations from the Federal Treasury.

Mr. CASE of South Dakota. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. CASE of South Dakota. Does the extension apply to the farm-to-market roads as well as to the primary system?

Mr. CUNNINGHAM. It certainly does, as well as the development of the highways in the urban areas.

Mr. CASE of South Dakota. The bill is very much in order for two reasons. One is that the time when the Japanese war expired, creating the resolution which the gentleman has referred to before, came along in the fall, which gave the States a short year the first year.

Mr. CUNNINGHAM. Yes. No States started building highways prior to October of 1945. They lost 4 months to start with. Then, there was a lack of material and shortage of labor and high prices, which caused the program to be held up. The whole program will be retarded and the States will lose some of this appropriation and there will be tremendous waste if this bill is not enacted. Possibly 12 months' grace period is not sufficient, but if it is not sufficient we can bring up another bill later.

Mr. CASE of South Dakota. If I remember correctly prior to this authorization the old Federal-aid authorization gave the States 2 years in which to act.

Mr. CUNNINGHAM. I think the gentleman is right.

Mr. H. CARL ANDERSEN. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield.

Mr. H. CARL ANDERSEN. I wish to state at this time that in my opinion this is very necessary legislation. As a previous member of the Committee on Roads, I would like to compliment the gentleman for bringing this bill up at this time.

Mr. CUNNINGHAM. I thank the gentleman.

Mr. DONDERO. Mr. Speaker, will the gentleman yield?

Mr. CUNNINGHAM. I yield to the chairman of the committee.

Mr. DONDERO. I think the gentleman has already covered the ground, but is it not a fact that because of the conditions enumerated by the gentleman, many of the States have been unable to comply with the provisions of this act, which makes this bill mandatory in order to protect the States?

Mr. CUNNINGHAM. That is absolutely true. In addition, there would be tremendous waste, because the highway program would be stopped, and highways partly completed would be left in status quo until the Congress took some additional action.

Mr. COLE of New York. Mr. Speaker, I withdraw my reservation of objection.

Mr. ANGELL. Mr. Speaker, reserving the right to object, as one of the members of this committee, I had an opportunity to study this bill very carefully. The people in my particular area in the Northwest are very, very much in sympathy with this bill. I think what the chairman has said and what the gentleman from Iowa [Mr. CUNNINGHAM] has said is absolutely true, that this bill is essential for our road-building program.

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill, as follows:

Be it enacted, etc., That paragraph (d) of section 4 of the Federal-Aid Highway Act of 1944, Public Law 521, Seventy-eighth Congress, approved December 20, 1944, is hereby amended by striking out the term "one year" where it appears in said paragraph and inserting in lieu thereof the term "two years."

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

TO CODIFY TITLE 18 OF THE UNITED STATES CODE, CRIMES AND CRIMINAL PROCEDURE

The Clerk called the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code entitled "Crimes and Criminal Procedure."

The SPEAKER. Is there objection to the present consideration of the bill?

There was no objection.

The Clerk read the bill the second time.

Mr. WALTER. Mr. Speaker, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. WALTER: On page 434, line 11, after the word "of", strike out "three" and insert "five."

Mr. WALTER. Mr. Speaker, the amendment you have just heard reported would have the effect, if adopted, of increasing the membership of the parole board from three to five.

At the last session of the Congress one of the subcommittees of the Committee on the Judiciary, in studying the legislation which we hoped might have the effect of cutting down the criminal rate in this country, found a perfectly appalling situation in the parole board. That board of three members actually interviews upward of 10,000 prisoners each year. That is, personal interviews. In addition to that, they have to review the cases acted on after personal interviews.

There are 21 criminal institutions in the United States that must be visited by this Board at regular intervals. So they have a perfectly impossible job with the result that men are paroled according to formula who should be compelled to serve their full sentence. I am not thinking about those men who are eligible for parole and in whose cases no action can be taken because the Board has not the time to reach their cases;

that is bad enough, but, significantly enough, over 50 percent of the criminals in the Federal institutions are repeaters. It seems to me that the least we can do is to make it possible or probable for a Board intelligently to pass on applications for parole in order to determine whether or not men should be released from their incarceration.

Mr. CARROLL. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. CARROLL. Would the gentleman's amendment change existing law?

Mr. WALTER. It does not change existing law at all.

Mr. COLE of New York. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. COLE of New York. If it does not change existing law, and this bill is designed to codify existing law, what is the necessity of offering the amendment?

Mr. WALTER. It changes existing law in that it changes the number of members on the Board. It does not, however, in any way affect the purpose of the law establishing the parole system; it merely changes the number of members of the Board. This is not different from what has been done by this committee in this very bill. The period of sentence has been changed in order to make different crimes fit the sentences that have been fixed by Congress from time to time. That is done throughout this entire title 28.

Mr. GRAHAM. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. GRAHAM. As I understand the gentleman's amendment it increases the number of members from three to five.

Mr. WALTER. That is right.

Mr. GRAHAM. But it does not increase the rate of compensation of the members.

Mr. WALTER. That is right, exactly.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. WALTER. I yield.

Mr. ROBSION. I may say this to the gentleman, this matter came up before our Judiciary Committee and former Senator George Wharton Pepper, who is tremendously interested in this subject, and others felt they had to have additional authorization to increase the number from three to five. Otherwise we are not amending the law. I think there is no objection to it. We have a bill which can be called up to do this thing.

Mr. WALTER. The gentleman is correct, but we are this far. I do not think there is any doubt but that the Judiciary Committee would unanimously approve a separate bill, but we have gotten this far with this legislation and it certainly seems to me the situation is so critical that we ought to act as quickly as we possibly can. That is the reason I have offered this amendment at this time.

The SPEAKER. The time of the gentleman from Pennsylvania has expired.

Mr. ROBSION. Mr. Speaker, this bill differs from the five codification bills which have preceded it on this calendar in that it constitutes a revision, as well as a codification, of the Federal laws

relating to crimes and criminal procedure.

A bill similar to this passed the House unanimously in the closing days of the Seventy-ninth Congress but was not acted upon in the other body. I believe that I should make a brief statement explaining the method of drafting the bill and its scope.

The work on this revision was commenced under the supervision of the former Committee on Revision of the Laws in 1944. That committee engaged the services of the West Publishing Co. and the Edward Thompson Co., two law-publishing companies that have assisted in the preparation of the original United States Code and every supplement and new edition of that code. These companies have worked continuously and closely with the Committee on Revision of the Laws and, since the beginning of this Congress, with the Committee on the Judiciary, and counsel for the committees. In turn, the companies supplemented their regular editorial staffs by engaging the services of a reviser who was long familiar with the operation and administration of these laws. In addition they assembled an outstanding group of men as an advisory committee who labored unselfishly toward achieving the best revision of the criminal laws. A number of these men—members of the bench and bar of the country—appeared before the Committee on the Judiciary and testified that in their opinion this bill is eminently worthy of favorable action by the Congress. The Department of Justice also designated a representative of the Criminal Division to cooperate in the preparation of this revision.

Several preliminary drafts of the revision were studied most carefully, word for word and line for line, by these various groups, culminating in the bill now up for consideration.

At the last Congress the Committee on the Revision of the Laws, through its chairman, appeared before a subcommittee of the Judiciary Committee and, in a number of sessions, pointed out and explained every change in substantive law made by the bill which had been reported by that committee. After full discussion the Committee on the Judiciary unanimously endorsed the then pending bill, which is similar to the bill before us today, and that bill was passed unanimously by the House on July 16, 1946, in the closing days of the session. The bill had received the endorsement of the Department of Justice and the Section on Criminal Law of the American Bar Association. I believe that I am not engaging in overstatement when I say that no bill of this magnitude ever came to the House with such a background of careful and painstaking preparation and critical appraisal by so many leaders in this branch of the law.

So much for the method of preparation—and I want to express our appreciation to the learned members of the bench and bar who contributed so much of their talent and time toward this work.

Now as to the scope of the bill.

XCIII——319

This bill is a restatement of the Federal laws relating to crimes and criminal procedure in effect on April 15, 1947. Most of these laws are now set forth in title 18 of the United States Code and are based upon the 1909 Criminal Code—which was the last revision of criminal laws enacted by the Congress—and subsequent laws on the subject. Of course, title 18 of the United States Code is only prima facie evidence of the law which is contained in numerous volumes of the Statutes at Large. Upon the enactment of this bill it will no longer be necessary to have recourse to those numerous volumes. All the law will be set out in one place and amendments in the future will be facilitated because of the orderly arrangement of the laws within one title.

Just a year ago with the adoption of the Federal Rules of Criminal Procedure many statutes became obsolete or superseded, but, of course, were not specifically repealed. These together with other obsolete, superseded, redundant, and repetitious statutes are repealed by this bill, and the effect of the rules is clearly set forth in the revision.

The law is restated in simple, clear, and concise language. Many sections of existing statutes are consolidated to facilitate finding the law. The advantages of codes are too well known to require any lengthy exposition on my part at this time.

You will find no radical changes in the philosophy of our criminal law in this bill. There is no attempt made here to coddle criminals and wrongdoers. Nor is this bill a subject of partisanship. Its predecessor which passed the House unanimously in the Seventy-ninth Congress had been reported unanimously by the Committee on the Revision of the Laws and had received the unanimous endorsement of the Committee on the Judiciary. This bill has also been reported unanimously by the Committee on the Judiciary.

Favorable action by the House today will constitute a big step toward an orderly and systematic code of laws and will prove a boon to the bench and bar and the public generally.

Mr. COLE of New York. Mr. Speaker, I rise in opposition to the amendment only for the purpose of suggesting that to some extent the gentleman's amendment is in violation of the understanding on which these bills were submitted to the House for passage today. It was understood that they were simply codifications of existing law and undertook to make no changes in existing law.

I understand that probably the gentleman's amendment has considerable merit, and I see several members of the Committee on the Judiciary on the floor. I certainly am not in a position and have no desire to raise any criticism of procedure or objection to it, but it does seem to be a violation of the understanding under which these bills were submitted.

Mr. ROBSION. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield.

Mr. ROBSION. I pointed out when I made my statement with reference to the first five bills that we considered, that

they were purely a codification. But there are some changes in this bill (H. R. 3198), I mean, for instance, when we were considering this bill the Philippine Islands were a part of the United States. We had many laws applicable to the Philippine Islands when she was a part of the United States that are no longer in force because the Philippines are no longer a part of the United States. Those laws we cut out.

We also found going through criminal law with the Department of Justice, the bar association, and the representatives of the Federal courts that Congress has passed many acts almost identical. In some of them the penalty was fixed at 5 years and in others, fixed at 6 months. We thought it wise to clarify and harmonize these.

Mr. COLE of New York. Mr. Speaker, so long as these distinguished gentlemen of the Judiciary Committee are satisfied with this procedure and with this bill, I shall not use the time of the House further.

Mr. MICHENER. Mr. Speaker, will the gentleman yield?

Mr. COLE of New York. I yield to the gentleman from Michigan.

Mr. MICHENER. Mr. Speaker, I hold in my hand a copy of the committee report which I wish the Members would look at carefully. Where there is any indication of change every one of these questions is fully explained in the report. If we start to amend now we are liable to get into trouble. I favor the bill suggested by the gentleman from Pennsylvania but I hope it will not be interjected here because it will upset the procedure which must be followed if we ever hope to accomplish this purpose.

Mr. COLE of New York. Is the amendment offered by the gentleman from Pennsylvania in the report accompanying this bill to which he has referred?

Mr. MICHENER. No; it is not.

The SPEAKER. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. WALTER].

The question was taken; and the Speaker being in doubt, the House divided, and there were—ayes 38, noes 6.

So the amendment was agreed to.

The bill was ordered to be engrossed and read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

EXTENSION OF REMARKS

Mr. STEVENSON asked and was given permission to extend his remarks in the Appendix of the RECORD and include a report to his constituents.

REVISION OF TITLE 28, UNITED STATES CODE

The Clerk called the bill (H. R. 3214) to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary."

The SPEAKER. Is there objection to the present consideration of the bill?

Mr. CURTIS. Mr. Speaker, reserving the right to object, this bill H. R. 3214 deals with the judiciary and judicial procedure and I wish to call attention merely to one part of it. That is the part

those employees who have not left the Federal Government, and who do not do so by the time this pending legislation is enacted. The violation of a covenant does not become either moral or ethical simply because it is done by legislation.

The major purpose of the bill S. 637 is to liberalize retirement benefits. It is incompatible with that purpose to break a covenant already made with employees now working, and take away from them retirement rights which they now have. It would be far more logical to provide for the commencement of retirement benefits at the age of 60, irrespective of whether a person is voluntarily or involuntarily separated from Government service.

I have prepared two proposed amendments to the bill S. 637, which have been printed. The first of these two amendments would do what I have just proposed: It would substitute the age of 60 years, throughout the bill, as the age at which retirement benefits are to begin. It would also cover the case of an employee who is forced to retire voluntarily at an earlier age than the retirement age, by permitting him to begin drawing a reduced annuity at the age of 55, or thereafter, computed on an actuarial basis.

I think this amendment is entirely equitable, and I should be glad to see it adopted. However, I do not intend to press it. Speaking frankly, I have been told that the offering of any amendments to this bill would result in defeating the bill, and I should not wish to be responsible for such an eventuation.

The second amendment which I sent to the desk, and which has been printed, was not intended to be offered unless the first amendment should have been defeated. Since I have decided not to press the first amendment, neither shall I press the second.

This second amendment treats only with the discrimination and equity between voluntary and involuntary retirement, and its sole effect would be to provide that an employee who has served the number of years entitling him to receive retirement benefits can begin to receive those benefits at the age of 62, regardless of whether his retirement is voluntary or involuntary.

Employees who left their jobs with oldline Government agencies, during the time when OPA and other war agency staffs were being recruited, and took positions with the newer agencies at salary increases ranging from one-third to 40 or even 50 percent above the salaries they were previously receiving, and who now face involuntary separation from the service as the wartime agencies are liquidated, are actually getting a special bonus when their agency ceases to exist, by being allowed the full deferred annuity at the age of 62, while those who stayed on the job in the old-line agencies are told they cannot receive a deferred annuity until they reach the age of 65. The migrant workers got higher salaries all during the war years, and they will get higher retirement benefits because of those higher salaries.

Both voluntary and involuntary separation, except for cause, should receive the same treatment in the Government's retirement system. No logical argument to the contrary can be offered, and no such argument was offered at the hearings on the bill S. 637.

I have made this statement to the Senate because I had already sent forward these two amendments, and they had been printed at my request; and I felt the Senate was entitled to an explanation of why I had prepared these amendments and what they were designed to accomplish. I felt, also, that the Senate was entitled to notice that I have decided not to press these amendments.

HOUSE BILLS REFERRED

The following bills were severally read twice by their titles, and referred, as indicated:

H. R. 84. An act to amend the Nationality Act of 1940, as amended;

H. R. 1467. An act to amend the act entitled "An act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes," of June 15, 1917, as amended, and the Alien Registration Act, 1940, to increase the penalties for violation of such acts;

H. R. 1555. An act to codify and enact into positive law, title 1 of the United States Code, entitled "General Provisions";

H. R. 1566. An act to codify and enact into positive law, title 4 of the United States Code, entitled "Flag and Seal, Seat of Government, and the States";

H. R. 1567. An act to codify and enact into positive law, title 6 of the United States Code, entitled "Official and Penal Bonds";

H. R. 2083. An act to codify and enact into positive law, title 17 of the United States Code, entitled "Copyrights";

H. R. 2084. An act to codify and enact into positive law, title 9 of the United States Code, entitled "Arbitration";

H. R. 2297. An act to correct an error in section 342 (b) (8) of the Nationality Act of 1940, as amended; and

H. R. 3190. An act to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure"; to the Committee on the Judiciary.

H. R. 289. An act to further perfect the consolidation of the Lighthouse Service with the Coast Guard;

H. R. 3054. An act to amend the act of April 14, 1930, to provide increased retired pay for certain members of the former Life Saving Service;

H. R. 2321. An act to amend section 20a of the Interstate Commerce Act; and

H. R. 2654. An act to authorize the Secretary of the Treasury to grant to the mayor and city council of Baltimore, State of Maryland, a permanent easement for the purpose of installing, maintaining, and servicing a subterranean water main in, on, and across the land of the United States Coast Guard station called Lazaretto depot, Baltimore, Md.; to the Committee on Interstate and Foreign Commerce.

H. R. 1179. An act to aid in defraying the expenses of the Seventeenth Triennial Convention of the World's Woman's Christian Temperance Union to be held in this country in June 1947; to the Committee on Foreign Relations.

H. R. 1208. An act to provide compensation to persons performing the duties of postmasters at post offices of the fourth class during annual and sick leave of the postmasters; to the Committee on Civil Service.

H. R. 1357. An act to regulate the marketing of economic poisons and devices, and for other purposes; to the Committee on Agriculture and Forestry.

H. R. 1862. An act to permit certain naval personnel to count all active service rendered under temporary appointment as warrant or commissioned officers in the United States Navy and the United States Naval Reserve, or in the United States Marine Corps and the United States Marine Corps Reserve, for purposes of promotion to commissioned warrant officer in the United States Navy or the United States Marine Corps, respectively; and

H. R. 1971. An act to authorize the Secretary of the Navy to appoint, for supply duty only, officers of the line of the Marine Corps, and for other purposes; to the Committee on Armed Services.

H. R. 1412. An act to grant to the Arthur Alexander Post, No. 68, the American Legion, of Belzoni, Miss., all of the reversionary interest reserved to the United States in lands conveyed to said post pursuant to act of Congress approved June 29, 1938;

H. R. 1874. An act to amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads, and for other purposes," approved July 11, 1916, as amended and supplemented, and for other purposes; and

H. R. 3029. An act to provide for the acquisition of a site and for preparation of plans and specifications for a courthouse to accommodate the United States Court of Appeals for the District of Columbia and the District Court of the United States for the District of Columbia; to the Committee on Public Works.

H. R. 2181. An act relating to institutional on-farm training for veterans; and

H. R. 2368. An act to amend paragraph 8 of part VII, Veterans Regulation No. 1 (a), as amended, to authorize an appropriation of $3,000,000 as a revolving fund in lieu of $1,500,000 now authorized, and for other purposes; to the Committee on Labor and Public Welfare.

H. R. 2353. An act to authorize the patenting of certain public lands to the State of Montana or to the Board of County Commissioners of Hill County, Mont., for public-park purposes; and

H. R. 2573. An act to authorize the Director of the United States Geological Survey to produce and sell copies of aerial or other photographs and mosaics, and photographic or photostatic reproductions of records, on a reimbursement of appropriations basis; to the Committee on Public Lands.

LABOR LEGISLATION—ADDRESS BY SENATOR BALL

[Mr. BALL asked and obtained leave to have printed in the RECORD a radio address on the subject of labor legislation delivered by him on May 12, 1947, which appears in the Appendix.]

THE PLACE OF THE UNITED STATES IN INTERNATIONAL AFFAIRS—ADDRESS BY SENATOR HATCH

[Mr. HOEY asked and obtained leave to have printed in the RECORD an address on the place of the United States in international relations, delivered by Senator HATCH, at the University of North Carolina, May 8, 1947, under the auspices of the International Relations Club of the University, which appears in the Appendix.]

PROHIBITION OF ALCOHOLIC-BEVERAGE ADVERTISEMENTS—STATEMENT OF DR. CLINTON N. HOWARD

[Mr. CAPPER asked and obtained leave to have printed in the RECORD a statement relative to Senate bill 265, prohibiting the transportation in interstate commerce of advertisements of alcoholic beverages, made by Dr. Clinton N. Howard before the Committee on Interstate and Foreign Commerce on May 13, 1947, which appears in the Appendix.]

UNIVERSAL MILITARY TRAINING— EDITORIAL FROM THE CHICAGO HERALD-AMERICAN

[Mr. BREWSTER asked and obtained leave to have printed in the RECORD an editorial entitled "For the Sake of Peace and Safety," published in the Chicago Herald-American of May 5, 1947, which appears in the Appendix.]

IS CONGRESS ANTILABOR?—EDITORIAL FROM MAGAZINE AMERICA

[Mr. MYERS asked and obtained leave to have printed in the RECORD an editorial entitled "Is Congress Antilabor?" from the magazine America, for April 19, 1947, which appears in the Appendix.]

THE STATE DEPARTMENT'S BROADCAST TO RUSSIA—ARTICLE FROM THE NEW YORK HERALD TRIBUNE

[Mr. LODGE asked and obtained leave to have printed in the RECORD an article entitled "The Henry Wallace Affair," by John Crosby, published in the New York Herald Tribune of May 9, 1947, which appears in the Appendix.]

### BUREAU OF MINES

The legislative clerk read the nomination of James Boyd, of Colorado, to be Director of the Bureau of Mines.

Mr. TAFT. Mr. President, I ask that the nomination be passed over.

The PRESIDING OFFICER. Without objection, the nomination will be passed over.

Mr. REVERCOMB. Mr. President, I join in the request that the nomination of James Boyd to be Director of the Bureau of Mines be passed over. I do that not for any personal reason whatsoever, but solely on the ground of doubt as to whether this nominee is fitted for the position and whether he has had the training and experience to fill the position.

The position of Director of Mines is becoming an increasingly important one. More and more he is a director of safety in the mines of this country.

At this session we passed a law with respect to continuing mine inspection in the Bureau of Mines. That law did not contain all that I wanted it to contain, but it indicates that there is a continued interest by the Federal Bureau of Mines in mine inspection. There are approximately $20,000 miners in the Nation, and, of that number approximately 400,000 are engaged in coal mining. The preservation of safety has become one of the foremost duties of the Bureau of Mines. I find that Mr. Boyd is absolutely devoid of any experience in the coal-mining industry.

I want to read two questions which he very frankly and fairly answered when he was before the committee. This question was asked by the Senator from Montana [Mr. MURRAY]:

Senator MURRAY. Mr. Boyd, what study have you given to the coal-mining industry?

Mr. BOYD. Senator, I have never worked in the coal-mining industry directly. I have, as a member of the faculty of the Colorado School of Mines, been instrumental in training men who have gone into the coal-mining industry. I have been on inspection trips myself to various coal mines in the West. As I have said, we had direction of coal operations in Europe, and I know something of the operations there. I have never myself been engaged in the coal-mining industry.

And then this question was asked by the Senator from Montana:

Senator MURRAY. You admit that you are not familiar with the conditions in the coal mines in the country, especially here in the eastern section of the country.

Mr. BOYD. Senator, I admit that I have never been employed in coal mines. I have studied the situation for many years, and I know the basic problems in the coal-mining industry.

Mr. President, in view of the fact that more than half of the miners in this country are engaged in the mining of coal, and in view of the fact that the safety of those miners has become the primary duty and interest of the Federal Bureau of Mines, I feel that it is entirely fair to raise the question of the training and competency of Mr. Boyd to fill this position; and I join in the request that the nomination go over.

The PRESIDING OFFICER. The nomination will be passed over.

The clerk will state the next nomination on the calendar.

### NATIONAL LABOR RELATIONS BOARD

The legislative clerk proceeded to read the nominations of two members and the general counsel of the National Labor Relations Board.

Mr. TAFT. Mr. President, I ask that the Labor Relations Board nominations go over.

The PRESIDING OFFICER. Without objection, it is so ordered.

### UNITED STATES PUBLIC HEALTH SERVICE

The legislative clerk proceeded to read sundry nominations in the United States Public Health Service.

Mr. TAFT. Mr. President, I ask that the nominations in the Public Health Service be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

### THE ARMY

The legislative clerk proceeded to read sundry nominations in the Army.

Mr. TAFT. Mr. President, I ask that the nominations in the Army be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

Mr. TAFT. The Senator from South Dakota [Mr. GURNEY] has additional nominations.

Mr. GURNEY. Mr. President, I submit the nominations of 129 captains, 307 first lieutenants, 123 lieutenant colonels, and also certain nominations in the Navy, and ask that they be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the nominations are confirmed en bloc.

### POSTMASTERS

The legislative clerk proceeded to read sundry nominations of postmasters.

Mr. TAFT. Mr. President, I ask that the postmaster nominations be confirmed en bloc.

The PRESIDING OFFICER. Without objection, the postmaster nominations are confirmed en bloc.

Mr. TAFT. I ask that the President be notified of the confirmations in all of these instances.

The PRESIDING OFFICER. Without objection, the President will be notified forthwith.

### CONDITIONAL ADJOURNMENT

#### JANUARY 2, 1948

Mr. TAFT. Mr. President, in accordance with the terms of Senate Concurrent Resolution 33, adopted earlier today, I move that the Senate do now adjourn.

The motion was agreed to; and (at 8 o'clock and 50 minutes a. m., Sunday, July 27, 1947) the Senate adjourned, the adjournment being, under the provision of Senate Concurrent Resolution 33, to January 2, 1948, at 12 o'clock meridian.

### NOMINATIONS

Executive nominations received by the Senate July 26 (legislative day of July 16), 1947:

SECRETARY OF DEFENSE

James V. Forrestal, of New York, to be Secretary of Defense.

COLLECTOR OF INTERNAL REVENUE

John T. Jarecki, of Chicago, Ill., to be collector of internal revenue for the first district of Illinois, in place of Nigel D. Campbell, resigned.

### CONFIRMATIONS

Executive nominations confirmed by the Senate July 26 (legislative day of July 16), 1947:

SECRETARY OF DEFENSE

James V. Forrestal, to be Secretary of Defense.

DEPARTMENT OF JUSTICE

Philip B. Perlman, to be Solicitor General of the United States.

DIPLOMATIC AND FOREIGN SERVICE

TO BE ENVOY EXTRAORDINARY AND MINISTER PLENIPOTENTIARY OF THE UNITED STATES OF AMERICA TO RUMANIA

Rudolf M. Schoenfeld

TO BE FOREIGN SERVICE OFFICERS OF CLASS 8, VICE CONSULS OF CAREER, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

John A. Bovey, Jr.        James R. Buchli
Ernest E. Ramsaur, Jr.    Ralph S. Saul
Miss Louise Schaffner     Robert M. Winfree
Richard W. Sterling       Robert W. Zimmerman

TO BE FOREIGN SERVICE OFFICERS OF CLASS 5, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Charles F. Baldwin
John Lammey Stewart
Ben H. Thibodeaux

TO BE FOREIGN SERVICE OFFICERS OF CLASS 5, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Ralph B. Curren          Oscar E. Haskie
Jerome T. Gaspard        Philip W. Ireland

TO BE FOREIGN SERVICE OFFICERS OF CLASS 4, CONSULS, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Turner C. Cameron,        Eric Kocher
   Jr.                    William Henry Lawrence
Harry Conover
Robert G. Creel          Frank G. Biscoe
Ridgway B. Knight

TO BE A FOREIGN SERVICE OFFICER OF CLASS 3, A VICE CONSUL OF CAREER, AND SECRETARY IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

James R. Gantin.

TO BE FOREIGN SERVICE OFFICERS OF CLASS 2, VICE CONSULS OF CAREER, AND SECRETARIES IN THE DIPLOMATIC SERVICE OF THE UNITED STATES OF AMERICA

Robert A. Aylward        Francis E. Magliozzi
Howard L. Boerman        Parke D. Massey, Jr.
William D. Brewer        Everett K. Melby
Edward West Burgess      Alfred E. Moon
Stephen A. Comiskey      Curtis W. Prendergast
William B. Dunn          Herbert F. Propps
Seymour M. Finger        Lowell G. Richardson
Walter F. Houk           Jordan T. Rogers
Vernon V. Huber          Howard Band Stephenson
Joseph E. Jacques
Robert L. James          Kenneth F. T. Sullivan
Edward J. Krache, Jr.    Edward J. Trost
Edward T. Long           Wayland B. Waters

App.

E

page 1

of those which duplicate or conflict with each other or with activities carried on by the Government of Puerto Rico. He shall report through the Secretary of the Interior to the President and to Congress concerning the administration of all Federal civilian functions and activities in Puerto Rico, specifying the recommendations made by him to the Federal agencies and the results of such recommendations. He shall advise the Secretary of the Interior, who shall advise the Bureau of the Budget and the Congress with respect to all appropriation estimates submitted by any civilian department or agency of the Federal Government to be expended in or for the benefit of Puerto Rico. He shall confer with the Governor of Puerto Rico with respect to the correlation of activities of Federal and insular agencies and all plans and programs and other matters of mutual interest.

"'(3) The President of the United States may, from time to time, after hearing, promulgate Executive orders expressly excepting Puerto Rico from the application of any Federal law, not expressly declared by Congress to be applicable to Puerto Rico, which as contemplated by section 9 of this act is inapplicable by reason of local conditions. The Coordinator of Federal Agencies may, from time to time, make recommendations to the President for such purpose. Any such recommendation shall show the concurrence or dissent of the Governor of Puerto Rico.

"'(4) The Coordinator of Federal Agencies, in the name of the President of the United States, shall have authority to request from the Governor of Puerto Rico, and the Governor shall furnish to him all such reports pertaining to the affairs, conditions, and government of Puerto Rico as the Coordinator of Federal Agencies shall from time to time request for transmission to the President through the Secretary of the Interior.

"'(5) The President of the United States shall prescribe such rules and regulations as may be necessary to carry out the provisions of this section.'

"SEC. 7. Section 2 of said Organic Act (48 U. S. C., sec. 737) is amended by adding at the end thereof the following new paragraph:

"'The rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States.'"

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

The Senate amendments were concurred in.

A motion to reconsider was laid on the table.

RECESS

The SPEAKER. The Chair declares the House in recess at this time subject to the call of the Chair.

Accordingly (at 12 o'clock and 10 minutes a. m.), the House stood in recess, subject to the call of the Chair.

AFTER RECESS

The recess having expired, the House was called to order by the Speaker at 12 o'clock and 31 minutes a. m.

FURTHER MESSAGE FROM SENATE

A further message from the Senate, by Mr. Carrell, one of its clerks, announced that the Senate agrees to the amendment

of the House to a concurrent resolution of the Senate of the following title:

S. Con. Res. 33. Concurrent resolution providing for the adjournment of the two Houses of Congress until January 2, 1948.

SENATE ENROLLED BILLS AND JOINT RESOLUTIONS SIGNED

The SPEAKER announced his signature to enrolled bills and joint resolutions of the Senate of the following titles:

S. 609. An act conferring jurisdiction upon the United States District Court for the Western District of Arkansas to hear, determine, and render judgment upon any claims arising out of the deaths of Norman Ray Pedron and Carl Franklin Morris;

S. 758. An act to promote the national security by providing for a Secretary of Defense; for a National Military Establishment; for a Department of the Army, a Department of the Navy, and a Department of the Air Force; and for the coordination of the activities of the National Military Establishment with other departments of the Government concerned with the national security;

S. 794. An act to authorize the sale of a small tract of land on the Cherokee Indian Reservation, N. C.;

S. 892. An act for the payment of claims of one Fidelity Trust Co., of Baltimore, Md., and others, covered by findings of fact made by the United States Court of Claims, dated June 5, 1944, and contained in Senate Document No. 229, Seventy-eighth Congress, second session;

S. 907. An act to provide for the orderly transaction of the public business in the event of the death, resignation, or separation from office of regional disbursing officers of the Treasury Department;

S. 1070. An act to provide for the cancellation of the capital stock of the Federal Deposit Insurance Corporation and the refund of moneys received for such stock, and for other purposes;

S. 1181. An act for the relief of Robert F. Parks;

S. 1350. An act to authorize relief of accountable officers of the Government, and for other purposes;

S. 1351. An act to amend the United States Housing Act of 1937 so as to permit loans, capital grants, or annual contributions for low-rent housing and slum-clearance projects where construction costs exceed present cost limitations upon condition that local housing agencies pay the difference between cost limitations and the actual construction costs;

S. 1463. An act to amend section 12 of the Immigration Act of 1917;

S. 1469. An act authorizing the conveyance to the State of Delaware of a portion of Pea Patch Island;

S. 1494. An act to amend section 14 of the Veterans' Preference Act of June 27, 1944;

S. 1505. An act authorizing the Secretary of Agriculture to convey certain lands in Boise, Idaho, to the Boise Chamber of Commerce;

S. 1582. An act relating to the sale of Paxon Field, Duval County, Fla.;

S. 1590. An act to amend the District of Columbia rent-control law so as to provide that schools and universities may recover possession of housing accommodations in certain cases;

S. 1593. An act to authorize the attendance of the Marine Band at the National Convention of the American Legion to be held in New York, N. Y., August 28 to 31, 1947, and the National Convention of the Veterans of Foreign Wars of the United States to be held in Cleveland, Ohio, September 4 to 9, 1947;

S. 1661. An act to provide additional inducements to physicians, surgeons, and den-

tists to make a career of the United States military, naval, and public-health services, and for other purposes;

S. J. Res. 112. Joint resolution to establish a commission to formulate plans for the erection, in Grant Park, Chicago, Ill., of a Marine Corps memorial;

S. J. Res. 130. Joint resolution relating to safety in bituminous-coal and lignite mines of the United States;

S. J. Res. 138. Joint resolution to provide for return of Italian property in the United States, and for other purposes; and

S. J. Res. 146. Joint resolution to authorize the temporary continuation of regulation of consumer credit.

ADJOURNMENT

Mr. HALLECK. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 12 o'clock and 32 minutes a. m.), pursuant to Senate Concurrent Resolution 33, the House adjourned until Friday, January 2, 1948, at 12 o'clock noon.

EXECUTIVE COMMUNICATIONS, ETC.

Under clause 2 of rule XXIV, executive communications were taken from the Speaker's table and referred as follows:

993. A letter from the Attorney General, transmitting request for withdrawal of the case of Juan Hernandez Ayala from those 120 cases involving suspension of deportation referred to in letter of June 16, 1917; to the Committee on the Judiciary.

994. A letter from the Clerk, House of Representatives, transmitting the motion to dismiss of the contestee in the contested election case of Lawrence Michael against Howard W. Smith for a seat in the House of Representatives from the Eighth Congressional District of the State of Virginia (H. Doc. No. 418); to the Committee on House Administration and ordered to be printed.

995. A letter from the Executive Secretary, Air Coordinating Committee, transmitting a draft of a proposed bill to encourage the development of a safe United States flag international air transportation system properly adapted to the present and future needs of foreign commerce of the United States, of the postal service, and of the national defense, and to meet certain of the obligations incumbent upon the United States by virtue of its membership in the International Civil Aviation Organization, by providing for the transfer, establishment, operation, administration, and maintenance of airport and airway property located outside the continental United States, for the training of foreign nationals in aviation activities, and for other purposes; to the Committee on Interstate and Foreign Commerce.

996. A letter from the Acting Secretary of Commerce, transmitting a draft of a proposed bill to provide basic authority for the performance of certain functions and activities of the Department of Commerce, and for other purposes; to the Committee on Interstate and Foreign Commerce.

997. A letter from the Acting Secretary of Commerce, transmitting a draft of a proposed bill to provide basic authority for certain functions and activities of the Weather Bureau, and for other purposes; to the Committee on Interstate and Foreign Commerce.

998. A letter from the Secretary of the Interior, transmitting interim report on the status of investigations of potential water resource developments in the Colorado River Basin in Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming (H. Doc No 419); to the Committee on Public Lands and ordered to be printed, with illustrations.

# Adjournment Resolutions

## 80th Congress, First Session

### Senate Concurrent Resolution 33
### July 26, 1947

*Resolved by the Senate*
*(the House of Representatives concurring),*

That when the two Houses adjourn on Sunday, July 27, 1947, they shall stand adjourned until 12 o'clock meridian on Friday, January 2, 1948, or until 12 o'clock meridian on the third day after the respective Members are notified to reassemble in accordance with section 2 of this resolution, whichever event first occurs.

Sec. 2.   The President pro tempore of the Senate, the Speaker of the House of Representatives, the majority leader of the Senate, and the majority leader of the House of Representatives, all acting jointly, shall notify the Members of the Senate and the House respectively, to reassemble whenever, in their opinion, the public interest shall warrant it.

———————

### House Concurrent Resolution 127
### December 19, 1947

*Resolved by the House of Representatives*
*(the Senate concurring),*

That, notwithstanding the provisions of S. Con. Res. 33, Eightieth Congress, the two Houses of Congress shall adjourn on Friday, December 19, 1947, and that when they adjourn on said day, they stand adjourned sine die.

In accordance with the terms of House Concurrent Resolution 127, the First Session of the Eightieth Congress adjourned sine die on December 19, 1947, the Senate at 7:17 P. M. and the House of Representatives at 7:32 P. M.

App F  ε  G

PAgε  1

# CONSTITUTIONAL AMENDMENT

## U. S. CONST. AMENDMENT—TERMS OF PRESIDENT

*See Congressional Comment, p. 1013*

### H. J. RES. 27

Joint Resolution proposing an amendment to the Constitution of the United States relating to the terms of office of the President.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each House concurring therein), That:*

The following article is hereby proposed as an amendment to the Constitution of the United States, which shall be valid to all intents and purposes as part of the Constitution when ratified by the legislatures of three-fourths of the several States:

"Article —

"Section 1. No person shall be elected to the office of the President more than twice, and no person who has held the office of President, or acted as President, for more than two years of a term to which some other person was elected President shall be elected to the office of the President more than once. But this Article shall not apply to any person holding the office of President when this Article was proposed by the Congress, and shall not prevent any person who may be holding the office of President, or acting as President, during the term within which this Article becomes operative from holding the office of President or acting as President during the remainder of such term.

"Sec. 2. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of three-fourths of the several States within seven years from the date of its submission to the States by the Congress."

JOSEPH W. MARTIN, JR.
*Speaker of the House of Representatives.*
WILLIAM F. KNOWLAND
*Acting President of the Senate pro tempore.*

I certify that this Joint Resolution originated in the House of Representatives.

JOHN ANDREWS
*Clerk.*

[Deposited in the Department of State, March 24, 1947.]

### Ratification by the States

| State | Date | State | Date |
|---|---|---|---|
| California | April 15, 1947 | Missouri | May 22, 1947 |
| Colorado | April 12, 1947 | Nebraska | May 23, 1947 |
| Connecticut | May 21, 1947 | New Hampshire | April 1, 1947 |
| Delaware | April 2, 1947 | New Jersey | April 15, 1947 |
| Illinois | April 3, 1947 | Ohio | April 16, 1947 |
| Iowa | April 1, 1947 | Oregon | April 3, 1947 |
| Kansas | April 1, 1947 | Pennsylvania | April 29, 1947 |
| Maine | March 31, 1947 | Vermont | April 15, 1947 |
| Michigan | March 31, 1947 | Wisconsin | April 16, 1947 |

†

XC

App. F & G
Page 2

be established by legislation now pending in the Congress (with an accompanying paper); to the Committee on Appropriations and ordered to be printed.

SUPPLEMENTAL ESTIMATE, FEDERAL WORKS AGENCY (S. Doc. No. 176)

A communication from the President of the United States, transmitting a supplemental estimate of appropriation for the Federal Works Agency, amounting to $16,-000,000, fiscal year 1949, and a proposed contract authorization in the amount of $10,-000,000 (with an accompanying paper); to the Committee on Appropriations and ordered to be printed.

SUPPLEMENTAL ESTIMATE, SEVERAL EXECUTIVE DEPARTMENTS AND INDEPENDENT OFFICES (S. Doc. No. 177)

A communication from the President of the United States, transmitting an estimate of appropriation for the several executive departments and independent offices to pay claims for damages, audited claims, and judgments rendered, against the United States, as provided by various laws, in the amount of $2,303,458.55, together with an indefinite amount as may be necessary to pay interest and costs (with accompanying paper); to the Committee on Appropriations and ordered to be printed.

PETITIONS AND MEMORIALS

Petitions, etc., were laid before the Senate and referred as indicated:

By the PRESIDENT pro tempore:

A letter in the nature of a petition from Laura B. Prisk, of New York, N. Y., relating to Flag Day; to the Committee on the Judiciary.

A telegram in the nature of a petition from Walter L. M. Hodge, chairman, Municipal Committee, St. Croix, V. I., praying for the enactment of House bill 6904, to incorporate the Virgin Islands Corporation; ordered to lie on the table.

A resolution adopted by the forty-second annual convention of the Maryland State and District of Columbia Federation of Labor, at Washington, D. C., protesting against the enactment of the Mundt-Nixon un-American activities bill; to the Committee on the Judiciary.

A memorial of sundry citizens of the State of Washington, remonstrating against the enactment of the so-called Mundt-Nixon un-American activities bill; to the Committee on the Judiciary.

REPORTS OF COMMITTEES

The following reports of committees were submitted:

By Mr. BUTLER, from the Committee on Interior and Insular Affairs:

S. 2080. A bill to provide for the establishment of the Philadelphia National Historical Park, and for other purposes; with amendments (Rept. No. 1522); and

H. R. 6060. A bill authorizing the Secretary of the Interior to issue patents for lands held under color of title; without amendment (Rept. No. 1818).

By Mr. WILEY, from the Committee on the Judiciary:

H. R. 3190. A bill to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure"; with amendments (Rept. No. 1620); and

H. R. 6412. A bill to codify and enact into law title 3 of the United States Code, entitled "The President"; without amendment (Rept. No. 1623).

By Mr. COOPER, from the Committee on the Judiciary:

S. 3764. A bill to amend the Trading With the Enemy Act; without amendment (Rept. No. 1619).

By Mr. SALTONSTALL, from the Committee on Appropriations:

H. R. 6772. A bill making appropriations for the Department of the Navy and the naval service for the fiscal year ending June 30, 1949, and. for other purposes; with amendments (Rept. No. 1821).

By Mr. BYRD, from the Committee on Armed Services:

S. 3098. A bill to authorize the transfer of horses and equipment owned by the United States Army to the New Mexico Military Institute, a State institution; with amendments (Rept. No. 1624).

PROTECTION AGAINST LYNCHING—REPORT OF A COMMITTEE

Mr. FERGUSON. Mr. President, from the Committee on the Judiciary, I ask unanimous consent to report an original bill, to provide for the better assurance of the protection of persons within the several States from lynching, and for other purposes, and I submit a report (No. 1625) thereon. The report is short, and I request that it be printed in the RECORD.

The PRESIDENT pro tempore. Without objection, the bill and the report will be received, and the bill will be placed on the calendar; and, without objection, the report will be printed in the RECORD.

The bill (S. 2860) to provide for the better assurance of the protection of persons within the several States from lynching, and for other purposes, was received, read twice by its title, and ordered to be placed on the calendar.

The report was ordered to be printed in the RECORD, as follows:

The Committee on the Judiciary, which has had under consideration various bills relating to the protection of persons within the several States from lynching, report favorably a bill to provide for the better assurance of the protection of persons within the several States from lynching, and for other purposes, with the recommendation that the bill do pass.

The purpose of the bill is self-explanatory in the title statement in that it is designed to provide for the better assurance of the protection of persons from lynching.

STATEMENT

Section 1 of the bill is self-explanatory.

Section 2 of the bill, which contains the definitions, might be considered one of the most important parts of the measure.

The bill defines lynching as an exercise or an attempt to exercise by an assembly of two or more persons, without authority of law, by action of physical force against person or property, of any power of correction or punishment over any persons in the custody of any peace officer, or suspected of, charged with, or convicted of the commission of any criminal offense with the purpose or consequence of preventing the apprehension or trial or punishment by law of such person, or of imposing a punishment. The essence of the offense is the depriving of the person accused or suspected of crime of a trial in the manner provided by law and, if such person is convicted of, punishment in the manner provided by law.

Section 3 of the bill makes it a crime punishable by imprisonment and/or a fine for Federal or State officers to conspire with members of a lynching mob in the prosecution of a lynching. The constitutionality of the imposition of Federal sanctions against Federal or State officers for their participation in a lynching will not be discussed in this section. In a later paragraph it is pointed out that such sanctions are valid. The question here involves the validity of Federal sanctions imposed against members of the lynch mob when they conspire with the Federal and State officers. It

seems to be well-settled law that any Federal sanctions against the individual lynchers (aiders, abettors, etc.) are invalid.

It appears well settled that under the fourteenth amendment to the Constitution, Congress does not have the authority to enact sanctions against private individuals or individual actions. (The Civil Rights cases (109 U. S. 3); U. S. v. Harris (106 U. S. 629); Slaughterhouses cases (83 U. S. 36); U. S. v. Cruikshank (92 U. S. 542); Strauder v. West Virginia (100 U. S. 303); Virginia v. Rives (100 U. S. 313); Hodges v. U. S. (203 U. S. 1); Corrigan v. Buckley (271 U. S. 321).)

It is the opinion of this committee that those individuals who conspire with Federal or State officers for the purpose of lynching may be held guilty of the crime or conspiracy when, in effect, they could not be held guilty of lynching. It is sufficient if one of the parties to a conspiracy is legally capable of committing the offense, while the other party may not have that capacity (Chaddock v. U. S. (141 F. 2d5); Olsen v. U. S. (287 F. 86), 85 C. C. A. 113, certiorari denied, 207 U. S. 596)). A person may be guilty of conspiring although incapable of committing the objective offense (Farnsworth v. Zerbst (98 F. 2d 541); U. S. v. Rabinowick (238 U. S. 78, 86); U. S. v. Holte (236 U. S. 140, 144); Jelke v. U. S. (255 F. 265); Israel v. U. S. (3 F. 2d 743); U. S. v. Lyman (190 F. 414); U. S. v. Socony Vacuum Oil Company (310 U. S. 150)).

Section 4 punishes State officers and employees for their failure to prevent a lynching. The fourteenth amendment is directed toward the action of the States, including the action of State officers. Any action by the officers of the State which violates the prohibition upon State action contained in the fourteenth amendment is subject to penalty imposed by the United States (Ex Parte Virginia (100 U. S. 339); Screws v. U. S. (325 U. S. 91)). The right not to be deprived by a State (or State officers) of a trial by the State, or of the punishment prescribed by law, is inherent in due process of law (Screws v. U. S. supra; Crews v. U. S. (160 F. 2d 746); U. S. v. Classic (313 U. S. 299)).

Section 5 of the bill penalizes Federal officers and employees for their willful failure to prevent a lynching. Congress has, many times, created penalties upon Federal officers for a violation of their duties. The creation of the sanction in itself creates a duty on a Federal officer not to commit acts which would invoke the imposition of the penalty. (See the offenses defined and punished in U. S. Code, title 18, secs. 171 et seq.)

Section 6 defines the duty of the Attorney General of the United States under this act. It imposes a duty upon him to cause an investigation to be made to determine whether there has been a violation of the bill, whenever a lynching occurs, and information on oath is submitted to him that any officer or employee of the United States or of a State, or any governmental subdivision thereof, is guilty of a criminal offense under section 4 or section 5 of the bill. This section merely spells out a duty which normally rests with the Attorney General, the chief law enforcement officer of the United States, to enforce, and prosecute violations of, all criminal laws of the United States. It is not intended to restrict the Attorney General in the enforcement of the act but to make it mandatory upon him to cause the investigation prescribed if the information on oath is submitted to him.

Section 7 provides for civil actions for damages by an individual who is lynched (or his next of kin) against any person violating section 3, section 4, or section 5 of the act with respect to that lynching.

The validity of this section rests upon the same constitutional bases and cases cited under the foregoing sections 3, 4, or 5. Obviously, if Congress has the authority to make certain acts a crime, punishable by fines and/or imprisonment, it also has the

# Calendar No. 1675

| 80th Congress | SENATE | Report |
|---|---|---|
| 2d Session | | No. 1620 |

## REVISION OF TITLE 18, UNITED STATES CODE

June 14 (legislative day, June 1), 1948.—Ordered to be printed

Mr. Wiley, from the Committee on the Judiciary, submitted the following

# REPORT

### [To accompany H. R. 3190]

The Committee on the Judiciary, to whom was referred the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure," having considered the same, do now report the bill to the Senate favorably, with amendments, and recommend that the bill, as amended do pass.

The purpose of the bill is to codify and revise the laws relating to Federal crimes and criminal procedure.

With the amendments proposed by the committee the bill includes all pertinent laws to January 5, 1948, and is made effective September 1, 1948.

The bill makes it easy to find the criminal statutes because of the arrangement, numbering, and classification. The original intent of Congress is preserved. A uniform style of statutory expression is adopted. The new Federal Rules of Criminal Procedure are keyed to the bill and are reflected in part II of title 18.

Obsolete and executed provisions are eliminated. Uncertainty will be ended and there will no longer be any need to examine the many volumes of the Statutes at Large as the bill, upon enactment, will itself embody the substantive law which will thus appear in full in the United States Code.

Codification and revision of the criminal statutes was undertaken in October 1943 by the House Committee on Revision of the Laws. A bill prepared by that committee passed the House on July 16, 1946, Seventy-ninth Congress, was reintroduced in the present Congress as H. R. 3190, and passed the House again on May 12, 1947.

The care with which the bill has been prepared and brought to date in the present Congress under the supervision of the House Committee on the Judiciary is reflected by that committee's report, House Report No. 304 of the Eightieth Congress. For a detailed

4      REVISION OF TITLE 18, UNITED STATES CODE

On page 118, line 23, before "shall be fined", strike out "amine into the affairs of such institution,".

### EXPLANATION

Amendments Nos. 6 and 7 involve no change in existing law. The stricken words are unnecessary and inconsistent with other sections of this revision defining embezzlement but are necessary and appropriate in defining the offense of false entries in sections 1005 and 1006. See sections 641, 645, and 659 of this title.

8.     On page 134, line 19, after "both", strike out the period at the end of this line and insert—

; or if he negligently suffers such person to escape, he shall be fined not more than $500 or imprisoned not more than one year, or both.

### EXPLANATION

This amendment gives effect to the act of June 21, 1947 (ch. 111, 61 Stat. 134). amending section 138 of the Criminal Code of 1909 (35 Stat. 1113; 18 U. S. C. sec. 244), the latter being section 755 of revised title 18 as set out in this bill.

9J     On page 158, insert new matter after line 12, as follows:

While any foreign government is a member both of the International Monetary Fund and of the International Bank for Reconstruction and Development, this section shall not apply to the sale or purchase of bonds, securities, or other obligations of such government or any political subdivision thereof or of any organization or association acting for or on behalf of such government or political subdivision, or to making of any loan to such government, political subdivision, organization, or association.

### EXPLANATION

This amendment incorporates in section 955 of title 18 the exception made to the Johnson Act by act of July 31, 1945 (ch. 339, sec. 9, 59 Stat. 516; 31 U. S. C., sec. 804b).

10.    On page 367, lines 15 to 18, inclusive, strike out all of lines 15 to 18, inclusive, and insert in lieu thereof the following two paragraphs:

The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.
Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.

### EXPLANATION

This amendment is necessary to preserve the provisions of section 371 (1) of title 28 United States Code, 1940 edition, giving the district court of the United States original jurisdiction of all offenses against the laws of the United States, exclusive of State courts.

11.    On page 415, line 10, after "Canal Zone," insert "District of Columbia,".

ter, east half of the northwest quarter, the east half of the east half of the west half of the northwest quarter, section 17, lots 1, 2, and 3, section 18, township 7 south, range 28 east, Montana principal meridian, containing approximately 626 acres.

The amendments were agreed to.

The bill was ordered to be engrossed for a third reading, read the third time, and passed.

## IMPROVEMENT OF POST OFFICE, LOS ANGELES, CALIF.

The bill (H. R. 5750) to provide for the extension and improvement of post-office facilities at Los Angeles, Calif., and for other purposes, was considered, ordered to a third reading, read the third time, and passed.

## LEASE OF LAFAYETTE BUILDING, WASHINGTON, D. C.

The bill (S. 2706) to authorize the Federal Works Administrator to lease for commercial purposes certain space in the building located at 811 Vermont Avenue NW., Washington, D. C., commonly known as the Lafayette Building, was considered, ordered to be engrossed for a third reading, read the third time, and passed, as follows:

*Be it enacted, etc.,* That the Federal Works Administrator is hereby authorized to lease for commercial purposes for periods not exceeding 10 years and upon such terms and conditions as he may deem to be in the public interest, such space in the building located at 811 Vermont Avenue NW., Washington, D. C., commonly known as the Lafayette Building, as was leased by the Reconstruction Finance Corporation for commercial purposes on July 30, 1947, the date title to such building was transferred from the Reconstruction Finance Corporation to the United States of America by section 306, title III, Public Law 268, Eightieth Congress. The rentals received pursuant to this act may be deposited into a common fund account or accounts in the United States Treasury, and notwithstanding the provisions of the act of June 30, 1932 (40 U. S. C. 303b), shall be available to pay the cost of maintenance, upkeep, and repair of the space so leased and for the establishment of necessary reserves therefor: *Provided,* That except for such necessary reserves, the unobligated balances of rentals so deposited into the Treasury shall be covered at the end of each fiscal year into miscellaneous receipts.

## ISSUANCE OF PATENTS FOR CERTAIN LANDS

The bill (H. R. 6090) authorizing the Secretary of the Interior to issue patents for lands held under color of title was considered, ordered to a third reading, read the third time, and passed.

## REVISION AND CODIFICATION OF TITLE 18, UNITED STATES CODE

The Senate proceeded to consider the bill (H. R. 3190) to revise, codify, and enact into positive law title 18 of the United States Code, entitled "Crimes and Criminal Procedure," which had been reported from the Committee on the Judiciary with amendments.

The PRESIDENT pro tempore. Is there objection to present consideration of the bill?

There being no objection, the Senate proceeded to consider the bill.

The PRESIDENT pro tempore. The bill contains a large volume of amendments. Is there objection to the consideration of the amendments en bloc?

Mr. TAFT. Mr. President, may we have an explanation of the bill? This is a long bill, containing 475 pages.

Mr. WILEY. Mr. President, I assure the distinguished Senator I shall not take much time, and that we shall not spend much time on the bill.

The House has sent to the Senate the revision of title 18. It was my privilege and duty to appoint a very distinguished subcommittee to go over the matter. The subcommittee was headed by the Senator from Missouri [Mr. DONNELL].

The purpose of the bill is to codify and revise the laws relating to Federal crimes and criminal procedure.

With the amendments proposed by the committee the bill includes all pertinent laws to January 5, 1948, and is made effective September 1, 1948.

The bill makes it easy to find the criminal statutes because of the arrangement, numbering, and classification. The original intent of Congress is preserved. A uniform style of statutory expression is adopted. The new Federal Rules of Criminal Procedure are keyed to the bill and are reflected in part II of title 18.

Obsolete and executed provisions are eliminated. Uncertainty will be ended and there will no longer be any need to examine the many volumes of the Statutes at Large as the bill, upon enactment, will itself embody the substantive law which will thus appear in full in the United States Code.

It is one of the constructive things we have been endeavoring to accomplish, and I think the bill accomplishes it. I should like to see the amendments adopted en bloc. If any further specific information is desired, I shall ask the distinguished senior Senator from Missouri to explain it, but I think, in view of the fact that the work has been gone into by some of the best experts in codification in America, in conjunction with the House committee, the committee has proposed a number of amendments, most of which are insubstantial, some of which are substantial. They will necessitate, I assume, if we pass the bill, a conference with the House. I hope the measure can be disposed of without a great deal of debate. As I said, it is along the line of bringing together the Federal criminal statutes into one place, so as to avoid the necessity of going from one volume to another in order to ascertain what the criminal law of the Nation is.

The PRESIDENT pro tempore. The Senator's time has expired. Is there objection to the consideration of the amendments en bloc?

There being no objection, the amendments were considered and agreed to en bloc.

The amendments agreed to en bloc are as follows:

Page 3, following "13. Laws of States adopted for areas within Federal jurisdiction." insert: "14. Applicability to Canal Zone."

Page 5, line 4, after "States" insert: ", except the Canal Zone."

Page 8, after line 15, insert:

"§ 14. Applicability to Canal Zone.

"In addition to the sections of this title which by their terms apply to and within the Canal Zone, the following sections of this title shall likewise apply to and within

the Canal Zone: 6, 8, 11, 331, 371, 472, 474, 478, 479, 480, 481, 482, 483, 485, 488, 489, 490, 469, 502, 506, 594, 595, 598, 600, 601, 604, 605, 608, 611, 612, 703, 756, 791, 792, 793, 794, 735, 796, 797, 915, 917, 951, 953, 954, 956, 957, 958, 959, 960, 961, 962, 963, 964, 965, 966, 967, 1017, 1073, 1301, 1364, 1382, 1543, 1544, 1546, 1584, 1621, 1622, 1761, 1821, 1914, 2153, 2152, 2153, 2154, 2155, 2156, 2158, 2199, 2231, 2234, 2235, 2274, 2275, 2277, 2384, 2385, 2388, 2389, 2390, 2421, 2422, 2423, 2424, 3059, 3105, 3109."

Page 91, strike out "610. Contributions by national banks or corporations." and insert: "610. Contributions or expenditures by national banks, corporations, or labor organizations."

Page 104, strike out lines 4 to 21, inclusive, and insert:

"§ 610. Contributions by national banks, corporations, or labor organizations.

"It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

"Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, in violation of this section shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.

"For the purposes of this section 'Labor organizaiton' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

Page 117, line 8, strike out all after "receiver," down to and including "System," in line 15.

Page 118, line 18, strike out all after "care," down to and including "institution," in line 23.

Page 134, line 19, after "both" insert:"; or if he negligently suffers such person to escape, he shall be fined not more than $500 imprisoned not more than 1 year, or both."

Page 168, after line 12, insert: "While any foreign government is a member bona of the International Monetary Fund and of the International Bank for Reconstruction and Development, this section shall not apply to the sale or purchase of bonds, securities, or other obligations of such government or any political subdivision thereof or of any organization or association acting for or on behalf of such government or political subdivision, or to making of any loan to such government, political subdivision, organization, or association."

Page 387, strike out lines 16 to 18, inclusive, and insert: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

Page 415, line 10, after "Zone," insert "District of Columbia."

Page 415, after line 17, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 416, after line 21, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 448, lines 24 and 25, strike out "the Revised Statutes (1 U. S. C., sec. 1)" and insert: "Title 1 of the United States Code."

Page 456, strike out lines 3 to 21, inclusive.

Page 456, line 22, strike out "19" and insert "18."

Page 457, line 3, strike out "20" and insert "19."

Page 457, strike out lines 8 to 15, inclusive, and insert:

"Sec. 20. This act shall take effect September 1, 1948."

Page 457, line 16, strike out "22" and insert "21."

Page 463, about middle of page, strike out:

"July 3.........| 758|   4, 5| 40|755, 756| 16|  705, 706"

Page 467, below middle of page, strike out:

"June 20.......| 634|   4| 49|      |     705
Do.........| 635|   1, 2| 49|  1657| 22|   243"

And insert:

"June 20.......| 635|   1, 2| 49|  1657| 22|   243"

Page 470, after

"June 8.........| 178| 1, 2, 3| 59|234, 235| 16| 241, 241a, 242"

insert:

"July 31.......| 339|   9| 69|  316| 31|   804b"

Page 471, at the end of the schedule of repeals on this page, insert:

"1947—

| Apr. 16. | 39 | ........ | 61 | 52 | 18 | 411 |
| May 10. | 73 | ........ | 61 | 97 | 18 | 744b-1 |
| June 21. | 111 | ........ | 61 | 154 | 18 | 244 |
| June 23. | 120 | 304 | 61 | 159 | 2 | 251"

The amendments were ordered to be engrossed and the bill to be read a third time.

The bill was read the third time and passed.

Mr. WILEY. Mr. President, I move that the Senate insist upon its amendments, request a conference with the House thereon, and that the Chair appoint the conferees on the part of the Senate.

The motion was agreed to.

The PRESIDENT pro tempore. The Chair will presently name the conferees.

Mr. WILEY subsequently said: Mr. President, I have been credibly informed that the House will accept our amendments. In view of that information, I ask that the action taken to rescind on my motion to appoint conferees in respect to the bill (H. R. 3190) be rescinded.

The PRESIDENT pro tempore. Without objection, it is so ordered.

## AMENDMENT OF TRADING WITH THE ENEMY ACT

The bill (S. 2764) to amend the Trading With the Enemy Act was announced as next in order.

The PRESIDENT pro tempore. Is there objection to the present consideration of the bill?

There being no objection, the Senate proceeded to consider the bill.

Mr. COOPER. Mr. President, I offer an amendment.

Mr. PEPPER. I should like an explanation of the bill.

The PRESIDENT pro tempore. The Senator from Kentucky offers an amendment which the clerk will state.

The CHIEF CLERK. On page 3, line 14, after the word "buy", it is proposed to strike out "July 31, 1949", and insert "April 30, 1949."

The PRESIDENT pro tempore. The question is on agreeing to the amendment submitted by the Senator from Kentucky.

Mr. PEPPER. Mr. President, I request an explanation of the bill.

Mr. COOPER. Mr. President, the bill proposes to amend section 32 of the Trading With the Enemy Act. That section, among other things, authorizes the Allen Property Custodian to return property to an alien if he deems that the alien was a persecutee. It has developed that some of these persons to whom property would be returned are dead, and there are no known heirs. In such case I assume the property would escheat to this country.

The bill provides that the President may designate approved organizations under certain limitations and conditions, and that such organizations may receive the property of a deceased persecutee alien and use it for the benefit of the group to which the persecutee belonged. I think it is a very humane measure. It was introduced by the Senator from Ohio [Mr. TAFT].

The PRESIDENT pro tempore. The question is on agreeing to the amendment offered by the Senator from Kentucky.

The amendment was agreed to.

The bill was ordered to be engrossed for a third reading, read the third time, and passed, as follows:

Be it enacted, etc., That section 32 of the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, is hereby further amended by adding at the end thereof the following subsection:

"(h) The President may designate one or more organizations as successors in interest to deceased persons, who, if alive, would be eligible to receive returns under the proviso of subdivision (C) or (D) of subsection (a) (2) hereof. An organization so designated shall be deemed a successor in interest by operation of law for the purposes of subsection (a) (1) hereof. Return may be made to an organization so designated (a) prior to July 31, 1949, or 2 years from the vesting of the property or interest in question, whichever is later, if the President or such officer or agency as he may designate determines from all relevant facts of which he is then advised that it is probable that the former owner is dead and is survived by no person eligible under section 32 to claim as successor in interest by inheritance, devise, or bequest; and (b) after such later date, if no claim for the return of the property or interest is pending.

"No return may be made to an organization so designated unless it files a claim on or before January 1, 1952, and unless it gives assurances satisfactory to the President that (i) it will use the property or interest returned to it for the rehabilitation and resettlement of persons who suffered substantial deprivation of liberty or failed to enjoy the full rights of citizenship within the meaning of subdivisions (C) and (D) of subsection (a) (2) hereof, by reason of their membership in the political, racial, or religious group of which the former owner was a member; (ii) it will transfer, at any time within 2 years from the time that return is made, such property or interest or the equivalent value thereof to any person designated as entitled thereto pursuant to this act by the President or such officer or agency; and (iii) it will make such reports and permit such examination of its books as the President or such officer or agency may from time to time require.

"The filing of a claim by an organization so designated shall not bar the payment of debt claims under section 34 of this act."

Sec. 2. The first sentence of section 33 of the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, is hereby further amended to read as follows:

"Sec. 33. No return may be made pursuant to section 9 or 32 unless notice of claim has been filed, (a) in the case of any property or interest acquired by the United States prior to December 18, 1941, by August 9, 1948, or (b) in the case of any property or interest acquired by the United States on or after December 18, 1941, by April 30, 1949, or 2 years from the vesting of the property or interest in respect of which the claim is made, whichever is later: Provided, That return may be made to successor organizations designated pursuant to section 32 (h) hereof if notice of claim is filed by January 1, 1952."

## PHILADELPHIA NATIONAL HISTORICAL PARK

The bill (S. 2080) to provide for the establishment of the Philadelphia National Historical Park, and for other purposes, was announced as next in order.

The PRESIDENT pro tempore. This bill is identical with Calendar No. 1764, House bill 5053.

Mr. BUTLER. Mr. President, I ask that the House bill be substituted for Senate bill S. 2080, and that the Senate proceed to the consideration of the House bill.

The PRESIDENT pro tempore. Is there objection to the substitution of the House bill for the Senate bill and its present consideration?

There being no objection, the bill (H. R. 5053) to provide for the establishment of the Independence National Historical Park, and for other purposes, was considered, ordered to a third reading, read the third time, and passed.

The PRESIDENT pro tempore. Without objection, Senate bill 2080 is indefinitely postponed.

## CODIFICATION OF TITLE 3 OF THE UNITED STATES CODE

The bill (H. R. 6412) to codify and enact into law title 3 of the United States Code, entitled "The President," was considered, ordered to a third reading, read the third time, and passed.

## TRANSFER OF CERTAIN ARMY EQUIPMENT TO NEW MEXICO MILITARY INSTITUTE

The Senate proceeded to consider the bill (S. 2698) to authorize the transfer of horses and equipment owned by the United States Army to the New Mexico Military Institute, a State institution, which had been reported from the Committee on Armed Services, with amendments, on page 1, line 4, after the word "authorized", to insert "upon the request of the institution"; in line 7, after the word "institution", to insert "to Cornell University, Ithaca, N. Y., to Norwich University, Norwich, Vt., and to Virginia Military Institute, Lexington, Va."; on page 2, line 1, before the word

App.   J
Page 2

8864                    CONGRESSIONAL RECORD—HOUSE                    JUNE 18

BROOKS] may be excused as a conferee on the bill, S. 2655.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

The SPEAKER. The Chair appoints the gentleman from North Carolina [Mr. DURHAM] to fill the vacancy.

The Clerk will notify the Senate of the action of the House.

## PROVIDING FOR WATER POLLUTION CONTROL ACTIVITIES

Mr. DONDERO. Mr. Speaker, I call up the conference report on the bill (S. 418) to provide for water pollution control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes, and ask unanimous consent that the statement of the managers on the part of the House be read in lieu of the report.

The Clerk read the title of the bill.

The SPEAKER. Is there objection to the request of the gentleman from Michigan?

There was no objection.

The Clerk read the statement.

The conference report and statement are as follows:

### CONFERENCE REPORT

The committee of conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 418) "An Act to provide for water pollution control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes", having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House, and agree to the same with amendments, as follows:

Page 2, line 12, of the amendment of the House, strike out the words "hereinafter declared to be a public nuisance".

Page 2, lines 13 and 14, of the amendment of the House, strike out the words "such interstate water and tributaries thereof", and insert the following words "surface and underground waters".

Page 9, line 11, of the amendment of the House, strike out the figure "$200,000" and insert the figure "$250,000".

Page 11, line 25, of the amendment of the House, strike out the figure "$20,000,000" and insert the figure "$22,500,000".

Page 12, line 25 of the amendment of the House, after the words "study of" insert the word "water", and strike out the word "pollution" after the word "pollution".

Page 13, line 1, of the amendment of the House, strike out the words "interstate waters".

Page 13, line 2, of the amendment of the House, before the word "pollution" insert the word "water", and after the word "pollution" strike out the words "of interstate waters".

Page 14, line 17 through line 23, of the amendment of the House, strike out all after the words "Sec. 9. (a)" and insert the following: "Five officers may be appointed to grades in the Regular Corps of the Public Health Service above that of senior assistant, but not to a grade above that of director, to assist in carrying out the purposes of this Act. Officers appointed pursuant to this subsection in any fiscal year shall not be counted as part of the 10 per centum of the original appointments authorized to be made

in such year under section 207, (b) of the Public Health Service Act; but they shall for all other purposes be treated as though appointed pursuant to such section 207 (b)."

And the House agree to the same.

GEO. A. DONDERO,
J. HARRY McGREGOR,
PAUL CUNNINGHAM,
JAMES O. AUCHINCLOSS,
WILL M. WHITTINGTON,
JOHN A. BLATNIK,
TOM FICKETT,
*Managers on the Part of the House.*

GEO. W. MALONE,
CHAPMAN REVERCOMB,
JOHN L. McCLELLAN,
*Managers on the Part of the Senate.*

### STATEMENT

The managers on the part of the House at the conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 418) submit the following statement in explanation of the effect of the action agreed upon and recommended in the accompanying conference report as to each of such amendments, namely:

The first two amendments apply to Sec. 2 (n), lines 4, 5, and 6, on page 18 of the bill. The language substituted more clearly defines the authority of the Surgeon General with respect to the preparation and adoption of comprehensive programs for eliminating or reducing the pollution of surface and underground waters.

The amendment to Sec. 5 (line 3, page 25), increases by $50,000 the maximum individual loan which may be made under the Act.

The amendment to Sec. 7 (line 16, page 27), increases by $2,500,000 the maximum authorized to be appropriated to the Federal Security Agency for each of the five fiscal years during the period beginning July 1, 1948, and ending June 30, 1953, for the purpose of making loans under Section 5 of the Act.

The purpose of the amendment to Sec. 8 (b) (lines 16, 17, and 18, page 38), is to expand the service of the Public Health Service station authorized to be erected at Cincinnati, Ohio, in connection with research and development in water pollution and the training of personnel in work related to control of water pollution.

The amendment with reference to Sec. 9 (a), (lines 10 to 16, page 30), substitutes a new Sec. 9 (a), which is required for the purpose set forth in the following letter:

FEDERAL SECURITY AGENCY,
*Washington; Zone 25, May 14, 1948.*

DEAR MR. CHAIRMAN: This is in reference to S. 418, which your Committee reported out, with amendments, on April 28, 1948.

Section 9 (a) of S. 418 as reported authorizes additional appointments to be made at higher grades in the Regular Corps of the Public Health Service pursuant to section 208 (b) of the Public Health Service Act to assist the Service in carrying out its new or expanded activities under S. 418. Since our letter of January 19, 1948, to you on this bill, however, the Congress has enacted Public Law 425, which amends the provisions of the Public Health Service Act in several respects, primarily in the matter of appointment and promotion of commissioned officers of the Public Health Service. As a result of Public Law 425, the authority to make additional appointments at higher grades in the Regular Corps of the Public Health Service, formerly contained in section 208 (b) of the Public Health Service Act, is now contained in section 207 (b) of that Act, in a somewhat revised form. In order, therefore, to accomplish the purposes for which section 9 (a) of S. 418 was intended, the following is suggested in lieu of such section 9 (a):

(a) Five officers may be appointed to grades in the Regular Corps of the Service above that of senior assistant, but not to a grade

above that of director, to assist in carrying out the purposes of this Act. Officers appointed pursuant to this subsection in any fiscal year shall not be counted as part of the 10 per centum of the original appointments authorized to be made in such year under section 207 (b) of the Public Health Service Act; but they shall for all other purposes be treated as though appointed pursuant to such section 207 (b).

The short time available for necessary action on the amendment suggested by this letter has not permitted us to obtain advice from the Bureau of the Budget as to the relationship of this amendment to the program of the President.

Sincerely yours,

J. DONALD KINGSLEY,
*Acting Administrator.*

Hon. GEORGE A. DONDERO,
*Chairman, Committee on Public Works, House of Representatives,*
*Washington 25, D. C.*

GEO. A. DONDERO,
J. HARRY McGREGOR,
JAMES O. AUCHINCLOSS,
PAUL CUNNINGHAM,
WILL M. WHITTINGTON,
JOHN A. BLATNIK,
TOM FICKETT,
*Managers on the Part of the House.*

The conference report was agreed to.

A motion to reconsider was laid on the table.

## UNITED STATES CODE, TITLE 18

Mr. REED of Illinois. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the bill (H. R. 3190) to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure", with Senate amendments thereto, and concur in the Senate amendments.

The Clerk read the title of the bill.

The Clerk read the Senate amendments, as follows:

Page 3, following:

"18. Laws of States adopted for areas within Federal jurisdiction."

Insert:

"14. Applicability to Canal Zone."

Page 5, line 4, after "States" insert ", except the Canal Zone."

Page 5, after line 15, insert:

" 14. Applicability to Canal Zone.

"In addition to the sections of this title which by their terms apply to and within the Canal Zone, the following sections of this title shall likewise apply to and within the Canal Zone: 6, 8, 11, 331, 371, 472, 474, 478, 479, 480, 481, 482, 483, 485, 488, 489, 490, 499, 502, 506, 594, 595, 598, 600, 601, 604, 606, 608, 611, 612, 703, 756, 791, 792, 703, 794, 795, 790, 797, 915, 917, 951, 953, 954, 956, 957, 958, 959, 960, 961, 962, 963, 964, 965, 938, 967, 1017, 1073, 1301, 1364, 1382, 1542, 1543, 1544, 1546, 1664, 1651, 1652, 1761, 1821, 1914, 2151, 2152, 2153, 2154, 2155, 2156, 2199, 2231, 2234, 2235, 2274, 2275, 2277, 2384, 2385, 2388, 2389, 2390, 2421, 2422, 2423, 2424, 3059, 3105, 3146."

Page 91, strike out

"610. Contributions by national banks or corporations."

And insert:

"610. Contributions or expenditures by national banks, corporations, or labor organizations."

Page 104, strike out lines 4 to 21, inclusive, and insert:

"§ 610. Contributions by national banks, corporations, or labor organizations

"It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political con-

vention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contributions prohibited by this section.

"Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer or any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, in violation of this section shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.

"For the purposes of this section 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

Page 117, line 8, strike out all after "receiver," down to and including "System," in line 15.

Page 118, line 18, strike out all after "care," down to and including "institution," in line 23.

Page 134, line 19, after "both" insert ": or if he negligently suffers such person to escape, he shall be fined not more than $500 or imprisoned not more than 1 year, or both."

Page 168, after line 13, insert "While any foreign government is a member both of the International Monetary Fund and of the International Bank for Reconstruction and Development, this section shall not apply to the sale or purchase of bonds, securities, or other obligations of such government or any political subdivision thereof or of any organization or association acting for or on behalf of such government or political subdivision, or to making of any loan to such government, political subdivision, organization, or association."

Page 387, strike out lines 15 to 18, inclusive, and insert "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

Page 415, line 10, after "Zone," insert "District of Columbia,".

Page 415, after line 17, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 416, after line 31, insert:

"Nothing in this title, anything therein to the contrary notwithstanding, shall in any way limit, supersede, or repeal any such rules heretofore prescribed by the Supreme Court."

Page 449, lines 24 and 25, strike out "the Revised Statutes (1 U. S. C., sec. 1)" and insert "Title 1 of the United States Code."

Page 456, strike out lines 3 to 21, inclusive.

Page 456, line 23, strike out "19" and insert "18."

Page 457, line 3, strike out "20" and insert "19."

Page 457, strike out lines 8 to 15, inclusive, and insert:

"Sec. 20. This act shall take effect September 1, 1948."

Page 457, line 16, strike out "22" and insert "21."

Page 463, about middle of page, strike out [July 3.......| 138| 4, 5| 60,714, 758| 18|      705, 705]

Page 467, below middle of page, strike out
[June 30......| 614| 5| 69| 1656| 10|      705
......| 614| 3| 69| 1657| 3⅓|      303]
and insert:
"June 30......| 633| 1, 3| 69| 1657| 3⅓|      30"

Page 470, after
[June 3.......| 1136| 1, 2, 3| 89,234, 22 ⅓| 10| 241, 24 ½a, 24 ⅔"
insert:
"July 16......| 332| 5| 58|      11 ⅓| 11|      55 ½h"

Page 471, at the end of the schedule of repeals on this page, insert:

"1947—
| Apr. 10.  | 24|     | 61| 57| 18|      411
| May 14.  | 73|     | 61| 59| 18|      74 (½h-i)
| June 21. | 113|     | 61| 61| 18|      244
| June 23. | 134|  30 ½| 61| 126| 9|      25 ½"

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

The Senate amendments were concurred in.

A motion to reconsider was laid on the table.

NATIONAL FREEDOM DAY

Mr. REED of Illinois. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the joint resolution (S. J. Res. 37) requesting the President to proclaim February 1 as National Freedom Day, and ask for its immediate consideration. I have consulted with the leaders on both sides.

The Clerk read the title of the joint resolution.

The SPEAKER. Is there objection to the request of the gentleman from Illinois?

There was no objection.

The Clerk read, as follows:

Resolved, etc., That the President of the United States is authorized to issue a proclamation designating the 1st day of February of each year as National Freedom Day for the purpose of commemorating the signing by President Abraham Lincoln, on February 1, 1865, of the joint resolution adopted by the Senate and the House of Representatives of the United States, proposing the thirteenth amendment to the Constitution of the United States of America.

The joint resolution was ordered to be read a third time, was read the third time, and passed, and a motion to reconsider was laid on the table.

PERMISSION TO EXTEND REMARKS AT THIS POINT

Mr. McGARVEY. Mr. Speaker, I ask unanimous consent to extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. McGARVEY. Mr. Speaker, the bill which has been reached on the Consent Calendar today will authorize and request the President to proclaim February 1 as National Freedom Day and invite the people of the United States to observe the day with appropriate ceremonies and thanksgiving. As you all know, on February 1, 1865, President Abraham Lincoln signed the joint resolution, which had previously been adopted by the Congress, proposing the thirteenth amendment to the Constitution.

I should like to repeat for you at this time the immortal words of that amendment: "Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." These words are the foundation of our form of government with its emphasis on the freedom of the individual and the human liberties which belong to every citizen of the United States. It is therefore with pride in our free Nation that I introduced this resolution at the first session of the Eightieth Congress. Since that time I have been striving to obtain approval of the legislation.

I wish to thank the members of the Judiciary Committee and, in particular, the members of the subcommittee which handled the resolution, headed by the gentleman from Illinois [Mr. REED], for the interest and cooperation they have displayed in reporting the legislation, also the gentleman from Pennsylvania [Mr. CHADWICK].

I should like to pause here to pay tribute to the founder of National Freedom Day, Maj. R. R. Wright. It is regrettable that Major Wright is not with us today to realize the fulfillment of his long years of hard work and inspiring efforts. Born in slavery, Major Wright rose to prominence as a great American and occupied an unequalled position in the hearts of his fellow Americans. The story of Major Wright is truly the story of America, for in no other country today is it possible for a citizen to achieve such outstanding success. His success, however, would not have occurred had the thirteenth amendment to the Constitution not been approved. Since its signing is one of the cornerstones in the foundation of our American traditions, I am proud that we have today passed the resolution commemorating its inception.

PROCUREMENT AND SUPPLY OF GOVERNMENT HEADSTONES

Mr. WELCH. Mr. Speaker, I ask unanimous consent to take from the Speaker's desk the bill (H. R. 4272) to provide for the procurement and supply of Government headstones or markers for unmarked graves of members of the armed forces dying in the service or after honorable discharge therefrom, and other persons, and for other purposes, with a Senate amendment thereto, and concur in the Senate amendment.

The Clerk read the title of the bill.

The Clerk read the Senate amendment, as follows:

Page 2, line 2, strike out all after "cemeteries," down to and including "costs," in line 14 and insert "The Secretary of the Army, the Secretary of the Navy, and the Secretary of the Air Force are authorized and directed to compile a list of the names of all members of the armed forces of the United States who died while serving in such forces in the overseas theaters of operations on or after September 8, 1939, and whose bodies have not been recovered or identified or have been buried at sea. Upon the compilation of such list of names and other appropriate data, the American Battle Monuments Commission and the Secretary of the Army are authorized and directed to provide for the inscribing of each such name and pertinent

App. K

page 2

the protection of their civil rights, all with due regard to the established customs of such peoples.

SEC. 4. For the purposes of this concurrent resolution, the committee, or any duly authorized subcommittee thereof, is authorized to hold such hearings, to sit and act at such times and places during the sessions, recesses, and adjourned periods of the Eightieth Congress, to employ such consultants, specialists, clerks, and other assistants, to travel, and authorize its assistants to travel, freely through such areas and such other places, to utilize such transportation, housing, and other facilities as the Army, Navy, Marine Corps, Coast Guard, and Air Force may make available, to require by subpena or otherwise the attendance of such witnesses and the production of such correspondence, books, papers, and documents, to administer such oaths, to take such testimony, and to make such expenditures, as it deems advisable. The cost of stenographic services to report such hearings shall not be in excess of 25 cents per hundred words. The expenses of the committee, which shall not exceed $50,000, shall be paid one-half from the contingent fund of the Senate and one-half from the contingent fund of the House of Representatives, upon vouchers approved by the chairman or vice chairman. Disbursements to pay such expenses shall be made by the Secretary of the Senate out of the contingent fund of the Senate, such contingent fund to be reimbursed from the contingent fund of the House of Representatives in the amount of one-half of disbursements so made.

*Passed June 18, 1948.*

<div style="float:right">Hearings.

Employment of consultants, etc.

Witnesses.

Expenses.</div>

---

### COMMUNIST PARTY OF THE UNITED STATES

*Resolved by the House of Representatives (the Senate concurring),* That there be printed six thousand additional copies of the report (House Report Numbered 1920) on the Communist Party of the United States as an Advocate of Overthrow of Government by Force and Violence, of which five thousand copies shall be for the use of the Committee on Un-American Activities of the House of Representatives and one thousand copies shall be for the House document room.

*Passed June 19, 1948.*

<div style="float:right">June 19, 1948
[H. Con. Res. 199]

Printing of additional copies of House report.</div>

---

### UNITED STATES BOARD OF PAROLE

*Resolved by the House of Representatives (the Senate concurring),* That, in accordance with paragraph 3 of section 2 of the Printing Act, approved March 1, 1907, the Committee on Expenditures in the Executive Departments, House of Representatives, be, and is hereby, authorized and empowered to have printed for its use two thousand five hundred copies of the hearings held before a special subcommittee of said committee during current Congress, relative to investigation as to the manner in which the United States Board of Parole is operating and as to whether there is a necessity for a change in either the procedure or basic law.

*Passed June 19, 1948.*

<div style="float:right">June 19, 1948
[H. Con. Res. 213]

Printing of hearings of special subcommittee.
34 Stat. 1012.
44 U. S. C. § 154.</div>

---

### ADJOURNMENT

*Resolved by the House of Representatives (the Senate concurring),* That when the two Houses adjourn on Sunday, June 20, 1948, they

<div style="float:right">June 20, 1948
[H. Con. Res. 218]</div>

**1436**  CONCURRENT RESOLUTIONS—<u>June 20, July 27, 1948</u>  [62 STAT.
<u>Aug. 7, 1948</u>

*Reassembly.*

stand adjourned until 12 o'clock meridian on Friday, December 31, 1948, or until 12 o'clock meridian on the third day after the respective Members are notified to reassemble in accordance with section 2 of this resolution, whichever event first occurs.

SEC. 2. The President pro tempore of the Senate, the Speaker of the House of Representatives, the acting majority leader of the Senate, and the majority leader of the House of Representatives, all acting jointly, shall notify the Members of the Senate and the House respectively, to reassemble whenever, in their opinion, the public interest shall warrant it.

Passed June 20, 1948.

---

<u>June 20, 1948</u>
[H. Con. Res. 219]

## SIGNING OF ENROLLED BILLS, ETC.

*Resolved by the House of Representatives (the Senate concurring),* That notwithstanding the adjournment of the two Houses until December 31, 1948, the Speaker of the House of Representatives and the President pro tempore of the Senate be, and they are hereby, authorized to sign enrolled bills and joint resolutions duly passed by the two Houses and found truly enrolled.

Passed June 20, 1948.

---

<u>July 27, 1948</u>
[H. Con. Res. 220]

*Communication from the President.*

## JOINT MEETING

*Resolved by the House of Representatives (the Senate concurring),* That the two Houses of Congress assemble in the Hall of the House of Representatives on Tuesday, July 27, 1948, at 12:30 o'clock in the afternoon, for the purpose of receiving such communication as the President of the United States may be pleased to make to them.

Passed July 27, 1948.

---

<u>August 7, 1948</u>
[H. Con. Res. 222]

## ADJOURNMENT

*Resolved by the House of Representatives (the Senate concurring),* That when the two Houses adjourn on Saturday, August 7, 1948, they stand adjourned until 12 o'clock meridian on Friday, December 31, 1948, or until 12 o'clock meridian on the third day after the respective Members are notified to reassemble in accordance with section 2 of this resolution, whichever event first occurs.

*Reassembly.*

SEC. 2. The President pro tempore of the Senate, the Speaker of the House of Representatives, the acting majority leader of the Senate, and the majority leader of the House of Representatives, all acting jointly, shall notify the Members of the Senate and the House, respectively, to reassemble whenever, in their opinion, the public interest shall warrant it.

Passed August 7, 1948.

---

<u>August 7, 1948</u>
[H. Con. Res. 223]

## SIGNING OF ENROLLED BILLS, ETC.

*Resolved by the House of Representatives (the Senate concurring),* That notwithstanding the adjournment of the two Houses until December 31, 1948, the Speaker of the House of Representatives and the President pro tempore of the Senate be, and they are hereby, authorized to sign enrolled bills and joint resolutions duly passed by the two Houses and found truly enrolled.

Passed August 7, 1948.

App.  L

PAGE 2

Mr. KERSTEN of Wisconsin asked and was given permission to extend his remarks in the Appendix of the RECORD in two instances.

The SPEAKER. The gentleman from Vermont [Mr. PLUMLEY].

Mr. PLUMLEY. I just wish to call attention to the fact that this is Father's Day, and, therefore, I say: Good night, good morning, good luck.

The SPEAKER. The gentleman from Illinois [Mr. BUSBEY].

Mr. BUSBEY. Mr. Speaker, I do not know how many have ever attended a sunrise service before, but you have today.

RECESS

The SPEAKER. The Chair declares a recess subject to the call of the Chair.

Thereupon (at 6 o'clock and 23 minutes a. m.) the House stood in recess subject to the call of the Chair.

AFTER RECESS

The recess having expired, the House was called to order by the Speaker at 8 o'clock and 55 minutes a. m.

FURTHER MESSAGE FROM THE SENATE

A further message from the Senate by Mr. Latta, its enrolling clerk, announced that the Senate had passed without amendment concurrent resolutions of the House of the following titles:

H. Con. Res. 318. Concurrent resolution providing for adjournment of the two Houses of Congress until December 31, 1948; and

H. Con. Res. 319. Concurrent resolution authorizing the signing of enrolled bills following adjournment.

The message also announced that the Senate agrees to the report of the committee of conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (H. R. 6248) entitled "An act to authorize the Secretary of Agriculture to stabilize prices of agricultural commodities; to amend section 22 of the Agricultural Adjustment Act, reenacted by the Agricultural Marketing Agreement Act of 1937; and for other purposes."

The message also announced that the Senate had passed without amendment joint resolutions of the House of the following titles:

H. J. Res. 305. Joint resolution authorizing the issuance of a special series of stamps commemorative of the fiftieth anniversary of the organization of the Rough Riders (First Volunteer United States Cavalry) of the Spanish-American War; and

H. J. Res. 327. Joint resolution to authorize the issuance of a special series of stamps commemorative of Juliette Low, founder and organizer of Girl Scouting in the United States of America.

The message also announced that the Senate agrees to the amendments of the House to bills of the Senate of the following title:

S. 2767. An act to provide assistance in the recruitment and distribution of farm labor for the increased production, harvesting, and preparation for market of agricultural commodities to meet domestic needs and foreign commitments; and

S. 3790. An act to amend the Servicemen's Readjustment Act of 1944, as amended, and for other purposes.

ENROLLED BILLS AND JOINT RESOLUTIONS SIGNED

Mr. LeCOMPTE, from the Committee on House Administration, reported that that committee had examined and found truly enrolled bills and joint resolutions of the House of the following titles, which were thereupon signed by the Speaker:

H. R. 371. An act for the relief of Jennens O. Thomas;

H. R. 566. An act for the relief of Sarah Lee Cregg;

H. R. 700. An act for the relief of Anthony Arabelo;

H. R. 705. An act for the relief of Leon Nikolaivich Volkov;

H. R. 851. An act for the relief of Adney W. Gray;

H. R. 911. An act for the relief of Kam Fong Chun, Mr. and Mrs. Jose Dias, Joseph De Souza, Mr. and Mrs. Kenneth Ayres, and Jose Oducado;

H. R. 912. An act for the relief of Hiro Higa and Kane Higa;

H. R. 915. An act to confer jurisdiction upon the District Court of the United States for the Territory of Hawaii to hear, determine, and render judgment on the claims of the executors and trustees of the estate of L. L. McCandless, deceased, as their interests may appear, against the United States of America;

H. R. 2076. An act for the relief of Chester O. Glenn;

H. R. 2220. An act for the relief of James D. Sigler and Frederick P. Vogeland III;

H. R. 1409. An act for the relief of Frantisek Jiri Pavlik or Georg Pavlik;

H. R. 1400. An act for the relief of the United States Radiator Corp. of Detroit, Mich.;

H. R. 1542. An act for the relief of Miss Rosella M. Kostenbader;

H. R. 1723. An act for the relief of O. O. Hedrick;

H. R. 1734. An act for the relief of Gabel Construction Co.;

H. R. 1779. An act for the relief of the Winona Machine & Foundry Co., a corporation of Winona, Minn.;

H. R. 1780. An act for the relief of the Cannon Valley Milling Co.;

H. R. 1910. An act for the relief of the legal guardian of Robert Lee Threatt, a minor;

H. R. 1930. An act for the relief of the Growers Fertilizer Co., a Florida corporation;

H. R. 2006. An act to amend section 11 of the act approved June 6, 1942 (56 Stat. 317), relating to Mammoth Cave National Park in the State of Kentucky, and for other purposes;

H. R. 2193. An act for the relief of the Massman Construction Co.;

H. R. 2293. An act for the relief of Robert E. Graham;

H. R. 2363. An act to provide for sale to the Crow Tribe of interests in the estates of deceased Crow Indian allottees;

H. R. 2372. An act for the relief of George Cleve Williams;

H. R. 2395. An act for the relief of the Cypress Creek drainage district of the State of Arkansas;

H. R. 2431. An act for the relief of the estate of David Jefferson Janow, deceased;

H. R. 3469. An act for the relief of James W. Adkins and Mary Clark Adkins;

H. R. 3551. An act for the relief of William E. Ramsey;

H. R. 3552. An act for the relief of Thomas A. Hanley;

H. R. 2696. An act for the relief of Otto Krause, receiver of the Nessle & Levy Ship & Engine Building Co.;

H. R. 2729. An act for the relief of the legal guardian of Rose Mary Amministo, a minor;

H. R. 2732. An act for the relief of Dennis Stanton;

H. R. 2734. An act for the relief of Joseph M. Henry;

H. R. 2876. An act to amend the act approved May 18, 1928 (45 Stat. 602), as amended, to revise the roll of the Indians of California provided therein;

H. R. 2880. An act for the relief of Aubrey F. Houston;

H. R. 2916. An act for the relief of the Sumner County Colored Fair Association;

H. R. 3012. An act for the relief of the estate of Rudolph Maximilian Goepp, Jr.;

H. R. 3218. An act to authorize an emergency fund for the Bureau of Reclamation to assure the continuous operation of its irrigation and power systems;

H. R. 3351. An act for the relief of Capt. Carroll C. Garretson;

H. R. 3427. An act for the relief of Mrs. Mary H. Overall and Thomas J. Baker;

H. R. 3499. An act for the relief of Petrol Corp.;

H. R. 3566. An act to amend subsection (c) of section 10 of the Immigration Act of 1947, as amended, and for other purposes;

H. R. 3735. An act to authorize and direct the Secretary of the Army to donate and convey to Okaloosa County, State of Florida, all the right, title, and interest of the United States in and to a portion of Santa Rosa Island, Fla., and for other purposes;

H. R. 3937. An act for the relief of William O. Reese;

H. R. 3999. An act to authorize the Attorney General to adjudicate certain claims resulting from evacuation of certain persons of Japanese ancestry under military orders;

H. R. 4047. An act for the relief of Edmund Huppler;

H. R. 4103. An act for the relief of Charles M. Davis;

H. R. 4199. An act for the relief of George Haniotis;

H. R. 4272. An act to provide for the procurement and supply of Government headstones or markers for unmarked graves of members of the armed forces dying in the service or after honorable discharge therefrom, and other persons, and for other purposes;

H. R. 4350. An act to authorize the Secretary of State to perform certain consultative functions within the United States and its Territories and possessions;

H. R. 4367. An act authorizing the Hidalgo Bridge Co., its heirs, legal representatives, and assigns, to construct, maintain, and operate a railroad toll bridge across the Rio Grande, at or near Hidalgo, Tex.;

H. R. 4436. An act to amend the Civil Aeronautics Act of 1938 by redefining certain powers of the Administrator, by authorizing delegation of certain powers by the Civil Aeronautics Board to the Administrator, and for other purposes;

H. R. 4441. An act for the relief of the William J. Burns International Detective Agency;

H. R. 4452. An act for the relief of Douglas L. Craig;

H. R. 4462. An act authorizing the conveyance of certain lands in Park County, Wyo., to the State of Wyoming;

H. R. 4516. An act for the relief of the Moore Dry Dock Co., of Oakland, Calif.;

H. R. 4518. An act for the relief of Gerald S. Furman;

H. R. 4587. An act for the relief of Mrs. Berry A. Light (formerly Mrs. Elsie Purrey);

H. R. 4590. An act for the relief of Mrs. Loraine Thomsen;

H. R. 4635. An act to amend section 11 of an act entitled "An act to regulate barbers in the District of Columbia, and for other purposes";

H. R. 4644. An act for the relief of E. Brevard Walker, trading as E. B. Walker Lumber Co.;

H. R. 4690. An act to amend the act of July 30, 1947, permitting vessels of Canadian registry to transport ...

:e Federal Communications Commis-

he PRESIDING OFFICER. Is there
etion?
r. YOUNG. I object.
.r. WHERRY. Then, Mr. President,
ove that the nomination of Frieda B.
.nuck, of New York, be confirmed.
he PRESIDING OFFICER. The
stion is on agreeing to the motion of
Senator from Nebraska.
Ir. BALL. Mr. President, what kind
procedure—is—this?—We—are—not—in
cutive session.
.r. WHERRY. I asked for unani-
us consent.
Ir. BALL. I did not hear any motion.
.r. WHERRY. I understand that I
:ed for unanimous consent.
The PRESIDING OFFICER. The
ator asked unanimous consent, and
animous consent was granted.
Mr. BALL. I am sorry.
The PRESIDING OFFICER. The
air did not understand that that is
at it was for.
Mr. WHERRY. If there is any doubt
out it——
The PRESIDING OFFICER. Con-
nt was granted.
Mr. WHERRY. Very well.
Mr. BALL. Are we in executive ses-
on, then?
The PRESIDING OFFICER. We are.
Mr. WHERRY. We are, for the con-
.deration of the—nomination of Miss
rieda B. Hennock.
Mr. BALL. May we proceed in the
:gular order, then, and have the nom-
nation stated, so that we will know what
.e are doing? I do not like to have
he Senate doing things by unanimous
onsent. I am not going to hold up the
Senate——
Mr. WHERRY. That is the very thing
hat is done after the Executive Calen-
iar is taken up, and I ask that the nom-
nation be stated.
The PRESIDING OFFICER. The
:lerk will state the nomination.
The LEGISLATIVE CLERK. Nomination
passed over. Frieda B. Hennock, of New
York, to be a member of the Federal
Communications Commission.
The PRESIDING OFFICER. The
question is, Will the Senate advise and
consent to the nomination?
Mr. BALL. Mr. President, I do not
intend to make a lengthy speech about
this nomination. I am opposed to it,
and I want the RECORD to show that.
So far as I can discover, the only in-
vestigation, the only hearing, regarding
this nomination, was a brief executive
session, of the subcommittee of the
Committee on Interstate and Foreign
Commerce. For several weeks the re-
ports were that the nomination would
never get out of committee. Then all of
a sudden it was reported, with, I may
say, somewhat suspicious haste. It is
for a 7-year term on the Federal Com-
munications Commission. In my opin-
ion that is a tremendously important
Commission. I think it is up to the
Senate to satisfy itself—and frankly I
am not satisfied. I do not know about
the wisdom of the nomination one way
or the other—that appointments to this

Commission will really serve the best
interests of the Nation.
I myself have observed some rather
disturbing things about the Federal
Communications Commission. I have
heard more disturbing reports since this
nomination was reported. I have heard
a report, on what I consider reliable au-
thority—and obviously in the past few
days I have not had any opportunity to
investigate it, I do not know whether it
is true or not—which indicates that cer-
tain interests, groups, who are greatly
interested in this nomination, have a
direct pipe line to the Federal Com-
munications Commission, which we cer-
tainly would not want to have occur.
What the score is I do not know. So far
as I can determine, Miss Hennock is a
lawyer from New York, and I might point
out that the late President Roosevelt
never appointed a member of the Fed-
eral Communications Commission from
New York City, for the simple reason
that New York City is the center of the
radio industry, and he wanted to avoid
any possibility of the industry itself hav-
ing too much influence on the Commis-
sion. So far as I can discover, she has
had no experience in radio matters, and
from what I can learn of her back-
ground, frankly I do not think she is
qualified for the job, and I want to be on
record as opposed to her confirmation.
Mr. BREWSTER. Mr. President, I
think the Senator from Minnesota has
been very fair in his statement. As
chairman of the subcommittee which in-
vestigated this nomination for the Sen-
ate Committee on Interstate and Foreign
Commerce, which reported it by a vote
of 8 to 0, with another member voting
"present," I think the Senate should
know what we have learned as to the
circumstances.
Miss Hennock has been a member of
the New York bar for 20 or 25 years. I
hesitate to estimate the age of a lady,
but I should say she is between 40 and 50
years old, so she is reasonably mature.
She has had quite a brilliant record at
the bar. She is a member now, which is
somewhat unusual for a woman, of the
third largest law firm in New York City,
one of the most highly respected and
distinguished, one composed almost ex-
clusively of Republicans. She has had
no experience in radio, as the Senator
from Minnesota has said, which, it
seemed to many of us, was perhaps most
fortunate, because one who had been
active in radio work, representing radio
clients, would by that very fact come in
under somewhat of a cloud. The com-
mittee took into consideration her
breadth of experience and training and
recognized abilities.
I may say that one of her most earnest
sponsors was John W. Davis, of New
York, who certainly is a leader of the
New York bar, and who vouched most
earnestly for her capacity and character.
And from many other quarters there
have come most earnest testimonials as
to the character and competency of this
woman.
Obviously only the future can tell how
well she can fulfill these responsibilities.
I can say that we in our committee,

share the concern which the Senator from
Minnesota has experienced concerning
the functioning of the Federal Commu-
nications Commission. We think it
needs new blood, and it was the con-
sensus of those of us who became familiar
with this matter through contact with
many who were acquainted with her and
through various representations, that she
would be well qualified to fit into this
position, and we believed her confirma-
tion was warranted and wise.
The PRESIDING OFFICER. The
question is, will the Senate advise and
consent to this nomination?
The nomination was confirmed.

## POSTMASTERS

EXECUTIVE REPORT OF A COMMITTEE

The following favorable report of a
committee was submitted:

By Mr. LANGER, from the Committee on
Post Office and Civil Service:

The nomination of Jack Bostwick to be
postmaster at Eastrop, in the State of
Louisiana.

On motion by Mr. LANGER, and by
unanimous consent, it was

Ordered, That the said nomination be
considered with those postmasters ap-
pearing on today's calendar.

Mr. BARKLEY. Does the Senator in-
tend that the nominations of postmasters
shall be considered?
Mr. WHERRY. Yes.
The PRESIDING OFFICER. The
clerk will state the nominations of post-
masters on the calendar.
The legislative clerk proceeded to read
the nominations of postmasters on the
calendar.
The PRESIDING OFFICER. With-
out objection, the nominations of post-
masters will be confirmed en bloc.
Without objection the President will
be notified of all nominations this day
confirmed on the Executive Calendar.
Mr. WHERRY. Mr. President, are
there any measures any Senator desires
to bring up at this time, or is there any
other matter that is desired to be con-
sidered?
Mr. O'MAHONEY. Mr. President,
may I ask the majority leader whether
there is any intention to proceed with
Calendar No. 125. ... ate Joint Resolu-
tion 76?
Mr. WHERRY. ... hat is the equal-
rights amendment?
Mr. O'MAHONEY. Yes.
Mr. WHERRY. I believe the Senator
who was particularly interested in the
legislation stated that it would not be
taken up at this time. I would not un-
dertake to take it up.
Mr. O'MAHONEY. Very well.

## CONDITIONAL ADJOURNMENT TO DECEMBER 31, 1948

Mr. WHERRY. I move that the Sen-
ate do now adjourn.

The motion was agreed to; and (at 7
o'clock and 14 minutes a. m., Sunday,
June 20, 1948) the Senate adjourned, the
adjournment being under the pro-
vision of House Concurrent Resolution
218, to Friday, December 31, 1948, at 12
o'clock meridian.

App.

N



# Congressional Record

**United States of America**

## PROCEEDINGS AND DEBATES OF THE 80th CONGRESS, SECOND SESSION

## SENATE

### MONDAY, JULY 26, 1948

The Senate reassembled this day in its Chamber at the Capitol, in the city of Washington, in pursuance of the proclamation of the President of the United States of the 15th day of July 1948.

ARTHUR VANDENBERG, President pro tempore, called the Senate to order at 12 o'clock noon.

Rev. Bernard Braskamp, D. D., pastor of the Gunton-Temple Memorial Presbyterian Church, Washington, D. C., offered the following prayer:

O Thou God of infallible wisdom, we have entered upon days which are fraught with perplexing problems and heavy responsibilities, but also with glorious opportunities and possibilities.

We pray that we may have the interpreting light and the clear and confident leading of Thy spirit in all our deliberations and decisions.

May the ideals and principles of our blessed Lord not only stir our emotions but our wills, and may every lofty God-inspired sentiment be translated into action and achievement.

Grant that it may be the goal of all our aspirations to glorify Thy great and holy name and to build Thy kingdom of peace and good will among men and nations.

Hear us for the sake of the Christ. Amen.

The PRESIDENT pro tempore. The proclamation of the President reconvening the Congress will be read by the clerk.

The Chief Clerk (Edward E. Mansur, Jr.) read the proclamation, as follows:

CONVENING THE CONGRESS BY THE PRESIDENT OF THE UNITED STATES OF AMERICA—A PROCLAMATION

Whereas the public interest requires that the Congress of the United States should be convened at 12 o'clock noon on Monday, the 26th day of July 1948, to receive such communication as may be made by the Executive;

Now, therefore, I, Harry S. Truman, President of the United States of America, do hereby proclaim and declare that an extraordinary occasion requires the Congress of the United States to convene at the Capitol in the city of Washington on Monday, the 26th day of July 1948, at 12 o'clock noon, of which all persons who shall at that time be entitled to act as Members thereof are hereby required to take notice.

In witness whereof, I have hereunto set my hand and caused to be affixed the great seal of the United States.

Done at the city of Washington this 15th day of July, in the year of our Lord 1948, and of the Independence of the United States of America the one hundred and seventy-third.

HARRY S. TRUMAN.

By the President:
    G. C. MARSHALL,
        Secretary of State.

### CALL OF THE ROLL

Mr. WHERRY. I suggest the absence of a quorum.

The PRESIDENT pro tempore. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

| | | |
|---|---|---|
| Aiken | Hickenlooper | O'Daniel |
| Baldwin | Hill | O'Mahoney |
| Barkley | Hoey | Pepper |
| Brewster | Holland | Reed |
| Brooks | Jenner | Revercomb |
| Butler | Johnson, Colo. | Robertson, Va. |
| Byrd | Johnston, S.C. | Robertson, Wyo. |
| Cain | Kem | Russell |
| Capehart | Kilgore | Saltonstall |
| Capper | Knowland | Smith |
| Connally | Langer | Sparkman |
| Cooper | Lodge | Stennis |
| Cordon | Lucas | Stewart |
| Donnell | McCarthy | Taft |
| Downey | McClellan | Taylor |
| Eastland | McFarland | Thomas, Okla. |
| Ecton | McGrath | Thomas, Utah |
| Ellender | McMahon | Thye |
| Ferguson | Magnuson | Tobey |
| Ferguson | Martin | Umstead |
| George | Maybank | Vandenberg |
| Green | Millikin | Watkins |
| Gurney | Moore | Wherry |
| Hatch | Murray | Wiley |
| Hawkes | Myers | Williams |
| Hayden | O'Conor | Young |

Mr. WHERRY. I announce that the Senator from Minnesota [Mr. BALL], the Senator from Ohio [Mr. BRICKER], the Senator from Delaware [Mr. BUCK], the Senator from South Dakota [Mr. BUSHFIELD], the Senator from Vermont [Mr. FLANDERS], the Senator from Oregon [Mr. MORSE], and the Senator from Iowa [Mr. WILSON] are necessarily absent.

The Senator from New Hampshire [Mr. BRIDGES] is detained on official business.

The Senator from Idaho [Mr. DWORSHAK] is absent on official state business.

The Senator from New York [Mr. IVES] is absent because of illness in his family.

The Senator from Nevada [Mr. MALONE] is absent on official committee business of the Committee on Public Works.

Mr. LUCAS. I announce that the Senator from New Mexico [Mr. CHAVEZ] is unavoidably detained.

The Senator from Arkansas [Mr. FULBRIGHT], the Senator from Nevada [Mr. McCARRAN], the Senator from Tennessee [Mr. McKELLAR], the Senator from Maryland [Mr. TYDINGS], and the Sena-

tor from New York [Mr. WAGNER] are necessarily absent.

The PRESIDENT pro tempore. Seventy-eight Senators having answered to their names, a quorum is present.

### THE JOURNAL

Mr. WHERRY. Mr. President, I ask unanimous consent that, without reading, the Journal of the proceedings of the Senate for the calendar days Friday, June 18, Saturday, June 19, and Sunday, June 20, 1948, be approved.

The PRESIDENT pro tempore. Without objection, the order is made.

ENROLLED BILLS AND JOINT RESOLUTIONS SIGNED AFTER ADJOURNMENT

Subsequent to the adjournment of the Senate on June 20, 1948, the President pro tempore, under the authority of House Concurrent Resolution 219, signed the following enrolled bills and joint resolutions, which had previously been signed by the Speaker of the House of Representatives:

S. 165. An act for the relief of Doris E. Snyder;

S. 418. An act to provide for water-pollution-control activities in the Public Health Service of the Federal Security Agency and in the Federal Works Agency, and for other purposes;

S. 695. An act to provide that the rates of compensation for disabilities incurred in active military or naval service other than in a period of war service shall be equal to 80 percent of the rates payable for similar disabilities incurred during active service in time of war;

S. 1243. An act to provide for the payment of revenues from certain lands into the tribal funds of the Confederated Tribes of the Warm Springs Reservation of Oregon, and for other purposes;

S. 1260. An act to create a commission to hear and determine the claims of certain motor carriers;

S. 1322. An act to provide a Federal charter for the Commodity Credit Corporation;

S. 1683. An act to confer jurisdiction on the State of New York with respect to offenses committed on Indian reservations within such State;

S. 1715. An act for the relief of Archie Hamilton and Delbert Hamilton;

S. 1717. An act for the relief of the estate of William R. Stigall, deceased;

S. 1969. An act to amend the Philippine Rehabilitation Act of 1946 in connection with the training of Filipinos as provided for in title III;

S. 2217. An act conferring jurisdiction upon the Court of Claims of the United States to hear, determine, and render judgment upon the joint claims of Silas Mason Co., Inc.; Walsh Construction Co.; and Atkinson-Kier Co.;

S. 2242. An act to authorize for a limited period of time the admission into the United States of certain European displaced persons for permanent residence, and for other purposes;

TEXAS STATE LIBRARY
Austin, Texas
82177

9253

App. O

PAGE 1

S. 2281. An act to provide for an air parcel-post service, and for other purposes;

S. 2371. An act validating certain conveyances of the Oregon Short Line Railroad Co. and the Union Pacific Railroad Co., and waiving, relinquishing, and disclaiming all title and all right of reverter and forfeiture of the United States of America to the lands described in said conveyance;

S. 2376. An act to provide a revolving fund for the purchase of agricultural commodities and raw materials to be processed in occupied areas and sold;

S. 2440. An act for the relief of Charles Duncan Montieth;

S. 2554. An act to promote the common defense by providing for the retention and maintenance of a national reserve of industrial productive capacity, and for other purposes;

S. 2621. An act authorizing the extension of the functions and duties of Federal Prison Industries, Inc., to military disciplinary barracks;

S. 2655. An act to provide for the common defense by increasing the strength of the armed forces of the United States, including the Reserve components thereof, and for other purposes;

S. 2676. An act to authorize the Secretary of the Interior to convey a certain parcel of land in St. Louis County, Minn., to the University of Minnesota;

S. 2692. An act to terminate the retirement system of the Office of the Comptroller of the Currency, and to transfer that retirement fund to the Civil Service Retirement and Disability Fund;

S. 2698. An act to authorize the transfer of horses and equipment owned by the United States Army to the New Mexico Military Institution, a State institution, and for other purposes;

S. 2705. An act to reimburse the James & Phelps Construction Co.;

S. 2709. An act for the relief of Stefan Magura and Michal Magura;

S. 2730. An act to include as allowable service under the act of July 6, 1945, service performed in the military forces and on war transfer by employees in the field service of the Post Office Department;

S. 2743. An act providing for the more expeditious determination of certain claims filed by Ute Indians;

S. 2747. An act to amend the Canal Zone Code for the purpose of incorporating the Panama Railroad Company;

S. 2767. An act to provide assistance in the recruitment and distribution of farm labor for the increased production, harvesting, and preparation for market of agricultural commodities to meet domestic needs and foreign commitment;

S. 2780. An act to amend the Servicemen's Readjustment Act of 1944, as amended, and for other purposes;

S. 2794. An act to authorize the Administrator of Veterans' Affairs to prescribe the rates of pay for certain positions at field installations;

S. 2830. An act to extend for 2 years the authority to provide for the maintenance of a domestic tin-smelting industry;

S. 2849. An act to authorize the Administrator of Veterans' Affairs to convey a certain tract of land in the State of Arkansas to Washington County, Ark.;

S. 2861. An act to assist by grants-in-aid the Republic of the Philippines in providing medical care and treatment for certain veterans;

S. 2877. An act to amend the Reconstruction Finance Corporation Act, as amended;

H. R. 333. An act for the relief of sundry residents of Alaska, the veterans of World War II;

H. R. 2209. An act for the relief of the estate of Vito Abarno;

H. R. 2269. An act for the relief of Frank A. Constable;

H. R. 2793. An act to amend section 5, Home Owners' Loan Act of 1933, and for other purposes;

H. R. 3190. An act to revise, codify, and enact into positive law title 18 of the United States Code, entitled "Crimes and Criminal Procedure";

H. R. 3416. An act to provide for the establishment of the Pensacola National Monument;

H. R. 4044. An act to amend the Trading With the Enemy Act, as amended; to create a commission to make an inquiry and report with respect to war claims; and to provide for relief for internees in certain cases;

H. R. 4917. An act to provide further benefits for certain employees of the United States who are veterans of World War II and lost opportunity for probational civil-service appointments by reason of their service in the armed forces of the United States, and who, due to service-connected disabilities, are unable to perform the duties of the positions for which examinations were taken;

H. R. 5416. An act to promote the interests of the Fort Hall Indian irrigation project, Idaho; and for other purposes;

H. R. 5882. An act to authorize the Secretary of the Army, the Secretary of the Navy, and the Secretary of the Air Force to donate excess and surplus property for educational purposes;

H. R. 5904. An act to continue the Virgin Islands Company as an agency of the United States;

H. R. 5248. An act to authorize the Secretary of Agriculture to stabilize prices of agricultural commodities; to amend section 22 of the Agricultural Adjustment Act, reenacted by the Agricultural Marketing Agreement Act of 1937; and for other purposes;

H. R. 6402. An act to provide for extension of the terms of office of the present members of the Atomic Energy Commission;

H. R. 6448. An act to authorize the Administrator of Veterans' Affairs to convey certain land in Tennessee to the city of Johnson City;

H. R. 6465. An act to amend and supplement section 2 of the act approved August 30, 1935, relating to the construction and financing of toll bridges over the Delaware River by the Delaware River Joint Toll Bridge Commission of the Commonwealth of Pennsylvania and the State of New Jersey;

H. R. 6481. An act making appropriations for Government corporations and independent executive agencies for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6527. An act to provide assistance to certain local school agencies overburdened with war-incurred or postwar national-defense-incurred enrollments;

H. R. 6641. An act to amend the Civil Service Retirement Act of May 29, 1930, to provide annuities for certain surviving spouses of annuitants retired prior to April 1, 1948;

H. R. 6771. An act making appropriations for military functions administered by the National Military Establishment for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6801. An act making appropriations for foreign aid, and for other purposes;

H. R. 6808. An act to permit refund or credit to brewers of taxes paid on beer lost in bottling operations;

H. R. 6829. An act making supplemental appropriations for the Executive Office and sundry independent executive bureaus, boards, commissions, and offices for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6916. An act to provide for permanent postal rates and to provide pay increases for Government employees;

H. R. 6935. An act making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1948, and for other purposes;

S. J. Res. 177. Joint resolution providing for participation by the Government of the United States in the Pan American Railway Congress, and authorizing an appropriation therefor;

S. J. Res. 219. Joint resolution to continue until March 1, 1919, the authority of the United States Maritime Commission to make provision for certain ocean transportation service to, from, and within Alaska;

H. J. Res. 190. Joint resolution authorizing the printing and binding of Cannon's Procedure in the House of Representatives and providing that the same shall be subject to copyright by the author;

H. J. Res. 305. Joint resolution authorizing the issuance of a special series of stamps commemorative of the fiftieth anniversary of the organization of the Rough Riders (First Volunteer U. S. Cavalry) of the Spanish-American War;

H. J. Res. 327. Joint resolution to authorize the issuance of a special series of stamps commemorative of Juliette Low, founder and organizer of Girl Scouting in the United States of America; and

H. J. Res. 433. Joint resolution permitting the free entry of certain articles imported to promote international good will, and for other purposes.

ENROLLED BILLS AND JOINT RESOLUTIONS PRESENTED AFTER ADJOURNMENT

Subsequent to the adjournment of the Senate on June 20, 1948, the following enrolled bills and joint resolutions, heretofore duly signed by the Presiding Officers of the two Houses, were presented to the President of the United States by the Secretary of the Senate:

On June 21, 1948:

S. 83. An act authorizing the naturalization of Elizabeth Pickering Winn;

S. 1107. An act relating to the arming of American vessels;

S. 1639. An act authorizing the repair and rehabilitation of irrigation works damaged by flood and the prevention of flood damage in the Fort Sumner irrigation district, and for other purposes;

S. 1730. An act for the relief of Mrs. Anna V. Reyer, Alexander A. Reyer, and Vitaly A. Reyer;

S. 1820. An act to confer jurisdiction on the State of Iowa over offenses committed by or against Indians on the Sac and Fox Indian Reservation;

S. 2186. An act to amend section 5 of the act entitled "An act to amend the laws relating to navigation, and for other purposes";

S. 2192. An act to amend the Interstate Commerce Act so as to permit the issuance of free passes to time inspectors of carriers subject to part I of such act;

S. 2341. An act to authorize an increase in the annual appropriation for the maintenance and operation of the Gorgas Memorial Laboratory;

S. 2510. An act to provide for certain administrative expenses in the Post Office Department, including retainment of pneumatic-tube systems, and for other purposes;

S. 2706. An act to authorize the Federal Works Administrator to lease for commercial purposes certain space in the building located at 811 Vermont Avenue NW., Washington, D. C., commonly known as the Lafayette Building;

S. 2739. An act to authorize the issuance of a stamp commemorative of the two hun-

# NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## To all to whom these presents shall come. Greeting:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf,

r the seal of the National Archives of the United States, that the attached reproduction(s) is a true and

copy of documents in his custody.

| SIGNATURE |
|---|
| *Aloha South* |

| NAME | DATE |
|---|---|
| ALOHA SOUTH | July 27, 2007 |

| TITLE |
|---|
| ASST. BRANCH CHIEF, OLD MILITARY & CIVIL RECORDS |

| NAME AND ADDRESS OF DEPOSITORY |
|---|
| NATIONAL ARCHIVES & RECORDS ADMINISTRATION |
| 700 PENNSYLVANIA AVENUE, NW |
| WASHINGTON, DC 20408 |

NA FORM 14007 (10-86)

App.    P

[PUBLIC LAW 772]
[CHAPTER 645]

H. R. 3190



Eightieth Congress of the United States of America
At the Second Session

Begun and held at the City of Washington on Tuesday, the sixth
day of January, one thousand nine hundred and forty-eight

## AN ACT

To revise, codify, and enact into positive law, Title 18 of the United
States Code, entitled "Crimes and Criminal Procedure".

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That Title 18 of the
United States Code, entitled "Crimes and Criminal Procedure", is
hereby revised, codified, and enacted into positive law, and may be
cited as "Title 18, U. S. C., § ———", as follows:

### TITLE 18—CRIMES AND CRIMINAL PROCEDURE

| Part | Sec. |
|---|---|
| I. Crimes | 1 |
| II. Criminal Procedure | 3001 |
| III. Prisons and Prisoners | 4001 |
| IV. Correction of Youthful Offenders | 5001 |

PART I—CRIMES

| Chapter | Sec. |
|---|---|
| 1. General provisions | 1 |
| 3. Animals, birds and fish | 41 |
| 5. Arson | 81 |
| 7. Assault | 111 |
| 9. Bankruptcy | 151 |
| 11. Bribery and graft | 201 |
| 13. Civil rights | 241 |
| 15. Claims and services in matters affecting government | 281 |
| 17. Coins and currency | 331 |
| 19. Conspiracy | 371 |
| 21. Contempts constituting crimes | 401 |
| 23. Contracts | 431 |
| 25. Counterfeiting and forgery | 471 |
| 27. Customs | 541 |
| 29. Elections and political activities | 591 |
| 31. Embezzlement and theft | 641 |
| 33. Emblems, insignia, and names | 701 |
| 35. Escape and rescue | 751 |
| 37. Espionage and censorship | 791 |
| 39. Explosives and combustibles | 831 |
| 41. Extortion and threats | 871 |
| 43. False personation | 911 |
| 45. Foreign relations | 951 |
| 47. Fraud and false statements | 1001 |
| 49. Fugitives from justice | 1071 |
| 51. Homicide | 1111 |
| 53. Indians | 1151 |
| 55. Kidnaping | 1201 |
| 57. Labor | 1231 |
| 59. Liquor traffic | 1261 |
| 61. Lotteries | 1301 |
| 63. Mail fraud | 1341 |
| 65. Malicious mischief | 1361 |
| 67. Military and Navy | 1381 |
| 69. Nationality and citizenship | 1421 |
| 71. Obscenity | 1461 |
| 73. Obstruction of justice | 1501 |

H. R. 3190—187

in the several districts through which it may be necessary for him to pass with such prisoner, so far as such power is requisite for the prisoner's safe-keeping.

§ 3194. TRANSPORTATION OF FUGITIVE BY RECEIVING AGENT

Any agent appointed as provided in section 3182 of this title who receives the fugitive into his custody is empowered to transport him to the State or Territory from which he has fled.

§ 3195. PAYMENT OF FEES AND COSTS

All costs or expenses incurred in any extradition proceeding in apprehending, securing, and transmitting a fugitive shall be paid by the demanding authority.

All witness fees and costs of every nature in cases of international extradition, including the fees of the commissioner, shall be certified by the judge or commissioner before whom the hearing shall take place to the Secretary of State of the United States, and the same shall be paid out of appropriations to defray the expenses of the judiciary or the Department of Justice as the case may be.

The Attorney General shall certify to the Secretary of State the amounts to be paid to the United States on account of said fees and costs in extradition cases by the foreign government requesting the extradition, and the Secretary of State shall cause said amounts to be collected and transmitted to the Attorney General for deposit in the Treasury of the United States.

CHAPTER 211.—JURISDICTION AND VENUE

Sec.
3231. District courts.
3232. District of offense—Rule.
3233. Transfer within District—Rule.
3234. Change of venue to another district—Rule.
3235. Venue in capital cases.
3236. Murder or manslaughter.
3237. Offenses begun in one district and completed in another.
3238. Offenses not committed in any district.
3239. Threatening communications.
3240. Creation of new district or division.
3241. Jurisdiction of offenses under certain sections.
3242. Indians committing certain offenses; acts on reservations.
3243. Jurisdiction of State of Kansas over offenses committed by or against Indians on Indian reservations.

§ 3231. DISTRICT COURTS

The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.

§ 3232. DISTRICT OF OFFENSE—(RULE)

SEE FEDERAL RULES OF CRIMINAL PROCEDURE

Proceedings to be in district and division in which offense committed, Rule 18.

H. R. 3190—240

| Date | Statutes at Large | | | | U. S. Code | |
|---|---|---|---|---|---|---|
| | Chapter | Section | Volume | Page | Title | Section |
| **1940—Continued** | | | | | | |
| Mar. 29 | 72 | | 54 | 80 | 18 | 97 |
| Apr. 17 | 101 | | 54 | 110 | 28 | 421 |
| Apr. 30 | 164 | | 54 | 171 | 18 | 86 |
| Do | 176 | 1–3 | 54 | 175, 176 | 18 | 733, 733a, 733b |
| June 6 | 241 | | 54 | 234 | 18 | 453 |
| June 8 | 278 | | 54 | 249 | 28 | 217a |
| Do | 296 | | 54 | 255, 256 | 18 | 412a |
| June 11 | 322 | | 54 | 304 | 18 | 451 |
| Do | 336 | 1–3 | 54 | 305 | 18 | 460–471 |
| June 13 | 350 | | 54 | 391 | 18 | 252 |
| June 25 | 428 | | 54 | 671, 672 | 18 | 75c |
| June 25 | 439 | 1–5 | 54 | 670, 671 | 18 | 9–13 |
| June 29 | 444 | | 54 | 688 | 18 | 627 |
| Do | 449 | 1–5 | 54 | 692, 693 | 18 | 641, 715, 719, 723d, 755k |
| Do | 455 | | 54 | 695 | 12 | 588b |
| July 10 | 507 | | 54 | 747 | 18 | 552 |
| July 19 | 640 | 1, 3, 5, 6 | 54 | 767, 772 | 18 | 61a, 611, 611n–1, 611 |
| Oct. 8 | 762 | | 54 | 1021 | 18 | 303 |
| Oct. 9 | 777 | 5 | 54 | 1028 | 18 | 382–385 |
| Do | 785 | 1–5 | 54 | 1055, 1056 | 18 | 576, 576a–576d |
| Oct. 14 | 878 | | 54 | 1184 | 18 | 590a |
| Do | 878 | 546 (a–b), (f), 547 | 54 | 1183–1185 | 8 | 746 (a–b), (f), 747 |
| Oct. 17 | 897 | 1–6 | 54 | 1201–1204 | 18 | 14, 14 note 15–17 |
| Nov. 30 | 926 | | 54 | 1220, 1221 | 50 | 101, 104–108 |
| **1941—**May 31 | 145 | 1 (part) | 55 | 220 | 18 | 647 |
| June 14 | 204 | | 55 | 242 | 18 | 753f |
| June 21 | 212 | | 55 | 254, 255 | 18 | 746a, 746b |
| June 28 | 261 | 10 | 55 | 344 | 12 | 1731 (d) |
| July 9 | 288 | | 55 | 561 | 18 | 296a |
| July 11 | 297 | | 55 | 583 | 18 | 316a |
| Aug. 18 | 366 | 1–4 | 55 | 631, 632 | 18 | 419a, 419b, 419c, 419d |
| Aug. 21 | 388 | | 55 | 655 | 50 | 104 |
| Oct. 21 | 453 | | 55 | 743, 744 | 18 | 753f |
| Nov. 15 | 473 | 1, 2 | 55 | 763, 764 | 18 | 106, 107 |
| Nov. 22 | 490 | | 55 | 779 | 18 | 689 |
| Dec. 22 | 618 | | 55 | 863 | 18 | 631 |
| Dec. 31 | 642 | 1–3 | 55 | 876, 877 | 18 | 503, 503, note, 504 |
| **1942—**Mar. 7 | 180 | | 56 | 141 | 18 | 361 |
| Mar. 10 | 178 | 1 (part) | 56 | 168 | 18 | 647 |
| Mar. 21 | 191 | | 56 | 178 | 18 | 97a |
| Mar. 27 | 199 | 1100 | 56 | 194 | 50 App. | 644a |
| May 6 | 305 | 1 | 56 | 271, 272 | 18 | 562 |
| Aug. 24 | 555 | 1, 2 | 55 | 747, 748 | 18 | 503a |
| Sept. 24 | 561 | 214 | 56 | | 50 | 544 |
| Dec. 24 | 528 | 1, 2, 3 | 56 | 1057 | 18 | 420, 420a, 420b |
| Do | 534 | | 56 | 1087, 1088 | 50 | 101 |
| Nov. 20 | 823 | | 57 | 566 | 50 | 647 |
| **1943—**June 30 | 179 | 1 (part) | 57 | 501 | 18 | 87 |
| **1944—**Mar. 4 | 53 | 1, 2, 3, 4 | 58 | 111 | 18 | 472, 472, 474 |
| Apr. 1 | 151 | | 58 | 143, 150 | 18 | 353n |
| Apr. 4 | 152 | | 58 | 158 | 18 | 409 |
| July 1 | 373 | 10 (a), (d), (e) | 58 | 657, 668 | 41 | 118 |
| Do | 358 | 10 (b) | 58 | 667 | 18 | 500a |
| Sept. 27 | 415 | | 58 | 752 | 18 | 394 |
| Oct. 3 | 479 | 23 | 58 | 781 | 18 | 560a |
| Dec. 20 | 635 | 4 | 58 | 837 | 12 | 1130n |
| Dec. 23 | 708 | 1, 2, 3 | 58 | 944, 915 | 18 | 62, 62a, 62b |
| **1945—**Apr. 20 | 103 | | 59 | 101 | 18 | 97b |
| May 18 | 126 | | 59 | 166 | 18 | 618a |
| June 5 | 173 | | 59 | 234, 235 | 18 | 241, 241a, 242 |
| July 31 | 339 | 9 | 59 | 516 | 41 | 304b |
| Sept. 24 | 352 | 1, 2, 3 | 59 | 535 | 18 | 403 |
| **1946—**Apr. 15 | 208 | | 60 | 152 | 18 | 616a |
| July 3 | 537 | | 60 | 630 | 10 | 17 note, 420c–420e–2, 63 note, 101 note, 181 note |
| July 10 | 547 | | 60 | 534, 535 | 18 | 641 |
| July 24 | 605 | | 60 | 666 | 18 | 409–411 |
| Aug. 2 | 725 | | 60 | 780 | 18 | 626a |
| Aug. 14 | 954 | 5 | 60 | 1,064 | 7 | 1, 028 |
| **1947—**Apr. 16 | 39 | | 61 | 52 | 18 | 611 |
| May 19 | 79 | | 61 | 97 | 18 | 744b–1 |
| June 21 | 111 | | 61 | 134 | 18 | 344 |
| June 23 | 120 | 304 | 61 | 159 | 2 | 251 |

41 First proviso, only, appearing on this page.
42 First proviso, only, appearing on this page.
43 As added by Act, Apr. 1, 1944, ch. 150 (part), 58 Stat. 146.
44 Second proviso, only, appearing on this page.
45 First, second, third, and sixth paragraphs, only, of this section of title 41 of the United States Code, 1940 edition.
46 Only the provisions amending section 52 of Act, July 23, 1937, ch. 617, title IV, 50 Stat. 631, 632.

*Approved*
*June 25 1948*

*Harry S Truman*

*12:23 P. M. E. D. T.*

*Joseph W. Martin Jr.*
*Speaker of the House of Representatives.*

*Arthur H. Vandenberg*
*President of the Senate pro tempore.*

App.   P

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

## 𝕿𝖔 𝖆𝖑𝖑 𝖙𝖔 𝖜𝖍𝖔𝖒 𝖙𝖍𝖊𝖘𝖊 𝖕𝖗𝖊𝖘𝖊𝖓𝖙𝖘 𝖘𝖍𝖆𝖑𝖑 𝖈𝖔𝖒𝖊. 𝕲𝖗𝖊𝖊𝖙𝖎𝖓𝖌:

By virtue of the authority vested in me by the Archivist of the United States, I certify on his behalf, ...der the seal of the National Archives of the United States, that the attached reproduction(s) is a true and ...t copy of documents in his custody.

| SIGNATURE | |
|---|---|
| *R. H. Hunt* | |
| NAME | DATE |
| Richard H. Hunt | 05/11/07 |
| TITLE Director | |
| Center for Legislative Archives | |
| NAME AND ADDRESS OF DEPOSITORY | |
| The National Archives Washington, D.C. 20408 | |

NA FORM APR 85 1407-A

App.  P

PAGE 5

**H. R.**          An Act

3190          to revise, codify, and enact into positive

law, Title 18 of the United States Code, entitled "Crimes

and Criminal Procedure.".

Examined and found truly enrolled.

K. M. LeCompte

*Chairman.*

--------------------------------- June 18 19 48

GPO   69792

App. P

PAGE 6

80th CONGRESS
1st Session

# H. R. 3190

---

# AN ACT

To revise, codify, and enact into positive law, Title 18 of the
United States Code, entitled "Crimes and Criminal Pro-
cedure".

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    That Title 18 of the United States Code, entitled "Crimes

4    and Criminal Procedure", is hereby revised, codified, and

5    enacted into positive law, and may be cited as "Title 18,

6    U. S. C., §—", as follows:

1   international extradition, including the fees of the com-
2   missioner, shall be certified by the judge or commissioner
3   before whom the hearing shall take place to the Secretary
4   of State of the United States, and the same shall be paid
5   out of appropriations to defray the expenses of the judiciary
6   or the Department of Justice as the case may be.

7       The Attorney General shall certify to the Secretary
8   of State the amounts to be paid to the United States on
9   account of said fees and costs in extradition cases by the
10  foreign government requesting the extradition, and the
11  Secretary of State shall cause said amounts to be collected
12  and transmitted to the Attorney General for deposit in the
13  Treasury of the United States.

CHAPTER 211.—JURISDICTION AND VENUE

Sec.
3231. District courts.
3232. District of offense—Rule.
3233. Transfer within District—Rule.
3234. Change of venue to another district—Rule.
3235. Venue in capital cases.
3236. Murder or manslaughter.
3237. Offenses begun in one district and completed in another.
3238. Offenses not committed in any district.
3239. Threatening communications.
3240. Creation of new district or division.
3241. Jurisdiction of offenses under certain sections.
3242. Indians committing certain offenses; acts on reservations.
3243. Jurisdiction of State of Kansas over offenses committed by or
       against Indians on Indian reservations.

14  § 3231.  DISTRICT COURTS

15      Offenses against the United States shall be cognizable
16  in the district courts of the United States, but nothing in
17  this title shall be held to take away or impair the jurisdiction
18  of the courts of the several states under the laws thereof.

App.  P
Page 8

80TH CONGRESS
1ST SESSION

# H. R. 3190

# AN ACT

To revise, codify, and enact into positive law,
Title 18 of the United States Code, entitled
"Crimes and Criminal Procedure".

JUN 17 1948

(CALENDAR DAY)
JUN 18 1948

House agrees to Senate amendments.

In the Senate of the United States,

JUN 18    LEG. DAY JUN 15 '48

Resolved, That this bill pass with
amendments.
Attest:

*Carl A. Loeffler*
*Secretary*

App.

PAGE 9

COPY

From

THE NATIONAL ARCHIVE
Records of the U.S.
House of
Representatives
Record Group 233

HR 80A-B9
HR 3190

471

| Date | Statutes at Large | | | | U. S. Code | |
|------|-------------------|---|---|---|------------|---|
| | Chapter | Section | Volume | Page | Title | Section |
| 1946—July 10__ | 547 | _____ | 60 | 524, 525 | 18 | 641 |
| July 24__ | 606 | _____ | 60 | 656 | 18 | 409–411 |
| Aug. 2___ | 735 | _____ | 60 | 789 | 18 | 408o |
| Aug. 14__ | 964 | 88 3 | 60 | 1064 | 7 | 1026 |

88 Only the provisions amending section 52 of Act July 22, 1937, ch. 517, title IV, 50 Stat. 531, 532.

Passed the House of Representatives May 12, 1947.

Attest:

*John Andrews*

*Clerk.*

App.

Page 11

S. 2790. An act to amend the Servicemen's Readjustment Act of 1944, as amended, and for other purposes; and

S. 2877. An act to amend the Reconstruction Finance Corporation Act, as amended.

BILLS AND JOINT RESOLUTIONS PRESENTED TO THE PRESIDENT AFTER ADJOURNMENT

Mr. LeCOMPTE, from the Committee on House Administration, reported that that committee did on the following dates present to the President, for his approval, bills and joint resolutions of the House of the following titles:

On June 21, 1948:

H. R. 371. An act for the relief of Jenness O. Thomas;

H. R. 554. An act for the relief of Sarah Lee Cregg;

H. R. 700. An act for the relief of Anthony Arancio;

H. R. 703. An act for the relief of Leon Nikolaivich Volkov;

H. R. 551. An act for the relief of Adney W. Gray;

H. R. 911. An act for the relief of Kam Fong Chun, Mr. and Mrs. Jose Diaz, Joseph de Souza, Mr. and Mrs. Kenneth Ayres, and Jose Oducado;

H. R. 912. An act for the relief of Hiro Higa and Kana Higa;

H. R. 915. An act to confer jurisdiction upon the District Court of the United States for the Territory of Hawaii to hear, determine, and render judgment on the claims of the executors and trustees of the estate of L. L. McCandless, deceased, as their interests may appear, against the United States of America;

H. R. 1076. An act for the relief of Chester O. Glenn;

H. R. 1409. An act for the relief of Frantisek Jiri Pavlik or Georg Pavlik;

H. R. 1490. An act for the relief of the United States Radiator Corp., of Detroit, Mich.;

H. R. 1642. An act for the relief of Miss Roselia M. Kostenbader;

H. R. 1220. An act for the relief of James D. Sigler and Frederick F. Vogelsang III;

H. R. 1733. An act for the relief of G. C. Hedrick;

H. R. 1734. An act for the relief of Gabel Construction Co.;

H. R. 1779. For the relief of the Winona Machine & Foundry Co., a corporation of Winona, Minn.;

H. R. 1780. An act for the relief of the Cannon Valley Milling Co.;

H. R. 1910. An act for the relief of the legal guardian of Robert Lee Threatt, a minor;

H. R. 1950. An act for the relief of the Growers Fertilizer Co., a Florida corporation;

H. R. 2096. An act to amend section 11 of the act approved June 5, 1942 (56 Stat. 317), relating to Mammoth Cave National Park in the State of Kentucky, and for other purposes;

H. R. 2122. An act for relief of the Massman Construction Co.;

H. R. 2198. An act for relief of Robert E. Graham;

H. R. 2352. An act to provide for sale to the Crow tribe of interests in the estates of deceased Crow Indian allottees, and to provide for the sale of certain lands to the Board of County Commissioners of Comanche County, Okla., and for other purposes;

H. R. 2372. An act for the relief of George Cleve Williams;

H. R. 2395. An act for the relief of the Cypress Creek drainage district of the State of Arkansas;

H. R. 2431. An act for the relief of the estate of David Jefferson Janow, deceased;

H. R. 2469. An act for the relief of James W. Adkins and Mary Clark Adkins.

H. R. 2551. An act for the relief of William B. Ramsey;

H. R. 2552. An act for the relief of Thomas A. Hanley;

H. R. 2696. An act for the relief of Otto Kraus, receiver of the Neafie and Levy Ship & Engine Building Co.;

H. R. 2729. An act for the relief of the legal guardian of Rose Mary Ammirato, a minor;

H. R. 2732. An act for the relief of Dennis Stanton;

H. R. 2734. An act for the relief of Joseph M. Henry;

H. R. 2878. An act to amend the act approved May 18, 1928 (45 Stat. 602), as amended, to revise the roll of the Indians of California provided therein;

H. R. 2889. An act for the relief of Aubrey F. Houston;

H. R. 2918. An act for the relief of the Sumner County Colored Fair Association;

H. R. 3092. An act for the relief of the estate of Rudolph Maximilian Goepp, Jr.;

H. R. 3218. An act to authorize an emergency fund for the Bureau of Reclamation to assure the continuous operation of its irrigation and power systems;

H. R. 3261. An act for the relief of Capt. Carroll C. Garretson;

H. R. 3427. An act for the relief of Mrs. Mary H. Overall and Thomas I. Baker;

H. R. 3499. An act for the relief of Petrol Corp.;

H. R. 3566. An act to amend subsection (c) of section 19 of the Immigration Act of 1917, as amended, and for other purposes;

H. R. 3735. An act to authorize the Secretary of the Army to sell and convey to Okaloosa County, State of Florida, all the right title, and interest of the United States in and to a portion of Santa Rosa Island, Fla., and for other purposes;

H. R. 3937. An act for the relief of William O. Reese;

H. R. 3999. An act to authorize the Attorney General to adjudicate certain claims resulting from evacuation of certain persons of Japanese ancestry under military orders;

H. R. 4047. An act for the relief of Edmund Huppler;

H. R. 4071. An act to amend sections 301 (k) and 304 (a) of the Federal Food, Drug, and Cosmetic Act, as amended;

H. R. 4103. An act for the relief of Charles M. Davis;

H. R. 4199. An act for the relief of George Haniotis;

H. R. 4272. An act to provide for the procurement and supply of Government headstones or markers for unmarked graves of members of the armed forces dying in the service or after honorable discharge therefrom, and other persons, and for other purposes;

H. R. 4330. An act to authorize the Secretary of State to perform certain consular-type functions within the United States and its Territories and possessions;

H. R. 4367. An act authorizing the Hidalgo Bridge Co., its heirs, legal representatives, and assigns, to construct, maintain, and operate a railroad toll bridge across the Rio Grande, at or near Hidalgo, Tex.;

H. R. 4435. An act to amend the Civil Aeronautics Act of 1938 by redefining certain powers of the Administrator, by authorizing delegation of certain powers by the Civil Aeronautics Board to the Administrator, and for other purposes;

H. R. 4441. An act for the relief of the Williams J. Burns International Detective Agency;

H. R. 4452. An act for the relief of Douglas L. Craig;

H. R. 4462. An act authorizing the conveyance of certain lands in Park County, Wyo., to the State of Wyoming;

H. R. 4518. An act for the relief of the Moore Dry Dock Co., of Oakland, Calif.;

H. R. 4518. An act for the relief of Gerald S. Furman;

H. R. 4597. An act for the relief of Mrs. Harry A. Light (formerly Mrs. Elsie Purvey);

H. R. 4590. An act for the relief of Mrs. Loraine Thomsen;

H. R. 4635. An act to amend section 11 of an act entitled "An act to regulate barbers in the District of Columbia, and for other purposes";

H. R. 4644. An act for the relief of E. Brevard Walker, trading as E. B. Walker Lumber Co.;

H. R. 4690. An act to amend the act of July 30, 1947, permitting vessels of Canadian registry to transport certain merchandise between Hyder, Alaska, and points in the continental United States;

H. R. 4816. An act to amend section 824 of the Public Health Service Act so as to provide a minimum allotment of $100,000 to each State for the construction of hospitals;

H. R. 4856. An act to delay the liquidation of mineral interests reserved to the United States as required by the Farmers' Home Administration Act of 1946, and for other purposes;

H. R. 4881. An act for the relief of Dimitri Petrou;

H. R. 4962. An act to provide pensions for certain widows of veterans of the Spanish-American War, including the Boxer Rebellion and the Philippine Insurrection;

H. R. 5058. An act to provide for the establishment of the Independence National Historical Park, and for other purposes;

H. R. 5252. An act to extend the time for commencing the construction of a toll bridge across the Rio Grande at or near Rio Grande City, Tex.;

H. R. 5355. An act authorizing a per capita payment of $50 each to the members of the Red Lake Band of Chippewa Indians from the proceeds of the sale of timber and lumber on the Red Lake Reservation;

H. R. 5508. An act to amend the Veterans' Preference Act of 1944 to extend the benefits of such act to certain mothers of veterans;

H. R. 5710. An act to amend the act entitled "An act to expedite the provision of housing in connection with national defense, and for other purposes," approved October 14, 1940, as amended;

H. R. 5716. An act to record the lawful admission to the United States for permanent residence of Patricia Schwartz and Beatrice Schwartz;

H. R. 5734. An act to authorize the Administrator of Veterans' Affairs to convey to the city of Cheyenne, Wyo., for public-park and golf-course purposes, certain land situated within the boundaries of the Veterans' Administration center at Cheyenne, Wyo.;

H. R. 5750. An act to provide for the extension and improvement of post-office facilities at Los Angeles, Calif., and for other purposes;

H. R. 5861. An act to direct the Secretary of Agriculture to convey certain land to the State of Oklahoma;

H. H. 5886. An act to amend section 332 (a) of the Nationality Act of 1940;

H. R. 5888. An act to amend and supplement the Federal-Aid Road Act approved July 11, 1916 (39 Stat. 355), as amended and supplemented, to authorize appropriations for continuing the construction of highways, and for other purposes;

H. R. 6039. An act to authorize the permanent appointment in the Regular Army of one officer in the grade of general and to authorize the permanent appointment in the Regular Air Force of one officer in the grade of general, and for other purposes;

H. R. 6089. An act to amend the act of July 6, 1945 (Public Law 134);

H. R. 6090. An act authorizing the Secretary of the Interior to issue patents for lands held under color of title;

H. R. 6096. An act to provide for making available the Government-owned alcohol plants at Muscatine, Iowa; Kansas City, Mo.; and Omaha, Nebr., for the production of products from agricultural commodities in the furtherance of authorized programs of

App.
Page 1


the Department of Agriculture, and for other purposes;

H. R. 6116. An act to amend the Trading With the Enemy Act;

H. R. 6162. An act to make imported beer and other similar imported fermented liquors subject to the internal-revenue tax on fermented liquor;

H. R. 6184. An act for the relief of the East Coast Ship & Yacht Corp., of Noank, Conn.;

H. R. 6186. An act for reimbursement of the Hawaiian Dredging Co., Ltd.;

H. R. 6224. An act for the relief of John Watkins;

H. R. 6293. An act to amend the act of June 19, 1934, providing for the establishment of the National Archives, so as to provide that certain fees collected by the Archivist shall be available for disbursement in the interest of the National Archives;

H. R. 6318. An act to amend section 3 of the Standard Time Act of March 19, 1918, as amended, relating to the placing of a certain portion of the State of Idaho in the third time zone;

H. R. 6327. An act to provide for the issuance of a license to practice chiropractic in the District of Columbia to Samuel O. Burdette;

H. R. 6428. An act to reimburse the Luther Bros. Construction Co.;

H. R. 6452. An act to amend section 7 of the act entitled "An act making appropriations to provide for the government of the District of Columbia for the fiscal year ending June 30, 1903, and for other purposes,": approved July 1, 1902, as amended;

H. R. 6454. An act to amend the Civil Service Retirement Act of May 29, 1930, as amended, to provide annuities for certain Federal employees who have rendered at least 20 years' service in the investigation, apprehension, or detention of persons suspected or convicted of offenses against the United States;

H. R. 6507. An act to amend subsection 602 (f) of the National Service Life Insurance Act of 1940, as amended, to authorize renewal of level premium term insurance for a second 5-year period, and for other purposes;

H. R. 6598. To amend section 2 of the act entitled "An act to provide for insanity proceedings in the District of Columbia," approved August 9, 1939;

H. R. 6633. An act to authorize an exchange of lands and interests therein between the city of San Diego, Calif., and the United States, and for other purposes;

H. R. 6634. An act to authorize the issuance of a special series of stamps in honor and commemoration of Moina Michael, originator of Flanders Field memorial poppy idea;

H. R. 6698. An act to authorize the course of instruction at the United States Naval Academy to be given to not exceeding four persons at a time from the Republic of the Philippines;

H. R. 6707. An act to amend the Office Personnel Act of 1947 (Public Law 381), 80th Cong.), and for other purposes;

H. R. 6818. An act to amend title X of the Social Security Act (relating to aid to the blind) so as to provide greater encouragement to blind recipients thereunder to become self-supporting;

H. R. 6822. An act to continue the authorization for the appointment of two additional Assistant Secretaries of State;

H. R. 6860. An act to amend the Federal Airport Act;

H. R. 6412. An act to codify and enact into law title 3 of the United States Code, entitled "The President";

H. R. 6419. An act authorizing the construction, repair, and preservation of certain public works on rivers and harbors for navigation, flood control, and for other purposes;

H. R. 6705. An act making appropriations for the Department of the Interior for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6772. An act making appropriations for the Department of the Navy and the naval service for the fiscal year ending June 30, 1949, and for other purposes;

H. J. Res. 397. Joint resolution to increase the sum authorized to be appropriated for the presentation to Eire of a statue of Commodore John Barry;

H. J. Res. 421. Joint resolution to authorize and direct the Commissioners of the District of Columbia to investigate and study certain matters relating to parking lots in the District of Columbia;

H. J. Res. 427. Joint resolution correcting act establishing the Theodore Roosevelt National Memorial Park, as amended;

H. J. Res. 428. Joint resolution providing an extension of time for claiming credit or refund with respect to war losses; and

H. J. Res. 429. Joint resolution relating to the marital deduction, for estate-tax purposes, in the case of life insurance or annuity payments.

On June 23, 1948:

H. R. 933. An act for the relief of sundry residents of Alaska, veterans of World War II;

H. R. 2009. An act for the relief of the estate of Vito Abarno;

H. R. 2269. An act for the relief of Frank A. Constable;

H. R. 2198. An act to amend section 5, Home Owners' Loan Act of 1933, and for other purposes;

H. R. 3190. An act to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure";

H. R. 3416. An act to provide for the establishment of the Pensacola National Monument;

H. R. 4044. An act to amend the Trading With the Enemy Act, as amended; to create a commission to make an inquiry and report with respect to war claims; and to provide for relief of internees in certain cases;

H. R. 4917. An act to provide further benefits for certain employees of the United States who are veterans of World War II and lost opportunity for probational civil-service appointments by reason of their service in the armed forces of the United States, and who, due to service-connected disabilities, are unable to perform the duties of the positions for which examinations were taken;

H. R. 5416. An act to promote the interests of the Fort Hall Indian irrigation project, Idaho, and for other purposes;

H. R. 5882. An act to authorize the Secretary of the Army, the Secretary of the Navy, and the Secretary of the Air Force to donate excess and surplus property for educational purposes;

H. R. 5904. An act to continue the Virgin Islands Company as an agency of the United States;

H. R. 6248. An act to authorize the Secretary of Agriculture to stabilize prices of agricultural commodities; to amend section 22 of the Agricultural Adjustment Act, reenacted by the Agricultural Marketing Agreement Act of 1937; and for other purposes;

H. R. 6402. An act to provide for extension of the terms of office of the present members of the Atomic Energy Commission;

H. R. 6443. An act to authorize the Administrator of Veterans' Affairs to convey certain land in Tennessee to the city of Johnson City;

H. R. 6465. An act to amend and supplement section 2 of the act approved August 30, 1935, relating to the construction and financing of toll bridges over the Delaware River by the Delaware River Joint Toll Bridge Commission of the Commonwealth of Pennsylvania and the State of New Jersey;

H. R. 6481. An act making appropriations for Government corporations and independent executive agencies for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6527. An act to provide assistance to certain local school agencies overburdened with war-incurred, or postwar national-defense-incurred enrollments;

H. R. 6641. An act to amend the Civil Service Retirement Act of May 29, 1930, to provide annuities for certain surviving spouses of annuitants retired prior to April 1, 1948;

H. R. 6771. An act making appropriations for military functions administered by the National Military Establishment for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6801. An act making appropriations for foreign aid, and for other purposes;

H. R. 6808. An act to permit refund or credit to brewers of taxes paid on beer lost in bottling operations;

H. R. 6829. An act making supplemental appropriations for the Executive Office and sundry independent executive bureaus, boards, commissions, and offices, for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6916. An act to provide for permanent postal rates and to provide pay increases for Government employees;

H. R. 6935. An act making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1948, and for other purposes;

H. J. Res. 190. Joint resolution authorizing the printing and binding of Cannon's Procedure in the House of Representatives and providing that the same shall be subject to copyright by the author;

H. J. Res. 305. Joint resolution authorizing the issuance of a special series of stamps commemorative of the fiftieth anniversary of the organization of the Rough Riders (First Volunteer United States Cavalry) of the Spanish-American War;

H. J. Res. 327. Joint resolution to authorize the issuance of a special series of stamps commemorative of Juliette Low, founder and organizer of Girl Scouting in the United States of America; and

H. J. Res. 433. Joint resolution permitting the free entry of certain articles imported to promote international good will, and for other purposes.

APPROVAL OF BILLS AND JOINT RESOLUTIONS AFTER ADJOURNMENT

A message from the President of the United States, received by the Clerk of the House, reported that on the following dates the President had approved and signed bills and joint resolutions of the House of the following titles:

On June 19, 1948:

H. R. 238. An act for the extension of admiralty jurisdiction;

H. R. 636. An act for the relief of W. A. Knox, W. L. M. Knox, and Frank C. Morris, operating as Knox Lumber Sales Co., of Thomson, Ga.;

H. R. 1222. An act for the relief of Mr. and Mrs. M. C. Lewis;

H. R. 1738. An act for the relief of Elsie L. Rosenow;

H. R. 1781. An act for the relief of Annie L. Taylor, and William Benjamin Taylor;

H. R. 1855. An act for the relief of Elbert Spivey;

H. R. 2062. An act for the relief of Mrs. Carrie M. Lee;

H. R. 2273. An act to amend the act of May 29, 1944, providing for the recognition of the services of the civilian officials and employees, citizens of the United States, engaged in and about the construction of the Panama Canal;

H. R. 2479. An act for the relief of Hardy H. Bryant;

H. R. 2684. An act for the relief of sundry fruit growers of the State of Delaware who sustained losses as the result of the fumigation of apples with methyl bromide in order to comply with the requirements of the

United States Department of Agriculture relating to the Japanese beetle quarantine;

H. R. 2721. An act for the relief of Walter Vandahl and Esther S. Vandahl, Allabrada Adams, Mrs. Lucile L. Rrice Talbot, Mrs. Gladys Webb, and John E. Webb;

H. R. 3721. An act to promote the conservation of wildlife, fish, and game, and for other purposes," as amended by the act approved August 14, 1946;

H. R. 2916. An act for the relief of Walter Vandahl and Esther S. Vandahl, Allabrada Adams, Mrs. Lucile L. Rrice Talbot, Mrs. Gladys Webb, and John E. Webb;

H. R. 2922. An act for the relief of Charles B. Featherstone;

H. R. 3007. An act for the relief of Ernest F. Lutzken;

H. R. 3114. An act for the relief of the estate of John Delman;

H. R. 3159. An act for the relief of Mrs. Mae H. Fitzgerald;

H. R. 3260. An act for the relief of Clarence S. Osika;

H. R. 3352. An act for the relief of Emeline Latigue;

H. R. 3402. An act to extend the authorized maturity date of certain bridge revenue bonds to be issued in connection with the refunding of the acquisition cost of the bridge across the Missouri River at Rulo, Nebr.;

H. R. 3433. An act to amend the act entitled "An act to classify the officers and members of the Fire Department of the District of Columbia, and for other purposes," approved June 20, 1906, and for other purposes;

H. R. 3500. An act for the relief of Lester L. Elder and Mrs. Esther E. Elder;

H. R. 3641. An act for the relief of Mrs. Helen E. Scofield;

H. R. 3883. An act to authorize and direct the Secretary of the Army to transfer to the Territory of Alaska the title to the Army vessel *Hygiene*;

H. R. 3916. An act to increase the size of the Arkansas-Mississippi Bridge Commission, and for other purposes;

H. R. 4244. An act to authorize assistance to certain veterans in acquiring specially adapted housing which they require by reason of the nature of their service-connected disabilities;

H. R. 4455. An act to authorize the conveyance by the Secretary of the Interior to the Richmond, Fredericksburg & Potomac Railroad Co., of certain lands lying in the bed of Roaches Run, Arlington County, Va., and for other purposes;

H. R. 4663. An act to confer jurisdiction upon the District Court of the United States for the Middle District of Georgia to hear, determine, and render judgment on the claims of the owners of the fee-simple titles and leasehold interests in land leased to the United States by the city of Macon, Ga., for use as a part of the site of Camp Wheeler, Ga.;

H. R. 4688. An act to enlarge the Gettysburg National Cemetery;

H. R. 4830. An act for the relief of Cooperative for American Remittances to Europe, Inc.;

H. R. 4874. An act to transfer Pelican Rock in Crescent City Harbor, Del Norte County, Calif., to that county;

H. R. 5065. An act to amend section 1700 (a) (1) of the Internal Revenue Code so as to exempt hospitalized servicemen and veterans from the admissions tax when admitted free;

H. R. 5112. An act to amend the Civil Service Retirement Act of May 29, 1930, as amended;

H. R. 5147. An act authorizing the Secretary of the Interior to issue a patent in fee to Florence A. W. Arens;

H. R. 5174. An act to authorize Commodity Credit Corporation to make adjustment payments to certain producers of raw cane sugar in Puerto Rico and Hawaii;

H. R. 5344. An act to prevent retroactive checkage of retired pay in the cases of certain enlisted men and warrant officers appointed or advanced to commissioned rank or grade under the act of July 24, 1941 (55 Stat. 603), as amended, and for other purposes;

H. R. 5330. An act for the relief of W. W. DeLoach;

H. R. 5655. An act confirming the claim of Juan Berar to certain lands in the State of Louisiana, county of Attakapas, now parish of St. Martin, said claim being listed as No. B–690 in the report of the commissioners dated June 1811, so as to include section 2, township 11 south, range 6 east, Louisiana meridian, containing one hundred and thirty-nine and sixty-two one-hundredths acres;

H. R. 5758. An act to amend further the Armed Forces Leave Act of 1946, as amended, to permit certain payments to be made to surviving brothers and sisters, and nieces and nephews, of deceased members and former members of the armed forces;

H. R. 5808. An act to continue a system of nurseries and nursery schools for the day care of school-age and under-school-age children of the District of Columbia;

H. R. 5820. An act to aid in the development of improved prosthetic appliances, and for other purposes;

H. R. 5883. An act making appropriations for the Department of Agriculture (exclusive of the Farm Credit Administration) for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 5889. An act to extend the provisions of title VI of the Public Health Service Act to the Virgin Islands;

H. R. 5891. An act to repeal an act approved August 24, 1894, entitled "An act to authorize the purchasers of the property and franchises of the Choctaw Coal & Railway Co. to organize a corporation, and to confer upon the same all the powers, privileges, and franchises vested in that company," and all acts amendatory thereof and supplemental thereto;

H. R. 5967. An act to provide for the establishment of the Fort Vancouver National Monument, in the State of Washington, to include the site of the old Hudson's Bay Co. stockade, and for other purposes;

H. R. 5983. An act to amend section 202 of title II of the Army-Navy Medical Services Corps Act of 1947, as amended, to remove the present restriction on appointments to the Navy Medical Service Corps;

H. R. 6073. An act to provide for the acquisition of lands for grazing and related purposes;

H. R. 6110. An act to permit the landing of halibut by Canadian fishing vessels to Alaskan ports, and for other purposes;

H. R. 6113. An act to transfer certain land in Langlade County, Wis., to the United States Forest Service;

H. R. 6114. An act to amend title I of the Bankhead-Jones Farm Tenant Act, as amended, so as to increase the interest rate on title I loans, to provide for the redemption of nondelinquent insured mortgages, to authorize advances for the preservation and protection of the insured loan security, and for other purposes;

H. R. 6229. An act to authorize the extension of leases of certain land in the Territory of Hawaii;

H. R. 6234. An act to authorize the establishment of internships in the Department of Medicine and Surgery of the Veterans' Administration;

H. R. 6252. An act to authorize the issuance of a land patent to certain public lands, situated in the county of Kauai, Territory of Hawaii, for school purposes;

H. R. 6339. An act to amend the provisions of title VI of the Public Health Service Act relating to standards of maintenance and operation for hospitals receiving aid under that title;

H. R. 6430. An act making appropriations for the government of the District of Columbia and other activities chargeable in whole or in part against the revenues of such District for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6469. An act to provide for the temporary free importation of lead;

H. R. 6716. An act to authorize the Administrator of Veterans' Affairs to transfer a portion of the Veterans' Administration center at Los Angeles, Calif., to the State of California for the use of the University of California; and

H. R. 6765. An act making supplemental appropriations for the Treasury and Post Office Departments for the fiscal year ending June 30, 1949, and for other purposes.

On June 21, 1948:

H. R. 633. An act for the relief of Mrs. Myrtle Hovde;

H. R. 6368. An act to provide for the issuance of a special postage stamp in commemoration of the dedication of the Palomar Mountain Observatory.

On June 22, 1948:

H. R. 929. An act for the relief of Ernest L. Godfrey;

H. R. 4964. An act to preserve seniority rights of 10-point preference eligibles in the postal service transferring from the position of letter carrier to clerk or from the position of clerk to letter carrier;

H. R. 6071. An act to extend the public land laws of the United States to certain lands, consisting of islands, situated in the Red River in Oklahoma; and

H. R. 5272. An act relating to the compensation of certain railway postal clerks;

H. R. 5822. An act to establish the Saratoga National Historical Park, in the State of New York, from the lands that have been acquired by the Federal Government for that purpose pursuant to the act of June 1, 1938 (52 Stat. 608), and for other purposes;

H. R. 6239. An act to provide for the suspension of annual assessment work on mining claims held by location in the Territory of Alaska;

H. R. 6246. An act to authorize the transfer of certain Federal lands within the Chopawamsic Park to the Secretary of the Navy, the addition of lands as unplus to the Department of the Navy to this park, the acquisition of additional lands needed to round out the boundaries of this park, to change the name of said park to Prince William Forest Park, and for other purposes; and

H. R. 6289. An act to provide for the voluntary admission and treatment of mental patients at St. Elizabeths Hospital.

On June 23, 1948:

H. R. 2588. An act requiring all mails consigned to an airport from a post office or branch, or from an airport to a post office or branch, within a radius of 35 miles of a city in which there has been established a Government-owned vehicle service to be delivered by Government-owned motor vehicles; and

H. R. 6766. An act to amend the Railroad Retirement Act of 1937, as amended, and the Railroad Unemployment Insurance Act, as amended, and for other purposes.

On June 24, 1948:

H. R. 239. An act to further perfect the consolidation of the Lighthouse Service with the Coast Guard;

H. R. 2867. An act to permit, subject to certain conditions, mining locations under the mining laws of the United States within that portion of the Harney National Forest, designated as a game sanctuary, and for other purposes;

H. R. 3889. An act to amend Veterans Regulation No. 1 (a), parts I and II, as amended, to establish a presumption of service connection for chronic and tropical diseases;

H. R. 4071. An act to amend sections 301 (k) and 304 (a) of the Federal Food, Drug, and Cosmetic Act, as amended;

H. R. 4047. An act for the relief of Edmund Huppler;



APP. Q

PAGE 3

H. R. 4516. An act for the relief of the Moore Dry Dock Co., of Oakland, Calif.;

H. R. 4952. An act to provide pensions for certain widows of veterans of the Spanish-American War, including the Boxer Rebellion and the Philippine Insurrection;

H. R. 5036. An act to authorize the attendance of the United States Marine Corps Band at the national assembly of the Marine Corps League to be held at Milwaukee, Wis., September 22 to September 25, inclusive, 1948;

H. R. 5275. An act to amend the Tariff Act of 1930 to provide for the free importation of limestone to be used in the manufacture of fertilizer;

H. R. 5936. An act to provide for the addition of certain surplus Government lands to the Chickamauga and Chattanooga National Military Park, in the States of Georgia and Tennessee, and for other purposes;

H. R. 6318. An act to amend section 3 of the Standard Time Act of March 19, 1918, as amended, relating to the placing of a certain portion of the State of Idaho in the third time zone;

H. R. 6771. An act making appropriations for military functions administered by the National Military Establishment for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 6822. An act to continue the authorization for the appointment of two additional Assistant Secretaries of State;

H. R. 6188. An act to confer jurisdiction over the Fort Des Moines Veterans' Village upon the State of Iowa;

H. R. 6698. An act to authorize the course of instruction at the United States Naval Academy to be given to not exceeding four persons at a time from the Republic of the Philippines;

H. R. 6726. An act to amend the Public Health Service Act to provide for, foster, and aid in coordinating research relating to dental diseases and conditions, and for other purposes; and

H. R. 6772. An act making appropriations for the Department of the Navy and the naval service for the fiscal year ending June 30, 1949, and for other purposes.

On June 25, 1948:

H. R. 564. An act for the relief of Sarah Lee Cregg;

H. R. 700. An act for the relief of Anthony Arancio;

H. R. 912. An act for the relief of Hiro Higa and Kana Higa;

H. R. 945. An act relating to the payment of fees, expenses, and costs of jurors;

H. R. 1409. An act for the relief of Frantisek Jiri Pavlik or Georg Pavlik;

H. R. 1642. An act for the relief of Miss Rozelle M. Kostenbader;

H. R. 2009. An act for the relief of the estate of Vito Abarno;

H. R. 2193. An act for the relief of Robert E. Graham;

H. R. 2431. An act for the relief of the estate of David Jefferson Janow, deceased;

H. R. 2734. An act for the relief of Joseph M. Henry;

H. R. 2766. An act to amend section 2 of an act, entitled, "An act to provide for the establishment of a probation system in the United States courts, except in the District of Columbia," approved March 4, 1925, as amended (18 U. S. C. 725);

H. R. 3190. An act to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure";

H. R. 3214. An act to revise, codify, and enact into law title 28 of the United States Code entitled "Judicial Code and Judiciary";

H. R. 3427. An act for the relief of Mrs. Mary H. Overall and Thomas I. Baker;

H. R. 4114. An act to amend the Public Health Service Act to permit certain expenditures, and for other purposes;

H. R. 4298. An act for the relief of Henry Hill;

H. R. 4452. An act for the relief of Douglas L. Craig;

H. R. 4566. An act for the relief of William Maly;

H. R. 4587. An act for the relief of Mrs. Harry A. Light (formerly Mrs. Elsie Purvey);

H. R. 4618. An act for the relief of Gerald S. Purman;

H. R. 4859. An act to ratify and confirm amendments to certain contracts for the furnishing of petroleum products to the United States;

H. R. 4881. An act for the relief of Dimitri Petrou;

H. R. 5524. An act making appropriations for civil functions administered by the Department of the Army for the fiscal year ending June 30, 1949, and for other purposes;

H. R. 5886. An act to amend section 332 (a) of the Nationality Act of 1940;

H. R. 6293. An act to amend the act of June 19, 1934, providing for the establishment of the National Archives, so as to provide that certain fees collected by the Archivist shall be available for disbursement in the interest of the National Archives;

H. R. 6327. An act to provide for the issuance of a license to practice chiropractic in the District of Columbia to Samuel O. Burdette;

H. R. 6412. A act to codify and enact into law title 3 of the United States Code, entitled "The President";

H. R. 6641. An act to amend the Civil Service Retirement Act of May 29, 1930, to provide annuities for certain surviving spouses of annuitants retired prior to April 1, 1948;

H. R. 6935. An act making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1948, and for other purposes;

H. J. Res. 297. Joint resolution to increase the sum authorized to be appropriated for the presentation to Eire of a statue of Commodore John Barry; and

H. J. Res. 433. Joint resolution permitting the free entry of certain articles imported to promote international good will, and for other purposes.

On June 26, 1948:

H. R. 2551. An act for the relief of William R. Ramsey;

H. R. 2782. An act for the relief of Dennis Stanton;

H. R. 3218. An act to authorize an emergency fund for the Bureau of Reclamation to assure the continuous operation of its irrigation and power systems;

H. R. 3937. An act for the relief of William C. Reese;

H. R. 6039. An act to authorize the permanent appointment in the Regular Army of one officer in the grade of general and to authorize the permanent appointment in the Regular Air Force of one officer in the grade of general, and for other purposes;

H. R. 6224. An act for the relief of John Watkins;

H. R. 6556. An act to extend the authority of the President under section 350 of the Tariff Act of 1930, as amended, and for other purposes; and

H. J. Res. 190. Joint resolution authorizing the printing and binding of Cannon's Procedure in the House of Representatives and providing that the same shall be subject to copyright by the author.

On June 28, 1948:

H. R. 371. An act for the relief of Jenness C. Thomas;

H. R. 1076. An act for the relief of Chester O. Glenn;

H. R. 1220. An act for the relief of James D. Sigler and Frederick P. Vogelsand III;

H. R. 2269. An act for the relief of Frank A. Constable;

H. R. 4330. An act to authorize the Secretary of State to perform certain consular-type functions within the United States and its Territories and possessions;

H. R. 4367. An act authorizing the Hidalgo Bridge Co., its heirs, legal representatives, and assigns, to construct, maintain, and operate a railroad toll bridge across the Rio Grande, at or near Hidalgo, Tex.;

H. R. 4635. An act to amend section 11 of an act entitled "An act to regulate barbers in the District of Columbia, and for other purposes";

H. R. 4690. An act to amend the act of July 30, 1947, permitting vessels of Canadian registry to transport certain merchandise between Hyder, Alaska, and points in the continental United States;

H. R. 4917. An act to provide further benefits for certain employees of the United States who are veterans of World War II and lost opportunity for probational civil-service appointments by reason of their service in the armed forces of the United States, and who, due to service-connected disabilities, are unable to perform the duties of the positions for which examinations were taken;

H. R. 5053. An act to provide for the establishment of the Independence National Historical Park, and for other purposes;

H. R. 5710. An act to amend the act entitled "An act to expedite the provision of housing in connection with national defense, and for other purposes," approved October 14, 1940, as amended;

H. R. 5716. An act to record the lawful admission to the United States for permanent residence of Patricia Schwartz and Beatrice Schwartz;

H. R. 6448. An act to authorize the Administrator of Veterans' Affairs to convey certain land in Tennessee to the city of Johnson City;

H. R. 6707. An act to amend the Officer Personnel Act of 1947 (Public Law 381, 80th Cong.), and for other purposes; and

H. R. 6801. An act making appropriations for foreign aid, and for other purposes.

On June 29, 1948:

H. R. 333. An act for the relief of sundry residents of Alaska, veterans of World War II;

H. R. 709. An act for the relief of Leon Nikolaivich Volkov;

H. R. 911. An act for the relief of Kam Fong Chun, Mr. and Mrs. Jose Diaz, Joseph Da Souza, Mr. and Mrs. Kenneth Ayres, and Jose Odusado;

H. R. 915. An act to confer jurisdiction upon the District Court of the United States for the Territory of Hawaii to hear, determine, and render judgment on the claims of the executors and trustees of the estate of L. L. McCandless, deceased, as their interests may appear, against the United States of America;

H. R. 1930. An act for the relief of the Growers Fertilizer Co., a Florida corporation;

H. R. 2239. An act to amend section 13 (a) of the Surplus Property Act of 1944, as amended;

H. R. 2372. An act for the relief of George Cleve Williams;

H. R. 2395. An act for the relief of the Cypress Creek Drainage District of the State of Arkansas;

H. R. 2744. An act to provide for the elimination of Regular Army and Regular Air Force officers and for the retirement of officers, warrant officers, and enlisted men of the Regular Army and the Regular Air Force, and to provide retirement benefits for members of the Reserve components of the Army of the United States, the Air Force of the United States, United States Navy and Marine Corps, and Coast Guard;

H. R. 3918. An act for the relief of the Sumner County Colored Fair Association;

H. R. 4103. An act for the relief of Charles M. Davis;

H. R. 4816. An act to amend section 624 of the Public Health Service Act so as to provide a minimum allotment of $100,000 to each State for the construction of hospitals;

H. R. 5734. An act to authorize the Administrator of Veterans' Affairs to convey to the city of Cheyenne, Wyo., for public-park and

79th Congress, 2d Session  · · · · · · · · ·   House Document No. 769

# CONSTITUTION
# JEFFERSON'S MANUAL

AND

# RULES OF THE HOUSE OF
# REPRESENTATIVES

OF THE UNITED STATES
EIGHTIETH CONGRESS

By

LEWIS DESCHLER
PARLIAMENTARIAN

TEXAS STATE LIBRARY
Austin, Texas

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1947

App. **S**
PAGE # 1

## HOUSE RESOLUTION NO. 674

IN THE HOUSE OF REPRESENTATIVES

*July 12, 1946.*

*Resolved*, That a revised edition of the Rules and Manual of the House of Representatives for the Eightieth Congress be printed as a House document, and that one thousand six hundred additional copies shall be printed and bound for the use of the House of Representatives, of which seven hundred copies shall be bound in leather with thumb index and delivered as may be directed by the Parliamentarian of the House for distribution to officers and Members of Congress.

Attest:

SOUTH TRIMBLE,
*Clerk.*

[III]

App. **S**
page 2

# PREFACE

The parliamentary practice of the House of Representatives emanates from four sources: First, the Constitution of the United States; second, from Jefferson's Manual; third, from the rules adopted by the House itself from the beginning of its existence; and, fourth, from the decisions of the Speakers of the House and from decisions of the Chairmen of the Committee of the Whole.

In the early history of the House the membership of that body frequently found it difficult to accomplish the purposes upon which they had determined. The Constitution directed the House to do certain things in a specified manner, and to do things not set forth specifically it gave the House carte blanche to make such rules as it thought necessary to carry out the purposes of a legislative body. The early Congresses, therefore, naturally borrowed from the English Parliament many of its practices. In the years following, these practices were adapted to meet the needs of our then youthful House. Special needs of the House have caused some of the motions adopted from the English system to lose their original form and purpose. They have evolved into a distinctly American system of procedure.

In the years from 1797 to 1801 Thomas Jefferson, then Vice President of the United States and President of the Senate, prepared the notable work which has come to be known as Jefferson's Manual. This work contributed greatly to the procedure of the House, although it was not

[v]

RULES OF THE HOUSE OF REPRESENTATIVES

until 1837 that the House finally adopted a rule, which is still in existence, permitting the provisions of the Manual "to govern the House in all cases to which they are applicable."

From the beginning of the First Congress the House has formulated rules for its procedure. Some of them have since gone out of existence. More of them have been amplified and broadened to meet the exigencies that have arisen from time to time. To-day they are perhaps the most finely adjusted, scientifically balanced, and highly technical rules of any parliamentary body in the world. Under them a majority may work its will at all times in the face of the most determined and vigorous opposition of a minority.

The rulings of the Speakers of the House and of the Chairmen of the Committee of the Whole are to the rules of the House what the decisions of the courts are to the statutes. It is rare, indeed, for a question to arise that has not been decided at some prior time. All of these decisions have been embodied in the monumental work of the Hon. Asher C. Hinds and the Hon. Clarence Cannon, former Parliamentarians of the House. These rulings, which aggregate more than 11,000 in number, cover practically every situation that may arise.

I believe that I am not making too broad a statement when I say that the parliamentary practice of the House is a system of procedure that ranks second to none. It has proven adequate to meet all the emergencies that have arisen in the past. It will meet the emergencies and problems of the future with the same degree of success.

In this edition of the House Rules and Manual there is included in the manner hereinafter described the text of the Legislative Reorganization Act of 1946. The provisions of that act specifically amending Rules X, XI, XII, and XXI have been placed within the standing rule structure. Part 3 of Title I of the act, containing the provisions

[vi]

App. 5
Page 4

RULES OF THE HOUSE OF REPRESENTATIVES

applicable to both Houses, has been inserted at the end of the standing rules. Titles II through VI of the act, containing the statutory provisions relating to congressional personnel, lobbying regulations, Federal tort claims, bridges, compensation and retirement of Members of Congress have been inserted where "Important Decisions" have heretofore been found. "Important Decisions" have been eliminated in this edition as they are now set out in full in Cannon's Precedents of the House of Representatives.

Rulings of the Speakers and Chairmen of the Committee of the Whole which are of significance have been inserted under the rule which governed the decision of the Chair.

References are to Hinds' and Cannon's Precedents, the Congressional Record, and the United States Reports.

LEWIS DESCHLER.

JANUARY 3, 1947.

[VII]

## CONSTITUTION OF THE UNITED STATES

§§ 51–54.

§ 51. Laws of Congress not binding on the House in its function of judging its elections.

The statutes of the United States provide specific methods for institution of a contest as to the title to a seat in the House (I, 678, 697–706); but the House regards this law as not of absolute binding force, but rather a wholesome rule not to be departed from except for cause (I, 597, 719, 825, 833), and it sometimes by resolution modifies the procedure prescribed by the law (I, 449, 600).

Decisions of the Supreme Court of the United States:

Reed *v.* County Commissioners, 277 U. S., 376; Barry *v.* U. S. ex. rel. Cunningham, 279 U. S., 597.

§ 52. The quorum.

* * * and a Majority of each [House] shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

§ 53. Interpretation of the Constitution as to number constituting a quorum.

Out of conditions arising between 1861 and 1891 the rule was established that a majority of the Members chosen and living constituted the quorum required by the Constitution (IV, 2885–2888); but later examination has resulted in a decision confirming in the House of Representatives the construction established in the Senate that a quorum consists of a majority of Senators duly chosen and sworn (I, 630; IV, 2891–2894). So the decision of the House now is that after the House is once organized the quorum consists of a majority of those Members chosen, sworn, and living whose membership has not been terminated by resignation or by the action of the House (IV, 2889, 2890). (Speaker Clark, May 9, 1913, Record, p. 1457, 63d Cong., 1st sess.)

§ 54. The theory of the quorum present; and the count by the Speaker.

For many years the quorum was determined only by noting the numbers of Members voting (IV, 2896, 2897), with the result that Members by refusing to vote could often break a quorum and obstruct the public business (II, 1034; IV, 2895, footnote; V, 5744). But in 1890 Mr. Speaker Reed directed the Clerk to enter on the Journal as part of the record of a yea-and-nay vote names of Members present but not voting, thereby establishing a quorum of record (IV, 2895). This decision, afterwards sustained by the Supreme Court (IV, 2904),

[18]

CONSTITUTION OF THE UNITED STATES

established the principle that a quorum present made valid any action by the House, although an actual quorum might not vote (I, 216, footnote; IV, 2932). And thenceforth the point of order as to a quorum was required to be that no quorum was present and not that no quorum had voted (IV, 2917). At the time of the establishment of this principle the Speaker revived the count by the Chair as a method of determining the presence of a quorum at a time when no record vote was ordered (IV, 2909). The Speaker has permitted his count of a quorum to be verified by tellers (IV, 2888), but did not concede it as a right of the House to have tellers under the circumstances (IV, 2916), claiming that the Chair might determine the presence of a quorum in such manner as he should deem accurate and suitable (IV, 2932). The Chair counts all members in sight, whether in the cloak rooms or within the bar (IV, 2970). Later, as the complement to the new view of the quorum, the early theory that the presence of a quorum is as necessary during debate or other business as on a vote was revived (IV, 2935–2949); also, a line of rulings made under the old theory were overruled, and it was established that the point of no quorum might be made after the House had declined to verify a division by tellers or the yeas and nays (IV, 2918–2926).

The absence of a quorum having been disclosed, there must be a quorum of record before the House may proceed to business (IV, 2952, 2953), and the point of no quorum may not be withdrawn after the absence of a quorum has been ascertained and announced by the Chair (IV, 2928–2931). But when an action has been completed, it is too late to make the point of order that a quorum was not present when it was done (IV, 2927). But where action requiring a quorum was taken in the ascertained absence of a quorum by ruling of a Speaker pro tempore, the Speaker on the next day ruled the action was null and void (IV, 2964). But such absence of a quorum should appear from the Journal if a legislative act is to be vacated for such reason (IV, 2962), and where the assumption that a quorum was present when the House acted was uncontradicted by the Journal, it was held that this assumption might not be overthrown by expressions of opinion by Members individually (IV, 2961 . A point of no quorum may prevent the report of the Chairman of a Committee of the Whole. (Speaker Gillett, Dec. 13, 1924, p. 624, 68th Cong., 2d sess.) If a question as to a quorum is raised before the reading of the Journal, a quorum must be ascertained before the reading may begin (IV, 2732, 2733). While messages are received in the absence of a quorum they are not read (IV, 3522; V, 6600, 6650). No motion is in order on the failure of a quorum but the motions to

§ 55. Relations of the quorum to acts of the House.

App. 5
Page 4

## CONSTITUTION OF THE UNITED STATES

§§ 104, 105.

has allowed to fail (IV, 3499–3502). In one instance he communicated his omission to sign a bill through the committee appointed to notify him that Congress was about to adjourn (IV, 3504). A bill that had not actually passed having been signed by the President, he disregarded it and a new bill was passed (IV, 3498). Messages of the President giving notice of bills approved are entered in the Journal and published in the Congressional Record (V, 6593).

§ 104. Disapproval (or veto) of bills.

A message withholding approval of a bill, called a veto message, is sent to the House in which the bill originated; but it has been held that such a message may not be returned to the President on his request (IV, 3521). A vetoed bill received in the House by way of the Senate is considered as if received directly from the President and supersedes the regular order of business (IV, 3537). A veto message may not be read in the absence of a quorum, even though the House be about to adjourn sine die (IV, 3522); but the message may be read and acted on at the next session of the same Congress (IV, 3522). When the President has been prevented by adjournment from returning a bill with his objections he has sometimes at the next session communicated his reasons for not approving (V, 6618–6620).

§ 105. Consideration of a vetoed bill in the House.

It is the usual but not invariable rule that a bill returned with the objections of the President shall be voted on at once (IV, 3534–3536), but it has been held that the constitutional mandate that "the House shall proceed to consider" means that the House shall immediately proceed to consider it under the rules of the House, and that the ordinary motions under the rules of the House—to refer, to commit, or to postpone to a day certain—are in order. (Speaker Gillett, May 15, 1924, 68th Cong., 1st sess., p. 8663; IV, 3542–3550.) A motion to refer a vetoed bill, either with or without the message, has been held allowable within the constitutional mandate that the House "shall proceed to reconsider" (IV, 3550). But while the ordinary motion to refer may be applied to a vetoed bill, it is not in order to move to recommit it pending the demand for the previous question or after it is ordered (IV, 3551). (Speaker Gillett, Aug. 19, 1919, p. 3983.) A vetoed bill having been rejected by the House, the message was referred (IV, 3552). Committees to which vetoed bills have been referred have sometimes neglected to report (IV, 3523, 3550, footnotes). A vetoed bill may be laid on the table (IV, 3549), but it is still highly privileged and a motion to take it from the table is in order at any time (IV, 3549). Also a motion to discharge a committee from the consideration of such a bill is privileged (IV, 3532). While

[34]

# BILLS

App.  S
PAGE 9

## STAGES OF A BILL OF THE HOUSE.

### 1. Introduction:

By a Member by laying the bill on the Clerk's table informally.
A Member sometimes introduces a petition only,
leaving to the committee the drawing of a bill, such a
petition referred to a committee having jurisdiction of
the subject giving authority to report a bill. Some-
times communications addressed to the House from the executive
departments or from other sources are referred to committees
by the Speaker and give authority for the committees to originate
bills. Messages from the President also are referred by the
Speaker or the House and give jurisdiction to the committees
receiving them to originate bills.

*§ 263. Introduc-*
*tion of a bill and*
*its progress to*
*final passage.*

### 2. Reference to a standing or select committee:

Public bills are referred under direction of the Speaker; private
bills are indorsed with the names of the committees to which
they go under the rule by the Members introducing them. Sen-
ate bills are referred under direction of the Speaker. A bill is
numbered and printed when referred.

### 3. Reported from the committee:

Committees having leave to report at any time make their
reports from the floor; other committees make their reports by
laying them on the Clerk's table informally. The bill and the
report are printed when reported.

### 4. Placed on the Calendar:

Occasionally a privileged bill is considered when reported; but
usually it is placed with the unprivileged bills on the Calendar
where it belongs under the rule by direction of the Speaker.

### 5. Consideration in Committee of the Whole:

Public bills which do not raise revenue or make or authorize
appropriations of money or property do not go through this stage.
All other bills are considered in Committee of the Whole. The
stages of consideration in Committee of the Whole are: General
debate; reading for amendment under the five-minute rule; order
to lay aside with a favorable recommendation, or to rise and re-
port; reporting of to the House.

[ 151 ]

**BILLS**

## 6. Reading a second time in the House:

Bills not requiring consideration in Committee of the Whole are read a second time in full, after which they are open to debate and amendment in any part. Bills considered in Committee of the Whole are read a second time in full in that committee and when reported out, with or without amendments, are not read in full again, but are subject to further debate or amendment in the House unless the previous question is ordered at once.

## 7. Engrossment and third reading:

The question on House bills is taken on ordering the engrossment and third reading at one vote. If decided in the affirmative, the reading a third time usually takes place at once, by title. But any Member may demand the reading in full of the engrossed copy, in which case the bill is laid aside until it can be engrossed. Senate bills come to the House in engrossed form, and the question is put on third reading alone. When the question on engrossment and third reading of a House bill or third reading of a Senate bill is decided in the negative the bill is lost as much as if defeated on the final passage. The question on engrossment and third reading is not made from the floor, but is put by the Speaker as a matter of course.

## 8. Passage:

The question on the passage of a bill is put by the Speaker as a matter of course, without awaiting a motion from the floor.

## 9. Transmission to the Senate by message.

## 10. Consideration by the Senate:

In the Senate House bills are usually referred to committees for consideration and report, after which they have their several readings, with opportunities for debate and amendment. The same procedure takes place in the House as to bills sent from the Senate.

## 11. Return of, from the Senate without amendments:

If the Senate passes a House bill without amendment it returns it to the House, where it is at once enrolled on parchment for signature. A bill thus passed without amendment goes into

[482]

**BILLS**

§ 983.

possession of the clerk, and is not laid before the House prior to enrollment. If the Senate rejects a House bill the House is informed. Similar procedure occurs when the House passes a Senate bill without amendment.

## 12. Return of, from the Senate with amendments:

House bills returned with Senate amendments go to the Speaker's table. If any Senate amendment requires consideration in Committee of the Whole the bill is referred by the Speaker informally to the standing committee having jurisdiction, and when that committee reports the bill with recommendations it is referred to Committee of the Whole House on the state of the Union, to be there considered and reported to the House itself. When no Senate amendment requires consideration in Committee of the Whole the bills come before the House directly from the Speaker's table.

## 13. Consideration of Senate amendments by the House:

When a bill with Senate amendments comes before the House, the House takes up each amendment by itself and may vote to agree to it, agree to it with an amendment, or disagree to it. If it disagrees it may ask a conference with the Senate or may send notice of its disagreement, leaving it to the Senate to recede or insist and ask the conference.

## 14. Settlement of differences by conference:

When disagreements are referred to conference, the managers embody their settlement in a report, which is acted on by each House as a whole. When this report is agreed to the bill is finally passed, and is at once enrolled for signature.

## 15. Enrollment on parchment:

The House in which a bill originates enrolls it.

## 16. Examination by the Committee on House Administration:

The chairman of the Committee on House Administration or Senate Committee on Rules and Administration as the case may be affixes to the bills examined a certificate that the bill has been found truly enrolled.

App. S
page 12

BILLS

§ 963.

## 17. Signing by the Speaker, and President of the Senate:

The enrolled bill is first laid before the House of Representatives and signed by the Speaker, whether it be a House or Senate bill, after which it is transmitted to the Senate and signed by the president of that body.

## 18. Transmittal to the President of the United States:

The Chairman of the Committee on House Administration or the Chairman of the Senate Committee on Rules and Administration as the case may be carries the bills from his House to the President. In the House of Representatives a report of the bills taken to the President each day is made to the House and entered on its Journal.

## 19. Approval by the President:

If the President approve he does so with his signature.

## 20. Disapproval by the President:

When the President disapproves a bill he returns it to the House in which it originated, with a message stating that he disapproves, and giving his reasons therefor,

## 21. Action on, when returned disapproved:

The House to which a disapproved bill is returned has the message read and spread on its Journal. It may then consider at once the question of passing the bill notwithstanding the President's objections, or may postpone to a day certain, or refer to a committee for examination. The vote on passing the bill, notwithstanding the President's objections, must be carried by two-thirds. If the bill fails to pass in the House to which it is returned it remains there; but if it passes it is sent to the other House for action.

## 22. Filing with the Secretary of State:

When approved by the President a bill is deposited in the office of the Secretary of State; and when the two Houses have passed a bill, notwithstanding the President's objections, the presiding officer of the House which acts on it last transmits it to the Secretary of State.

[484]

THE STATE LIBRARY
AUSTIN, TEXAS

<table>
<tr><td>59TH CONGRESS<br>2d Session</td><td>HOUSE OF REPRESENTATIVES</td><td>DOCUMENT<br>No. 355</td></tr>
</table>

# HINDS' PRECEDENTS

OF THE

# HOUSE OF REPRESENTATIVES

OF THE

## UNITED STATES

INCLUDING REFERENCES TO PROVISIONS
OF THE CONSTITUTION, THE LAWS, AND DECISIONS
OF THE UNITED STATES SENATE

By

ASHER C. HINDS, LL. D.

Clerk at the Speaker's Table

## VOLUME IV

PUBLISHED BY AUTHORITY OF THE ACT OF CONGRESS
APPROVED MARCH 4, 1907

WASHINGTON
GOVERNMENT PRINTING OFFICE
1907

Chapter 72. The impeachment and trial of Samuel Chase.
Chapter 73. The impeachment and trial of James H. Peck.
Chapter 74. The impeachment and trial of West H. Humphreys.
Chapter 75. The first attempts to impeach the President.
Chapter 76. The impeachment and trial of the President.
Chapter 77. The impeachment and trial of William W. Belknap.
Chapter 78. The impeachment and trial of Charles Swayne.
Chapter 79. Impeachment proceedings not resulting in trial.
Chapter 80. Questions of privilege and their precedence.
Chapter 81. Privilege of the House.
Chapter 82. Privilege of the Member.

## VOLUME IV.

Chapter 83. The Journal and its approval
Chapter 84. The making of the Journal.
Chapter 85. The quorum.
Chapter 86. The call of the House.
Chapter 87. The order of business.
Chapter 88. Special orders.
Chapter 89. Private and District of Columbia business.
Chapter 90. Petitions and memorials.
Chapter 91. Bills, resolutions, and orders.
Chapter 92. Approval of bills by the President.
Chapter 93. Bills returned without the President's approval.
Chapter 94. General appropriation bills.
Chapter 95. Authorization of appropriations on general appropriation bills.
Chapter 96. Appropriations in continuation of a public work.
Chapter 97. Legislation in general appropriation bills.
Chapter 98. Limitations in general appropriation bills.
Chapter 99. History and jurisdiction of the standing committees.
Chapter 100. History and jurisdiction of the standing committees.  (Continued.)
Chapter 101. History and jurisdiction of the standing committees.  (Continued.)
Chapter 102. General principles of jurisdiction of committees.
Chapter 103. Select and joint committees.
Chapter 104. Appointment of committees.
Chapter 105. Organization and procedure of committees.
Chapter 106. Reports of committees.
Chapter 107. The Committee of the Whole.
Chapter 108. Subjects requiring consideration in Committee of the Whole.
Chapter 109. Reports from the Committee of the Whole.
Chapter 110. Consideration "In the House as in Committee of the Whole."

## VOLUME V.

Chapter 111. The question of consideration.
Chapter 112. Conduct of debate in the House.
Chapter 113. References in debate to committees, the President, or the other House.
Chapter 114. Disorder in debate.
Chapter 115. Debate in Committee of the Whole.
Chapter 116. Reading of papers.
Chapter 117. Motions in general.
Chapter 118. The motion to adjourn.
Chapter 119. The motion to lay on the table.
Chapter 120. The previous question.
Chapter 121. The ordinary motion to refer.

CONTENTS.

Chapter 122. The motion to refer as related to the previous question
Chapter 123. The motion to reconsider.
Chapter 124. Dilatory motions.
Chapter 125. Amendments.
Chapter 126. The House rule that amendments must be germane.
Chapter 127. General principles as to voting.
Chapter 128. Voting by tellers and by ballot.
Chapter 129. The vote by yeas and nays.
Chapter 130. Division of the question for voting.
Chapter 131. Amendments between the Houses.
Chapter 132. General principles of conferences.
Chapter 133. Appointment of managers of a conference.
Chapter 134. Instruction of managers of a conference.
Chapter 135. Managers to consider only matters in disagreement.
Chapter 136. Privilege and form of conference reports.
Chapter 137. Consideration of conference reports.
Chapter 138. Messages and communications.
Chapter 139. Recess.
Chapter 140. Sessions and adjournments.
Chapter 141. The rules.
Chapter 142. Suspension of the rules.
Chapter 143. Questions of order and appeals.
Chapter 144. The Congressional Record.
Chapter 145. Amendments to the Constitution.
Chapter 146. Ceremonies.
Chapter 147. Service of the House.
Chapter 148. Miscellaneous.

# VOLUME VI.

### INDEX-DIGEST.

[A to G.]

# VOLUME VII.

### INDEX-DIGEST.

[H to P.]

# VOLUME VIII.

### INDEX-DIGEST.

[Q to Z.]

App.     T

PAGE 3

# Chapter LXXXIII.[*]

## THE JOURNAL AND ITS APPROVAL.

1. Provisions of the Constitution. Section 2726.
2. The official record. Section 2727.[1]
3. Title and copy. Sections 2728–2730.[c]
4. Reading and approval. Sections 2731–2756.[c]
5. Business not transacted before approval. Sections 2751–2759.[3]
6. Motions to amend, especially as to record of votes. Sections 2760–2770.
7. Delay in approval. Sections 2771–2774.
8. As to record of amendments and approval. Sections 2775–2782.
9. Changes in as related to actual facts. Sections 2783–2789.[4]
10. Changes after approval. Sections 2790–2797.
11. As to entry of protests and declarations. Sections 2798–2808.[5]
12. In general. Sections 2809, 2810.

**2726. The Constitution requires the House to keep and publish a Journal, excepting from publication such parts as require secrecy.**

**Votes by yeas and nays and veto messages of the President are required by the Constitution to be spread on the Journal.**

The Constitution of the United States, in section 5 of Article I, provides:

Each House shall keep a Journal of its proceedings, and from time to time publish the same, excepting such parts as may in their judgment require secrecy; and the yeas and nays of the Members of either House on any question shall, at the desire of one-fifth of those present, be entered on the Journal.[6]

Also in section 7 of Article I:

Every bill which shall have passed the House of Representatives and the Senate shall, before it become a law, be presented to the President of the United States. If he approve he shall sign it, but if not he shall return it, with his objections, to that House in which it shall have originated, who shall enter the objections at large on their Journal and proceed to reconsider it.

---

[*] See Volume VI, Chapter CCVI.

[1] Printed and distributed by the Clerk. Section 251 of Volume I.
Office of journal clerk and its requirements. Section 2644 of Volume III.

[2] Preparation and reading is not prevented by death of Clerk. Section 237 of Volume I.
Amendment of Congressional Record secondary to. Section 6989 of Volume V.

[3] Administration of oath to Member-elect before. Sections 171, 172 of Volume I.

[4] See also section 3091 of this volume.

[5] Clerk declines to entertain a protest at organization. Section 80 of Volume I.
Summary of precedents as to entry of protests. Sections 2597, 2783 of this volume.

[6] Field v. Clark, 143 U. S., 649.

1

being in secret session, had passed the "act declaring war between Great Britain and her dependencies," whereupon Mr. George Poindexter moved to have inserted in the Journal a declaration in the following words:

> George Poindexter, Delegate from the Mississippi Territory, not having a constitutional right to record his suffrage on the Journal of the House on the important question under consideration, and being penetrated with a firm conviction of the propriety of the measure, asks the indulgence of the House to express his own and the sense of his constituents,[1] in support of the honorable and dignified attitude which the Government of his country has assumed in vindication of its rights against the lawless violence and unprecedented usurpations of the Government of Great Britain.

This paper was read, and appeared in the Journal of the next day, whereupon Mr. Nathaniel Macon, of North Carolina, moved that it be expunged from the Journal. This motion was disagreed to—yeas 44, nays 62. A motion that the House proceed to consider the declaration was decided in the negative.

**2809. The Parliamentary method of raising a committee to investigate an alleged error in the Journal has not been utilized.**—On February 10, 1885,[2] a question being raised as to the correctness of the Journal, a motion was made that a committee be appointed to ascertain the facts in regard to the matter over which the error was alleged to occur. This motion was made in accordance with the parliamentary principle laid down in Jefferson's Manual. The motion was not agreed to.

**2810. Certified extracts of the Journal are admitted as evidence in the courts of the United States.**—The Statutes of the United States provide:

> Extracts from the Journals of the Senate, or of the House of Representatives, and of the Executive Journal of the Senate when the injunction of secrecy is removed, certified by the Secretary of the Senate or by the Clerk of the House of Representatives, shall be admitted as evidence in the courts of the United States, and shall have the same force and effect as the originals would have if produced and authenticated in court.[3]

---

[1] Mr. Poindexter must have wished to enter this expression in the Journal, for he had the right of debate and frequently exercised it. (For an instance see Annals, March 12, 1812, pp. 1201–1204.)

[2] Second session Forty-eighth Congress, Record, pp. 1497–1500; Journal, p. 508.

[3] See Revised Statutes, sec. 895.

# Chapter LXXXV.*

## THE QUORUM.¹

---

1. Provision of the Constitution.  Section 2884.
2. Interpretation of the Constitutional provision.  Sections 2885–2894.
3. Ruling of Mr. Speaker Reed as to quorum present.  Sections 2895–2904.
4. Rule for counting a quorum and its interpretation.  Sections 2905–2908.²
5. Reestablishment of the Speaker's count.  Section 2909.³
6. Review of Senate practice.  Sections 2910–2915.⁴
7. Speaker's count final.  Section 2916.
8. Making the point of no quorum.  Sections 2917–2931.
9. All business, including debate, suspended by failure of quorum.  Sections 2932–2965.⁵
10. Failure of quorum in Committee of the Whole.  Sections 2966–2979.

---

**2884. A majority of the House constitutes a quorum to do business.—** The Constitution of the United States provides in Article 1, section 5, that—

A majority of each [House] shall constitute a quorum to do business.

**2885. Out of conditions arising between 1861 and 1891 the rule was established that a majority of the Members chosen and living constitutes the quorum required by the Constitution.—**On July 19, 1861,⁶ Mr. Charles B. Sedgwick, of New York, moved the previous question on the engrossment of a joint resolution to provide for the selection of a site for the Naval Academy. Fifty-two Members having voted in favor of and 41 Members having voted against seconding the same, the Speaker⁷ declared that the previous question was seconded.⁸

---

* See Volume VI, Chapter CCVIII.
¹ A majority of a committee is a quorum.  Section 4540 of this volume.
Quorum of Senate sitting for impeachment trial.  Section 2063 of Volume III.
Senate counted during impeachment trial.  Section 2105 of Volume III.
As to quorum of managers in impeachment trial.  Section 2035 of Volume III.
² Principle that legislator detained by force may be counted.  Section 356 of Volume I.
³ See also section 1653 of Volume III.
Illustration of former practice of ascertaining presence of.  Section 2733 of this volume.
⁴ Elaborate Senate discussion.  Section 630 of Volume I.
⁵ Oath administered to Members in absence of.  Sections 174–178 of Volume I.
Must be present before reading of Journal.  Section 2733 of this volume.
Motion to reconsider in absence of.  Sections 5606–5608 of Volume. V.
Point of no quorum held dilatory.  Sections 5724–5730 of Volume V.
⁶ First session Thirty-seventh Congress, Journal, p. 117; Globe, p. 210.
⁷ Galusha A. Grow, of Pennsylvania, Speaker.
⁸ The previous question no longer requires a second.  (See sec. 5443 of Vol. V of this work.)

2937. On March 7, 1838,[1] during the debate in Committee of the Whole on an appropriation bill, Mr. John Reed, of Massachusetts, said he had some remarks to make, but there was no House to make them to. The Chair then appointed tellers to count the House, when it was found that there were but 72 Members in their seats—not a quorum. So the committee rose and reported the fact to the House.

2938. On February 24, 1875,[2] the Speaker,[3] in the course of a decision, said:

If any gentleman raises the question that business is proceeding without the presence of a quorum, it is within the competence of the Chair to decide that a quorum is present; and he will not allow the business of the House to be interrupted by any dilatory proceeding. He assumes the responsibility for that purpose of declaring that a quorum is present, because no business can proceed without a quorum. Even a gentleman speaking is entitled to have a quorum present. If the point be raised, a gentleman addressing the Chair may be taken off the floor by any Member raising the point that no quorum is present.

2939. On February 12, 1877,[4] a question of order was raised that debate could not proceed without a quorum.

In the course of the discussion of the question Mr. Nathaniel P. Banks, of Massachusetts, a former Speaker, said:

If any Member states that a quorum is not present, the Speaker counts the House, as he is bound to do, and if a quorum is found not to be present, business is suspended and a motion for a call of the House may be made.

The Speaker[5] said: "The House is not a House without a quorum," and the debate was not permitted to proceed.

2940. On Wednesday, January 21, 1891,[6] the Journal of the proceedings of yesterday's sitting having been read, and the question being on its approval,

Mr. William McKinley, jr., of Ohio, demanded the previous question, when Mr. W. C. P. Breckinridge, of Kentucky, made the point of order that no quorum was present.

The Speaker[7] ruled that the point of order that no quorum was present could only be raised when that fact was established by a division.[8]

---

[1] Second session Twenty-fifth Congress, Globe, p. 224.
[2] Second session Forty-third Congress, Record, p. 1733.
[3] James G. Blaine, of Maine, Speaker.
[4] Second session Forty-fourth Congress, Record, pp. 1488, 1489.
[5] Samuel J. Randall, of Pennsylvania, Speaker.
[6] Second session Fifty-first Congress, Journal, p. 162; Record, p. 1630.
[7] Thomas B. Reed, of Maine, Speaker.
[8] The actual transaction is recorded as follows in the Record:
Mr. McKINLEY. Mr. Speaker——
The SPEAKER. The gentleman from Ohio [Mr. McKinley] is recognized.
Mr. BRECKINRIDGE, of Kentucky. I raise the question of order——
Mr. McKINLEY. I move the previous question.
Mr. BRECKINRIDGE, of Kentucky (continuing). That there is no quorum in the House to do business.
The SPEAKER. The gentleman from Ohio [Mr. McKinley] moves the previous question.
Mr. BRECKINRIDGE, of Kentucky. I raise the question of order that there is no quorum present.
The SPEAKER. That will be determined by the vote. As many as are in favor of ordering the previous question will say "aye."

Mr. J. Warren Keifer, of Ohio, said:

Mr. Chairman, I make the point of order that the gentleman from Illinois in charge of the bill has the floor, making a speech, and the distinguished gentleman from Mississippi is not entitled to take him off the floor.

After debate the Chairman [1] held:

The Chair is of opinion that a question of order involving the presence of a quorum may be raised, and the Chair will count to ascertain whether a quorum is present.

**2950. A quorum not being present, no motion is in order but for a call of the House or to adjourn.**—On February 5, 1846,[2] the House was in Committee of the Whole House on the state of the Union, considering joint resolution (No. 5) of notice to Great Britain to "annul and abrogate" the convention between Great Britain and the United States of the 6th of August, 1827, relative to the country "on the northwest coast of America, westward of the Stony Mountains," commonly called Oregon. Finding itself without a quorum, the committee rose. A motion to adjourn having been decided in the negative, on motion of Mr. George W. Jones, of Tennessee, a call of the House was ordered; and the roll having been called as far as the name of Stephen Adams, of Mississippi, a motion was made by Mr. Robert B. Rhett, of South Carolina, that further proceedings in the call be dispensed with. And the question being put, it was decided in the affirmative.

A motion was made by Mr. Howell Cobb, of Georgia, that the House take a recess until 7.30 o'clock.

Mr. Robert C. Winthrop, of Massachusetts, raised the question of order that, a quorum of Members not being present, it was not competent for the Chair to entertain a motion for a recess.

The Speaker [3] decided that, it appearing from the record that there was not a quorum present, no motion was in order except for a call of the House or to adjourn.

In this decision the House acquiesced.

**2951. The absence of a quorum having been disclosed, the only proceedings in order are the motions to adjourn or for a call of the House; and not even by unanimous consent may business proceed.**—On May 24, 1872,[4] the House, while considering the bill of the Senate (No. 569) for the relief of Thomas B. Wallace, of Lexington, Mo., found itself without a quorum on the vote on the passage of the bill. A call of the House was ordered, and then a motion to adjourn was defeated, a yea and nay vote being had on each of these motions.

At this point Mr. James A. Garfield, of Ohio, proposed that by unanimous consent further proceedings under the call be dispensed with, and that the bill be acted on by a rising vote, on the assumption that a quorum was present.

The Speaker pro tempore [5] said:

The vote upon the passage of this bill by yeas and nays has disclosed the fact that there is not a quorum in the House. The House thereby becomes constitutionally disqualified to do further business,

---

[1] Edgar D. Crumpacker, of Indiana, Chairman.
[2] First session Twenty-ninth Congress, Journal, p. 355.
[3] John W. Davis, of Indiana, Speaker.
[4] Second session Forty-second Congress, Globe, p. 3855.
[5] Clarkson N. Potter, of New York, Speaker pro tempore.

except that business which the Constitution authorizes the House to do when a quorum is not present, to adjourn, or to order a call of the House, and the proceedings in respect to that bill fell, and the bill, should there be a quorum in the House, must again come before the House for its passage.

**2952. The absence of a quorum having been disclosed, there must be a quorum of record before the House may proceed to business.**—On February 28, 1849,[1] at an evening session, Mr. Caleb B. Smith, of Indiana, moved a resolution to close debate in Committee of the Whole on a bill to establish the Territorial government of New Mexico.

On this motion the question stood, ayes 41, noes 64, no quorum voting. On a motion for a call of the House no quorum voted.

Mr. Samuel F. Vinton, of Ohio, proposed that by common consent they go into committee and take up the amendments of the Senate to the Indian appropriation bill.

The Speaker[2] said the Chair was obliged to state to the gentleman from Ohio that the last two votes showed that there was no quorum present. There must be a quorum of record before the House could proceed to business.

**2953.** On February 11, 1901,[3] Mr. James D. Richardson, of Tennessee, moved that the House adjourn. The yeas and nays being demanded and ordered, there appeared, yeas 59, nays 80, answering present, 6.

The result being announced, Mr. William S. Knox, of Massachusetts, announced his purpose to call up a report of the Committee of the Whole House on the state of the Union, in relation to an occurrence in the committee.

The Speaker said:

The Chair, however, is compelled to take cognizance of the fact that the House is without a quorum and not in a position to do business.

**2954. The absence of a quorum being disclosed, a motion to fix the day to which the House shall adjourn may not be entertained.**

**A motion which was by the rules more highly privileged than the motion to adjourn was not entertained after an affirmative vote on a motion to adjourn.**

On February 21, 1894[4] no quorum appearing, Mr. Richard P. Bland, of Missouri, moved that the House do now adjourn, pending which motion, Mr. J. Fred C. Talbott, of Maryland, moved that when the House adjourn to-day it be to meet on Friday next.

The Speaker[5] declined to entertain the motion of Mr. Talbott, for the reason that a quorum was required to decide it, the roll of the last preceding vote not having disclosed a quorum.

The question being put, Will the House adjourn? it was decided in the affirmative, yeas 141, nays 107.

Before the result of the foregoing vote was announced, Mr. Julius C. Burrows, of Michigan, moved that when the House adjourn to-day it be to meet on Friday next.

---

[1] Second session Thirtieth Congress, Globe, p. 624.
[2] Robert C. Winthrop, of Massachusetts, Speaker.
[3] Second session Fifty-sixth Congress, Record, pp. 2286, 2287.
[4] Second session Fifty-third Congress, Journal, p. 188.
[5] Charles F. Crisp, of Georgia, Speaker.

The Speaker [1] overruled the point of order on the ground that when the order was made the absence of a quorum was not disclosed by any proceeding in the House and did not appear in the Journal of the House, and that the statements of Members on the subject were merely expressions of their individual opinions.

**2962. The absence of a quorum should appear from the Journal if a legislative act is to be vacated for such reason.**—On June 9, 1856,[2] Mr. George W. Jones, of Tennessee, moved that the Journal of the preceding legislative day be amended by striking out the notice of a bill filed by Mr. Edwards, there being no quorum present on that day.[3]

It was objected in opposition to this motion that the Journal of that day did not show the absence of a quorum; but Mr. Jones urged that it was a matter of common knowledge that there was no quorum present. This was not denied.

Various attempts to dispose of the motion were made, but failed for lack of a quorum until June 20, when Mr. Jones's motion was laid on the table, yeas 89, nays 38.

**2963. When a vote taken by yeas and nays shows that no quorum has voted it is the duty of the Chair to take notice of that fact.**—On June 5, 1884,[4] the House having under consideration a bill forfeiting certain land grants, the yeas and nays were ordered and taken on the passage of the bill. After the vote had been taken the Speaker [5] announced that no quorum had voted and that the bill had not passed.

Upon the question being made by Mr. Poindexter Dunn, of Arkansas, that no Member had made the point that a quorum had not voted, the Speaker decided that when a vote was taken by yeas and nays it would be entered on the Journal of the House, and it was the duty of the Chair to take notice of the fact that a quorum had not voted and that the bill had not passed by a constitutional vote.

**2964. The previous question having been ordered on a bill by unanimous consent in the absence of a quorum, the Speaker on the next day ruled that the action was null and void.**—On February 19, 1873,[6] pending the demand for the previous question on the bill of the House (No. 2354) to provide for the recomputation of the accounts between the United States and the several States growing out of moneys expended by the States in the war of 1812, a quorum failed to vote and a call of the House was ordered. After the roll had been called, the doors closed, and excuses offered, on motion of Mr. Leonard Myers, of Pennsylvania, by unanimous consent, this order was agreed to.

*Ordered,* That all further proceedings under the call be dispensed with, that the previous question shall be considered as seconded, and the main question ordered, upon the bill of the House (H. R. 2354) to provide for the recomputation of the accounts between the United States and the several States growing out of moneys expended by said States in the war of 1812, and that the House shall now adjourn.

The House accordingly, at 12 o'clock m., adjourned.

On the next day, the Journal having been read, Mr. Nathaniel P. Banks, of Massachusetts, made the point of order that the main question on the bill of the

---

[1] Charles F. Crisp, of Georgia, Speaker.
[2] First session Thirty-fourth Congress, Journal, pp. 1079, 1095; Globe, pp. 1379, 1427.
[3] Formerly bills were introduced by leave, and a previous notice was required.
[4] First session Forty-eighth Congress, Journal, p. 1385.
[5] John G. Carlisle, of Kentucky, Speaker.
[6] Third session Forty-second Congress, Journal, p. 447; Globe, p. 1518.

# Chapter XCI.*

## BILLS, RESOLUTIONS, AND ORDERS.

———

1. Rules for introduction and reference of bills, petitions, etc.   Sections 3364–3366.
2. Forms and practice in relation to bills and resolutions.   Sections 3367–3382.
3. Practice as to consideration of.   Sections 3383–3390.
4. Reading, amendment, and passage.   Sections 3391–3428.
5. Enrolling and signing of.   Sections 3429–3459.
6. Recall of bills from other House for correction of errors.   Sections 3460–3481.

———

**3364.** Petitions, memorials, and bills are introduced by the Member delivering them to the Clerk.

The reference of a private bill is indorsed on it by the Member introducing it, while the reference of a public bill is made by the Speaker.

Any petition or memorial of an obscene or insulting nature may be returned by the Speaker to the Member presenting it for reference.

Rules for correction of erroneous reference of private and public bills.

Petitions, memorials, and bills referred by delivery to the Clerk are entered on the Journal and Record.

The erroneous reference of a petition or private bill referred by the Member under the rule does not confer jurisdiction on the committee receiving it.

Sections 1, 2, and 3 of Rule XXII provide for the introduction, reference to committees, and change of reference of petitions, memorials, bills, and resolutions:

1. Members having petitions or memorials or bills of a private nature to present may deliver them to the Clerk, indorsing their names and the reference or disposition to be made thereof, and saí tions and memorials and bills of a private nature, except such as, in the judgment of the Speaker, are of an obscene or insulting character, shall be entered on the Journal with the names of the Members presenting them, and the Clerk shall furnish a transcript of such entry to the official reporters of debate, for publication in the Record.

2. Any petition or memorial or private bill excluded under this rule shall be returned to the Member from whom it was received; and petitions and private bills which have been inappropriately referred may, by direction of the committee having possession of the same, be properly referred in the manner originally presented; and an erroneous reference of a petition or private bill under this clause shall not confer jurisdiction upon the committee to consider or report the same.

3. All other bills, memorials, and resolutions may, in like manner, be delivered, indorsed with the names of Members introducing them, to the Speaker, to be by him referred, and the titles and references thereof and of all bills, resolutions, and documents referred under the rules shall be entered on

———

*See Volume VII, Chapter CCXVII.

**Enrolled bills are presented to the President by the committee of enrollment.**

**Notice of the signature of a bill by the President is sent by message to the House in which it originated, and that House informs the other.**

**An enrolled bill, when signed by the President, is deposited in the office of Secretary of State.**

Jefferson's Manual, in Section LXVIII, provides:

> When a bill has passed both Houses of Congress the House last acting on it notifies its passage to the other, and delivers the bill to the Joint Committee of Enrollment,[1] who see that it is truly enrolled in parchment. When the bill is enrolled it is not to be written in paragraphs, but solidly, and all of a piece, that the blanks between the paragraphs may not give room for forgery.[2] (9 Grey, 143.) It is then put into the hands of the Clerk[3] of the House of Representatives to have it signed by the Speaker.[4] The Clerk then brings it by way of message to the Senate[5] to be signed by their President. The Secretary of the Senate return it to the Committee of Enrollment, who presents it to the President of the United States. If he approve, he signs, and deposits it among the rolls in the office of the Secretary of State, and notifies by message the House in which it originated that he has approved and signed it; of which that House informs the other by message.

**3430. The printing, enrolling, signing, and certification of bills on their passage between the two Houses are governed by usages founded on former joint rules.**

**The certification and presentation of enrolled bills to the President is governed by usage founded on former joint rules.**

**The Committee on Enrolled Bills reports, for entry on the Journal, the date of presentation of bills to the President.**

**History of certain of the joint rules and their abrogation in 1876.**

From a very early date[6] the House and Senate had joint rules, a large portion of which related to the handling of bills; and although they have since been allowed to lapse, the usages instituted by them remain. These rules relating to bills are:

---

[1] A bill passed before the appointment of the Committee on Enrolled Bills is enrolled by the Clerk and presented directly to the Speaker for his signature. (See Journal, p. 17, first session, Fifty-second Congress, December 23, 1891.)

[2] Under the law as to enrolling bills by printing this regulation as to paragraphs is not observed. Bills which originate in the House are enrolled by the enrolling clerk of the House, while those originating in the Senate are enrolled under direction of that body.

[3] The chairman of the Committee on Enrolled Bills certifies the bills as correctly enrolled. Formerly he made this report from his place on the floor (see Globe, p. 375, first session Thirty-third Congress), but now he lays the bills, each with his certificate as to its correctness, on the Speaker's table, to be placed before the House and signed by the Speaker.

[4] The signing by the Speaker of the House of Representatives and by the President of the Senate in open session of an enrolled bill is an official attestation by the two Houses of such bill as one that has passed Congress. When approved by the President and deposited in the State Department according to law, its authentication is completed and unimpeachable. (Field v. Clark, April 15, 1892, 143 United States Supreme Court Reports, p. 649.)

[5] In the early days of the House the chairman of the Committee on Enrolled Bills took the message to the Senate (see first session Twelfth Congress, Annals, p. 203); but under the present practice the Clerk, or one of his assistants, takes all enrolled bills signed by the Speaker (whether House or Senate bills) and conveys them to the Senate as a message from the House. As all enrolled bills are signed first by the Speaker, the Senate Committee on Enrolled Bills send their bills to the House Committee on Enrolled Bills, who report them to the House for signature as they report House bills. These Senate bills bear a certificate from the chairman of the Senate Committee on Enrolled Bills.

[6] The joint rules were agreed to November 13, 1794, but many of them antedated even that time. (First session Third Congress, Journal, pp. 230, 231.)

App.    T

PAge

Objection having been made, the following resolution was offered by Mr. John Dalzell, of Pennsylvania, and agreed to by the House:

*Ordered*, That the clerk be directed to return to the Senate the enrolled bill (S. 5718) providing for the sale of sites for manufacturing or industrial plants in the Indian Territory, with the information that the House has considered the request of the Senate that the House vacate the action of the Speaker in signing said enrolled bill, and that the unanimous consent necessary to enable such action to be taken was refused.

3458. **The Speaker may not sign an enrolled bill in the absence of a quorum.**—On May 20, 1826,[1] Mr. Jacob Isacks, of Tennessee, from the Joint Committee for Enrolled Bills, reported that the committee had examined an enrolled bill entitled "An act making appropriations for the public buildings in Washington, and for other purposes," and had found the same to be duly enrolled.

When, a quorum not being present, objection was made by a Member to signing the said bill by the Speaker.[2]

And thereupon the House adjourned.

3459. **Proceedings in correcting an error where the Speaker had signed the enrolled copy of a bill that had not passed.**—On March 14, 1864,[3] the Speaker stated to the House that—

the Secretary of the Senate having inadvertently, on Friday last, announced the passage by the Senate of the Court of Claims bill No. 116, instead of the bill of the House (H. R. 116), and having since corrected said error by certifying to the bill which actually did pass, the Speaker, with the consent of the House, will cause the Journal of that day to be amended by the insertion of the title of the bill which actually passed, in lieu of the one originally announced; and when reported by the committee he will sign the proper enrolled bill, canceling his signature of H. R. C. C. 116.

The unanimous consent of the House was given to the course indicated by the Speaker.[4]

3460. **It is a common occurrence for one House to ask of the other the return of a bill, for the correction of errors or otherwise.**—On April 11, 1810,[5] the House proceeded to consider the amendments of the Senate to the bill entitled "An act regulating the Post-Office Establishment."

Mr. Ezekiel Bacon, of Massachusetts, moved that the following words, "Section 25, lines 2 and 3, strike out the words 'each postmaster, provided each of his letters or packets shall not exceed half an ounce in weight,'" appearing to have been an interpolation in the amendments sent from the Senate after the same were received by this House, be expunged therefrom.

Pending consideration a message was received from the Senate requesting the return of the bill and amendments,

it having been discovered that an inaccuracy had taken place in stating the amendments of the Senate.

The House ordered the bill returned, and the same day a message from the Senate returned to the House the corrected amendments.

---

[1] First session Nineteenth Congress, Journal, p. 639.
[2] John W. Taylor, of New York, Speaker.
[3] First session Thirty-eighth Congress, Journal, p. 377; Globe, p. 1096.
[4] Schuyler Colfax, of Indiana, Speaker.
[5] Second session Eleventh Congress, Journal, pp. 355, 356 (Gales and Seaton ed.); Annals, pp. 650 (Vol. I) and 1769 (Vol. II).

# Chapter XCII.*

## APPROVAL OF BILLS BY THE PRESIDENT.

1. Provision of the Constitution.   Section 3482.
2. As to resolutions requiring approval.   Sections 3483, 3484.
3. Bills approved are deposited with the Secretary of State.   Section 3485.
4. Delay in presenting bills to President.   Sections 3486–3488.[1]
5. Practice of the President in approving.   Sections 3489–3492.
6. Approval after adjournment for a recess.   Sections 3493–3496.
7. Exceptional instance of approval after final adjournment.   Section 3497.
8. Error in approval.   Section 3498.
9. Notification of the Houses as to approvals.   Sections 3499–3504.
10. Return of bills by President for correction of errors.   Sections 3505–3519.

3482. **Every bill which has passed the two Houses is presented to the President for his signature if he approve.**

In general, orders, resolutions, and votes in which the concurrence of the two Houses is necessary must be presented to the President on the same condition as bills.

A concurrent resolution providing for final adjournment of the two Houses is not presented to the President for approval.

The Constitution of the United States, in section 7 of Article I, provides:

Every bill which shall have passed the House of Representatives and the Senate shall, before it become a law, be presented to the President of the United States; if he approve, he shall sign it, &c.

Every order, resolution, or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States, and before the same shall take effect shall be approved by him, or, being disapproved by him, shall be repassed by two-thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill.

3483. **Although the requirement of the Constitution seems specific, the practice of Congress has been to present to the President for approval only such concurrent resolutions as are legislative in effect.**—On January 27, 1897, Mr. David B. Hill, of New York, from the Committee on the Judiciary, submitted to the Senate a report[2] which that committee had been directed to make on the subject of joint and concurrent resolutions and their approval by the President. The subject involved the construction of a portion of section 7 of Article I of the

---

\* See Volume VII, Chapter CCXVIII.
[1] Method of taking enrolled bills to the President.   Section 2601 of Volume III.
[2] Senate Report No. 1335, second session Fifty-fourth Congress.

Within the experience of the Chair in the Senate no concurrent resolution has ever been sent to the President of the United States, nor has he ever signed one. The Chair has endeavored faithfully to find out how concurrent resolutions escape the provision of the Constitution. He has not been able to succeed.

This led to debate in the course of which the report of the Judiciary Committee in a former Congress was quoted with approval.[1]

**3485. A statute requires that bills signed by the President shall be received by the Secretary of State from the President.**

**When a bill returned without the President's approval is passed by the two Houses, the Secretary of State receives the bill from the presiding officer of the House in which it last was passed.**

The act approved December 28, 1874,[2] provides:

Whenever a bill, order, resolution, or vote of the Senate and House of Representatives, having been approved by the President, or not having been returned by him with his objections, becomes a law or takes effect, it shall forthwith be received by the Secretary of State from the President; and whenever a bill, order, resolution, or vote is returned by the President with his objections, and on being reconsidered is agreed to be passed and is approved by two-thirds of both Houses of Congress, and thereby becomes a law or takes effect, it shall be received by the Secretary of State from the President of the Senate or Speaker of the House of Representatives, in whichsoever House it shall last have been so approved, and he shall carefully preserve the originals.

**3486. Instance wherein a bill enrolled and signed by the presiding officers of the two Houses of one session was sent to the President and approved at the next session.**—On December 8, 1904,[3] Mr. Frank C. Wachter, of Maryland, chairman of the Committee on Enrolled Bills, offered the following:

Whereas the bill (H. R. 10516) for the relief of Edward J. Farrell passed both Houses at the second session of this Congress, but was enrolled too late to receive the signatures of the presiding officers of the two Houses and be presented to the President of the United States before the adjournment of the said second session; and

Whereas the bill (H. R. 11444) to grant certain lands to the State of Ohio passed both Houses and was signed by the presiding officers thereof, but failed to be presented to the President of the United States before the adjournment of the said second session: Therefore,

*Resolved by the House of Representatives (the Senate concurring),* That the said bills be, and are hereby, ordered to be reenrolled for the signatures of the presiding officers of the two Houses and for presentation to the President of the United States.

The resolution was agreed to by the House.

On December 12,[4] in the Senate, the resolution was referred to the Committee on Rules and was not reported therefrom.

The Senate having taken no action on the resolution, the bill (H. R. 10516) was reenrolled as of the third session, signed by the presiding officers, and transmitted to the President, who signed it.[5]

---

[1] See section 3483 of this chapter.
[2] 18 Stat. L., p. 294. A law on this subject had existed from 1789 and had been amended in 1838. (See sec. 204 of Revised Statutes.)
[3] Third session Fifty-eighth Congress, Record, p. 66.
[4] Record, p. 125.
[5] See history of bill (H. R. 10516) in indexes of Journal and Record.

The bill (H. R. 11444) relating to Ohio lands, was transmitted to the President without reenrollment, appearing as a bill of the second session.[1] After receiving an opinion from the Attorney-General the President signed the bill.[2]

**3487. Enrolled bills pending at the close of a session were at the next session of the same Congress ordered to be treated as if no adjournment had taken place.**—On August 21, 1856,[3] Mr. James Pike, of New Hampshire, by unanimous consent, presented the following resolution:

*Resolved (the Senate concurring),* That such bills as passed both Houses at the last session and for want of time were either not presented to the two Houses for the signatures of their presiding officers, or, having been thus signed were not presented to the President for approval, be now reported or presented to the President as if no adjournment had taken place.

---

[1] The chairman of the Committee on Enrolled Bills took this action after he had considered the following precedents furnished to him by Mr. William Tyler Page, for many years clerk of the Committee on Accounts:

"Touching the matter of the right of the chairman of the Committee on Enrolled Bills to present to the President of the United States a bill passed at the last session and presented too late to be presented to the President before adjournment, I beg to state that I have had my memory as to a precedent for such action confirmed by the Journals of the Fiftieth Congress. In the first session of that Congress there were passed by both Houses of Congress bills of the following numbers and titles, to wit:

"H. R. 11139, an act to authorize the building of a bridge or bridges across the Mississippi River at La Crosse, Wis.

"H. R. 11262, an act to authorize the construction of bridges across the Kentucky River and its tributaries, by the Richmond, Irvine and Beattyville Railroad Company.

"H. R. 1152, an act for the relief of the legal representatives of Eliza M. Ferris.

"These several acts, as stated, were passed by both Houses and, on October 17, 1888, first session Fiftieth Congress, page 2932 of the Journal of the House, they were reported by the chairman of the Committee on Enrolled Bills as having been examined by said committee and found duly enrolled, whereupon, said bills were signed by the Speaker of the House.

"These acts were not presented to the President of the United States until the succeeding session of Congress, when, on December 7, 1888, there appears this entry in the Journal:

"'Mr. Kilgore, from the Committee on Enrolled Bills, reported that he did on yesterday present to the President of the United States bills of the House numbered H. R. 11262, H. R. 11139, H. R. 1152.' (House Journal, p. 57, second session Fiftieth Congress.)

"In the Journal of the same session, on page 115, there appears the following entry:

"'A message in writing was received from the President of the United States * * * informing the House that he did at the dates named approve bills of the House of the following titles, namely:

"'On the 10th, H. R. 11139, an act to authorize the building of a bridge or bridges across the Mississippi River at La Crosse, Wis.

"'H. R. 11262, an act to authorize the construction of bridge or bridges across the Kentucky River and its tributaries, by the Richmond, Irvine and Beattyville Railroad Company.

"'H. R. 1152, an act for the relief of the legal representatives of Eliza M. Ferris.'[21]

[2] See history of bill (H. R. 11444) in the indexes.

[3] Second session Thirty-fourth Congress, Journal, p. 1352; Globe, p. 4.

In this case Congress was immediately convened to pass an army appropriation bill, which had failed at the regular session. Several bills were left enrolled but not signed at the adjournment. At that time a joint rule presented the resumption of business from a former session immediately.

Formerly the joint rules provided that no bill from one House should be sent for concurrence to the other on either of the last three days of the session, and also that no bill should be sent to the President for his approval on the last day of the session. On June 20, 1874, a proposition to suspend these rules caused some debate as to the useful purpose they were intended to serve, and upon the fact, then alleged, that they had uniformly been suspended since 1822. They were suspended on this occasion. (First session Forty-third Congress, Record, p. 5309.)

tion upon it, or else, Congress taking a recess under such circumstances and thus preventing him from communicating with them, the bill does not become a law because by their own act of adjournment they have prevented him from having the time for consideration which is intended by the Constitution. [Here follows a brief reference to the clause of the Constitution providing for the return of a vetoed bill.] * * *  All these provisions indicate that in order to enable the President to return a bill the House should be in session; and if by their own act they see fit to adjourn and deprive him of the opportunity to return the bill, with his objections, and are not present themselves to receive and record these objections and to act thereon, the bill can not become a law unless ten days shall have expired during which the President will have had the opportunity thus to return it.[1]  There is no suggestion that he may return it to the Speaker, or Clerk, or any officer of the House; but the return must be made to the House as an organized body."

Hon. George F. Edmunds, President pro tempore of the Senate, in a note to President Arthur under date of December 24, 1884, expressing a like opinion, says:

"A bill  * * *  has passed both Houses of Congress and was presented for my signature after both Houses have adjourned until 5th of January.  This is more than ten days; and, if it were now presented to you, you could not return it with your objections.  I do not know what the practice has been, but it would seem to me as if the bill could not become a law constitutionally; but if you think it can I will send it to you."

This note was probably not carefully considered, but it is of value as the impression of a lawyer and legislator of great ability and experience.

The Attorney-General, after discussing the nature of the recess in question, concludes that it is not an adjournment within the meaning of the clause of the Constitution under discussion.  As the approval or disapproval of a bill by the President has been sometimes held to be a legislative act, required to be done while the Congress is in session, the Attorney-General finds difficulties in giving a definite opinion, and concludes upon the whole that the course indicated in the syllabus should be pursued.

On January 4, 1893,[2] on the reassembling of Congress after the recess, the President communicated to the Senate notice that he had approved sundry bills on December 22 and December 28, during the recess, but there appears no message of disapproval of any bill.

3497. An instance where the President signed a bill after the adjournment of Congress.—On May 16, 1864,[3] the House ordered—

that the Committee on the Judiciary be instructed to inquire and report to the House by what warrant or authority the act[4] entitled "An act to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within the United States" was approved on the 12th day of March, 1863, and whether said act is still in force.

On June 11, 1864, Mr. James F. Wilson, of Iowa, from the committee, made this report:[5]

On the reception of this resolution the committee caused a note to be addressed to the Secretary of State, asking to be informed whether, "as a matter of fact, it appeared on the original files in the State Department that the act referred to was approved on the 12th day of March, 1863."

In reply to this note, the Secretary of State responded that "the original act is, to all appearance, regular in every respect of form; as to the date of its approval—that of 12th of March, 1863—the words

---

[1] This question was subject of a decision in Connecticut about 1904.
[2] Second session Fifty-second Congress, Record, p. 301.
[3] First session Thirty-eighth Congress, Globe, p. 2290.
[4] See 12 Stat. L., p. 820.
[5] House Report No. 108, first session Thirty-eighth Congress.

and figures 'approved March 12, 1863,' are in the handwriting of the President, and followed by his signature."

Thus it appears, from the original files in the State Department, that said act was approved March 12, 1863, and this is true, in fact, as to the date of approval.

The section of the Constitution of the United States bearing upon this question reads as follows:

"If any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the Congress, by their adjournment, prevent its return, in which case it shall not be a law."

The committee are informed that in the great press of business immediately preceding the adjournment of Congress on the 4th of March, 1863, the act which is made the subject-matter of inquiry by the resolution of the House was passed to the Secretary of the Treasury for examination, as it related particularly to his Department. It did not reach the President again until after the adjournment of Congress, when it was approved by him under the belief that the last clause of the section of the Constitution, above quoted, was designed more especially to prevent Congress from enacting laws without the approval of the Executive, which might be done by the passage of bills by the two Houses, followed by an adjournment, before the President could examine and return them, were it not for the declaration that in such cases the bills shall not be laws; and did not relate to cases wherein the Executive should approve bills sent to him by Congress within ten days, even though an adjournment should occur before the return of the bills.

That there is force and plausibility in this position, a little reflection will discover to any mind; but the committee can not receive it as a correct interpretation of the Constitution.

The ten days' limitation contained in the section above quoted refers to the time during which Congress remains in session, and has no application after adjournment. Hence, if the Executive can hold a bill ten days after adjournment, and then approve it, he can as well hold it ten months before approval. This would render the laws of the country too uncertain, and could not have been intended by the framers of the Constitution.

The spirit of the Constitution evidently requires the performance of every act necessary to the enactment and approval of laws to be perfect before the adjournment of Congress.

The committee, therefore, conclude that the act referred to, approved March 12, 1863, is not in force; and in this conclusion the committee are unanimous.[1]

**3498. A bill that had not actually passed, having been enrolled and signed by the President of the United States, was disregarded by the Executive, and Congress passed another bill.**—On March 11, 1836,[2] the House considered a joint resolution (No. 2) to place the name of Benedict Alford on the pension roll. The Debates of March 18,[3] give the following explanation of the presentation of this resolution:

At the first session of the Twenty-third Congress a bill passed the House of Representatives granting pensions to Benedict Alford and Robert Brush, soldiers of the Revolutionary war. By the Journals of the Senate it appears that this bill was indefinitely postponed in that body, and the House of Representatives was so notified. And it is also so entered on the Journal of the House. The postponement of the bill in the Senate in the last hour of the session was inadvertently overlooked by the enrolling clerk, as well as by the Committee on Enrolled Bills in the House, and it was enrolled and signed by the officers of the two Houses, and presented to, and approved by, the President. A few days after the adjournment of Congress the error was discovered in the Clerk's office in the House of Representatives, and notice of the fact was immediately given to the War Department. The Secretary of War thereupon declined complying with the provisions of the bill, under the conviction that it was not a valid statute. At the last session of Congress the President communicated the fact to the Senate by message. No

---

[1] The act of July 2, 1864 (13 Stat. L., p. 375), was amendatory of the act "approved March 12, 1863," thereby indicating that the latter act was still considered a law. (See Globe, first session, thirty-eighth Congress, p. 2820, for debate on the bill S. 232. )

[2] First session Twenty-fourth Congress, Journal, pp. 470, 498, 525, 526; Debates, pp. 2747, 2881.

[3] Debates, p. 2881.

# Chapter  CVII.*

## THE COMMITTEE OF THE WHOLE.[1]

1. Rule for forming committee.  Section 4704.
2. Origin and development of.  Section 4705.
3. Nature and powers of.  Sections 4706–4715.[2]
4. Certain motions not in order in.  Sections 4716–4721.
5. Yeas and nays not taken in.  Sections 4722–4724.
6. After voting to go into committee no motions in order.  Sections 4725–4728.
7. Order of business in.  Sections 4729–4734.
8. Unfinished business in.  Sections 4735, 4736.
9. Rules of proceeding in.  Section 4737.[3]
10. Reading of bills.  Sections 4738–4741.
11. Amendment under five-minute rule.  Sections 4742–4751.
12. Rising and reporting.  Sections 4752–4766.
13. The simple motion to rise.  Sections 4767–4773.
14. Various motions for disposition of a bill.  Sections 4774–4782.
15. Questions of order.  Sections 4783, 4784.[4]
16. Informal rising.  Sections 4785–4791.[5]

**4704.** In forming a Committee of the Whole, the Speaker leaves the chair, after appointing a Chairman to preside.

The Chairman of the Committee of the Whole may cause the galleries or lobby to be cleared in case of disturbance or disorderly conduct therein.

Present form and history of section 1 of Rule XXIII.

---

* See Volume VIII, Chapter CCXXXVII.
[1] In early practice given power to take testimony.  (Sec. 1804 of Vol. III.)
Subjects once considered in, irrespective of appropriations or revenue.  (Sec. 1984 of Vol. III.)
House sometimes attends impeachment trials in.  (Secs. 2027, 2374 of Vol. III.)
Motions to go into, to consider revenue and appropriation bills.  (Secs. 3072–3085 of this volume.)
Motions to go into, after call of committees.  (Secs. 3134–3141 of this volume.)
Relations to special orders.  (Secs. 3214–3230 of this volume.)
Conference reports not considered in.  (Secs. 6559–6561 of Vol. V.)
Relations to Congressional Record.  (Secs. 6986–6988 of Vol. V.)
Rule of admission to floor applies to.  (Sec. 7285 of Vol. V.)
[2] In early years matters originated in.  (Secs. 1507, 1541 of Vol. II.)
Articles of impeachment considered in.  (Secs. 2415, 2420 of Vol. III.)
[3] As to debate in.  (Chapter CXV, secs. 5203–5211 of Vol. V.)
Failure of quorum in.  (Secs. 2966–2979 of this volume.)
[4] See also sections 6927–6937 of Vol. V.
Speaker sometimes takes the chair to restore order.  (Secs. 1348–1351 of Vol. II.)
Extreme disorder in.  (Secs. 1649–1653, 1657 of Vol. II.)
Questions of privilege in.  (Secs. 2540–2544 of Vol. III.)
[5] Reception of messages while sitting.  (Sec. 6590 of Vol. V.)

App. T
PAGE 19

**4787. At an informal rising of the Committee of the Whole a message from the President of the United States may be laid before the House only by unanimous consent.**—On June 13, 1902,[1] the Committee of the Whole House on the state of the Union rose informally to receive messages from the President of the United States.

The messages having been communicated to the House, the Speaker [2] said:

If there is no objection, the Chair will lay the messages before the House.

Mr. Oscar W. Underwood, of Alabama, objected.

Thereupon the Speaker said:

Objection being made, the Committee of the Whole will resume its sitting.

**4788. Sometimes on the informal rising of the Committee of the Whole, the House, by unanimous consent, transacts business, such as the presentation of enrolled bills, the swearing in of a Member, or consideration of a message.**—On February 26, 1859,[3] the Committee of the Whole informally rose, and Mr. James Pike, of New Hampshire, from the Committee on Enrolled Bills, reported that they had examined and found truly enrolled certain bills.

Thereupon the Speaker [4] signed the same; and the committee then resumed its session.[5]

**4789.** On May 5, 1880,[6] the Committee of the Whole informally rose to receive a message from the Senate. The message having been read, Mr. Martin Maginnis, of Montana, asked the House to concur in a verbal amendment to one of the bills just received from the Senate.

The Speaker[7] said:

The rising of the committee is informal.  That request can not now be entertained.

**4790.** On May 14, 1896,[8] the Committee of the Whole informally rose to receive a message from the Senate, one of the announcements of which was that the Senate had passed with amendments a bill (H. R. 7977) making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes, asked a conference with the House of Representatives on the bill and amendments, and had appointed Mr. Frye, Mr. Quay, and Mr. Vest as the conferees on the part of the Senate.

As soon as the reading of the message was concluded, Mr. Binger Hermann, of Oregon, asked unanimous consent that the Senate amendments to this bill be

---

[1] First session Fifty-seventh Congress, Record, p. 6746.

[2] David B. Henderson, of Iowa, Speaker.

[3] Second session Thirty-fifth Congress, Globe, p. 1417.

[4] James L. Orr, of South Carolina, Speaker.

[5] It is quite common for the committee to rise informally for this purpose.  (See Record, first session Fifty-first Congress, p. 10350; first session Fifty-fifth Congress, p. 507; and first session Fifty-first Congress, p. 7774.  In the latter case conferees also were appointed.)

[6] Second session Forty-sixth Congress, Record, p. 3028.

[7] Samuel J. Randall, of Pennsylvania, Speaker.

[8] First session Fifty-fourth Congress, Record, pp. 5249, 5270, 5532.

# Chapter CXL.

## SESSIONS AND ADJOURNMENTS.[1]

---

1. Provision of the Constitution. Section 6672.
2. The three-day period and its conditions. Sections 6673–6675.[2]
3. The holiday recess. Sections 6676–6685.
4. Instance of a session prolonged by recess. Section 6686.
5. A recess a real, not imaginary time. Section 6687.
6. Adjournment of Congress not fixed by law. Section 6688.
7. Sine die adjournment. Section 6689.[3]
8. Special session ends with day of meeting of next regular session of a Congress. Sections 6690–6693.
9. End of last session of a Congress. Sections 6694–6697.
10. Privilege of concurrent resolutions of adjournment. Sections 6698–6706.
11. Adjournment of House at time of sine die adjournment of Congress. Sections 6707–6721.[4]
12. Forms and ceremonies at adjournment sine die. Sections 6722–6726.
13. Business undisposed of at end of a session. Section 6727.
14. Sessions on Sunday. Sections 6728–6733.[5]
15. Adjournment of the legislative day. Sections 6734–6740.[6]

---

**6672. Neither House during a session of Congress may, without the consent of the other, adjourn for more than three days, or to another place.**

**When the two Houses disagree as to adjournment, the President may adjourn them.**

Section 5 of Article I of the Constitution provides:

Neither House during the session of Congress shall, without the consent of the other,[7] adjourn for more than three days, nor to any other place than that in which the two Houses shall be sitting.

---

[1] See also Chapter I of Volume I, sections 1–13, for precedents as to the meeting of Congress.

[2] The Senate sitting for an impeachment trial may adjourn for more than three days. (Sec. 2423 of Vol. III.)

[3] Forms of resolutions providing for adjournment sine die or for a recess, and then privileged nature. (Sec. 4031 of Vol. IV.)

[4] Adjournment in the midst of a roll call. (Sec. 6325 of this volume.)

[5] As to Sunday, 7245, 7246 of this volume.

[6] Distinction between the legislative and calendar day. (Sec. 3192 of Vol. IV.)

Fixing the hour of daily meetings. (Sections 104–117 of Vol. I.)

[7] December 21, 1882 (second session Forty-seventh Congress, Record, p. 490), when the concurrent resolution of the House proposing a holiday recess of the Congress was received in the Senate, an amendment was offered to permit the House alone to take such recess, leaving the Senate in session. The Senate declined to agree to the amendment. Procedure like this has never been taken, the two Houses always having continued in session together except in instances wherein the President has convened the Senate alone in extraordinary session.

App.

The Speaker then said:

The first part of that clause declares that "each House shall be the judge of the election, returns, and qualifications of its own Members, and a majority of each shall constitute a quorum to do business." This is the broad charter given in the Constitution by which the two Houses transact all their legislative business. It includes, of course, within its range of power the authority to lay down an order of business, to decide when they shall meet, and what business they shall or shall not take up when they do meet. This is the power conferred by the Constitution upon a quorum of each House.

The clause then concludes by giving certain powers to less than a quorum. "A smaller number may adjourn from day to day, and may be authorized to compel the attendance of absent Members, but in such manner and under such penalties as each house may provide." They must, therefore, compel the attendance of absent Members in such Manner as each House (which means a quorum thereof) shall have provided anterior to that time. It follows, the Chair thinks, by the plain reading of the Constitution, that a minority of each House, less than a quorum, can not have, as the gentleman from Ohio (Mr. Schenck) argues, larger power than a majority of each House sitting as a legislative body. If the point of order made is correct, less than a quorum has more power than more than a quorum, an anomaly never recognized by parliamentary law nor conferred by the Constitution, in the opinion of the Chair. The limitation of the power of less than a quorum is absolute. They may do certain things in such manner and form and under such penalties as each House (which means a majority thereof) shall have previously provided.

The Chair, therefore, overrules the point of order on three grounds: First, that both Houses of Congress, at the opening meeting of the first session of this Congress, considered this provision of the Constitution, when it declared for exactly such an adjournment as is provided for in the pending resolution. That is a parliamentary precedent not questioned at that time, as the Chair understands, by any Member in either branch—certainly not appealed from in either branch—but spoken of latterly, when it was supposed there might not be a quorum present on the 3d day of July.

The Chair overrules it for a second reason, which is, that a majority of each House, when there was a quorum present, have determined that when Congress assembled on the 3d of July, if there was not a quorum present the absent Members should not be coerced, but that the presiding officers of both branches, who were simply the organs and servants of the two Houses to execute their orders, should then adjourn Congress without day, with full notice to every Senator and Representative of what would be the specific order of business on the 3d day of July, and what would be the result if a majority of either House failed to appear on that day.

The Chair overrules it on the third ground, that at the conclusion of long sessions the two Houses have sometimes provided for an adjournment at a specified day and hour, but that after a certain date only formal business, such as the signing of bills, shall be transacted, and at the final adjournment of such first session less than a quorum has been present.

If the point of order made by the gentleman from Ohio be correct, then if there were no quorum present at such a time the absence of a quorum would render null the concurrent resolutions of quorum of both the House and the Senate.

Mr. Schenck having appealed, the Chair was sustained, yeas 125, nays 14.

On July 20,[1] the Congress took another recess until November 21. When it reassembled the roll of the House was not called, and no notice of the presence of a, quorum was sent to either Senate or House. The Speaker (Mr. Colfax) also assumed that the first business in order was the reading of the Journal of the last day before the recess.

**6687. A recess of Congress is a real, not imaginary time, when it is not sitting in regular or extraordinary session.**

---

[1] First session Fortieth Congress, Journal, p. 253; Globe, p. 768. The resolution providing for this recess was in the ordinary form, providing simply that the presiding officers adjourn their respective Houses to meet on November 21. (Journal, p. 250.)



JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

*CHRISTOPHER YOUNG*

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  *88888*
(EXCEPT IN U.S. PLAINTIFF CASES)

*PRO SE PR*

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

## DEFENDANTS

*MICHAEL MUKASEY*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

AT

Case: 1:08-cv-01511
Assigned To : Robertson, James
Assign. Date : 8/27/2008
Description: Habeas Corpus/2255

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- (⊗) 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSH

FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

### ☐ A. Antitrust

- ☐ 410 Antitrust

### ☐ B. Personal Injury/ Malpractice

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review

- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Immigration**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus- Alien Detainee
- ☐ 465 Other Immigration Actions

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant

- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.

- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not Administrative Agency Review or Privacy Act)

— ⊗ —

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☑ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC 2241 - Writ of Habeas Corpus

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint    **JURY DEMAND:** ☐ YES ☑ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☐ YES ☑ NO    If yes, please complete related case form.

DATE    8.27.08    SIGNATURE OF ATTORNEY OF RECORD    NCD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.